HAGENS BERMAN SOBOL SHAPIRO LLP
STEVE W. BERMAN (*pro hac vice* to be filed)
steve@hbsslaw.com
THOMAS E. LOESER (BAR NO. 202724)
toml@hbsslaw.com
1918 Eighth Avenue, Suite 330
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594

QUINN EMANUEL URQUHART & SULLIVAN, LLP
JOHN B. QUINN (BAR NO. 090378)
johnquinn@quinnemanuel.com
SHON MORGAN (BAR NO. 187736)
shonmorgan@quinnemanuel.com
865 South Figueroa Street, 10th Floor
Los Angeles, CA 90017
Telephone: (213) 443-3000
Facsimile: (213) 443-3100

*Attorneys for Plaintiffs and the proposed class and subclasses*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DENNIS BURDEN, PATRICIO BURILLO, JOHN CHAPMAN, SAMUEL CLARK, JEREMY CODER, COBY COHEN, PAUL-MATTHIEU COSTE, RUSSEL CRONQUIST, CHERYL DEWORKEN, JAIME DREIKOSEN, TIM ELDRIDGE, QIANG FENG, JEROME FOHET, NATHAN FORBES, JOSH GOLDEN, MICHAEL GUILBAULT, CHISEPE GWARADA, YOON KYO HAN, PETER HARPER, JONATHAN HUGGETT, RYAN HURST, SUSAN KEOHAN, ERIK MIKKELSEN, ALEXANDER POLILLO, RICHARD REMINGTON, ROBERT RIFKIN, TODD SCHWARZ, MATTHEW SNYDER, DOUGLAS STEWART, NATHAN STRICKER, MORTON KENT TAYLOR, ANDREW WALKER, CONSTANCE WOLFSON, PENGHUI XUE, and ROMAN ZVYAGELSKY, on behalf of themselves and all others similarly situated. | No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**<u>JURY TRIAL DEMANDED</u>** |

Plaintiffs,

vs.

VOLKSWAGEN GROUP OF AMERICA, INC., a New Jersey Corporation; VOLKSWAGEN AG, a German Corporation; AUDI AG, a German Corporation; PORSCHE CARS NORTH AMERICA, INC., a Delaware Corporation; and PORSCHE AG, a German Corporation.

Defendants.

**TABLE OF CONTENTS**

**Page**

I. INTRODUCTION ..... 1
II. FACTUAL ALLEGATIONS ..... 4
A. Volkswagen Falsely Portrays Itself as an Environmental Leader ..... 6
B. Volkswagen Falsely Markets its Diesel Engine Systems as Clean ..... 6
C. Volkswagen's CleanDiesel Engine Systems Are a Fraud ..... 15
D. Volkswagen Has Caused a Quantifiable Environmental Injury ..... 19
E. Volkswagen Reaped Massive Profits From its Fraud ..... 23
F. Volkswagen's Fraud Has Harmed Owners and Drivers of NOV II Affected Vehicles ..... 24
G. Volkswagen Continues to Harm Consumers and the Environment By Refusing to Take Remedial Action ..... 27
III. JURISDICTION ..... 30
IV. VENUE ..... 30
V. PARTIES ..... 31
A. Arizona Plaintiff ..... 31
B. California Plaintiffs ..... 31
C. Colorado Plaintiffs ..... 38
D. Florida Plaintiff ..... 39
E. Georgia Plaintiff ..... 40
F. Idaho Plaintiff ..... 40
G. Illinois Plaintiffs ..... 41
H. Indiana Plaintiff ..... 42
I. Massachusetts Plaintiff ..... 42
J. New Jersey Plaintiff ..... 43
K. North Carolina Plaintiff ..... 43
L. Ohio Plaintiff ..... 44
M. Oregon Plaintiffs ..... 45

N. Pennsylvania Plaintiff ............................................................ 46
O. Rhode Island Plaintiff ............................................................ 46
P. Texas Plaintiff ............................................................ 47
Q. Virginia Plaintiff ............................................................ 47
R. Vermont Plaintiff ............................................................ 48
S. Washington Plaintiffs ............................................................ 48
T. Defendants ............................................................ 49
VI. TOLLING OF THE STATUTE OF LIMITATIONS ........................................ 51
A. Discovery Rule Tolling ............................................................ 51
B. Fraudulent Concealment Tolling ............................................................ 52
C. Estoppel ............................................................ 52
VII. CLASS ALLEGATIONS ............................................................ 53
VIII. VIOLATIONS ALLEGED ............................................................ 58
A. Claims Brought on Behalf of the Nationwide Class ............................ 58
B. Claims Brought on Behalf of the Arizona Subclass ............................ 61
C. Claims Brought on Behalf of the California Subclass ............................ 67
D. Claims Brought on Behalf of the Colorado Subclass ............................ 81
E. Claims Brought on Behalf of the Florida Subclass ............................ 88
F. Claims Brought on Behalf of the Georgia Subclass ............................ 96
G. Claims Brought on Behalf of the Idaho Subclass ............................ 107
H. Claims Brought on Behalf of the Illinois Subclass ............................ 117
I. Claims Brought on Behalf of the Indiana Subclass ............................ 128
J. Claims Brought on Behalf of the Massachusetts Subclass ................. 135
K. Claims Brought on Behalf of the New Jersey Subclass ..................... 139
L. Claims Brought on Behalf of the North Carolina Subclass ................ 144
M. Claims Brought on Behalf of the Ohio Subclass ............................ 149
N. Claims Brought on Behalf of the Oregon Subclass ............................ 156
O. Claims Brought on Behalf of the Pennsylvania Subclass ................... 166

P. Claims Brought on Behalf of the Rhode Island Subclass .................. 176
Q. Claims Brought on Behalf of the Texas Subclass .............................. 186
R. Claims Brought on Behalf of the Vermont Subclass .......................... 193
S. Claims Brought on Behalf of the Virginia Subclass ........................... 203
T. Claims Brought on Behalf of the Washington Subclass ..................... 210
REQUEST FOR RELIEF ........................................................................... 220
DEMAND FOR JURY TRIAL .................................................................... 221

Plaintiffs Dennis Burden, Patricio Burillo, John Chapman, Samuel Clark, Jeremy Coder, Coby Cohen, Paul-Matthieu Coste, Russell Cronquist, Cheryl DeWorken, Jaime Dreikosen, Tim Eldridge, Qiang Feng, Jerome Fohet, Nathan Forbes, Josh Golden, Michael Guilbault, Chisepe Gwarada, Yoon Kyo Han, Peter Harper, Jonathan Huggett, Ryan Hurst, Susan Keohan, Erik Mikkelsen, Alexander Polillo, Richard Remington, Robert Rifkin, Todd Schwarz, Matthew Snyder, Douglas Stewart, Nathan Stricker, Morton Kent Taylor, Andrew Walker, Constance Wolfson, Penghui Xue, and Roman Zvyagelsky ("Plaintiffs"), individually and on behalf of all others similarly situated (the "Class"), allege the following:

## I. INTRODUCTION

1. The United States Government, through the Environmental Protection Agency ("EPA"), as well as individual state regulators, have passed and enforced laws designed to protect their citizens from pollution and in particular, certain chemicals and agents known to cause disease in humans. Automobile manufacturers must abide by these laws and must adhere to state and EPA rules and regulations. This case arises because Defendants Volkswagen Group of America, Volkswagen AG, Audi AG, Porsche Cars North America, Inc., and Porsche AG (collectively, "Volkswagen") purposefully and intentionally breached the laws of the United States and the rules and regulations of various states and the EPA by selling in the United States Volkswagen, Audi, and Porsche vehicles that purposefully evaded federal and state laws.

2. Volkswagen has previously admitted engaging in such violations relating to its 2.0 liter so-called "CleanDiesel" models after receiving a Notice of Violation from the EPA on September 18, 2015 ("NOV I").[1] Subsequently, the EPA found that Volkswagen also evaded the emissions requirements with respect to its 3.0 liter diesel models. Cynthia Giles, Assistant Administrator for the Office of

---

[1] The vehicles subject to NOV I are referred as "NOV I Affected Vehicles."

Enforcement and Compliance Assurance at the EPA, characterized the development pertaining to additional vehicles as follows: "VW has once again failed its obligation to comply with the law that protects clean air for all Americans."[2]

3. As detailed in the EPA's November 2, 2015 Notice of Violation ("NOV II"), sophisticated software in Volkswagen, Audi, and Porsche 3.0 liter diesel vehicles sold in the United States detects when the vehicle is undergoing official emissions testing and turns on "temperature conditioning mode." In this mode, the vehicles emit pollutants below the legal limit. At all other times, however, the vehicle operates in "normal mode," during which it emits pollutants far in excess of what is permitted by law. The affected cars thus meet emissions standards in the laboratory or testing station, but during normal operation emit nitrogen oxides ($NO_X$) at up to nine times the standard allowed under federal and state laws and regulations. The software used by Volkswagen is a defeat device as defined by the Clean Air Act.

4. By manufacturing and selling cars with defeat devices that generate higher levels of emissions than certified to the EPA, and higher levels than state and federal regulations allow, Volkswagen violated the Clean Air Act and a host of state regulations, breached its express and implied warranties, defrauded its customers, and engaged in unfair competition under state and federal law.

5. According to the NOV II, Volkswagen installed defeat device software in at least the following diesel models of its vehicles:

- MY 2014 VW Touareg,
- MY 2016 Audi A6 Quattro,
- MY 2016 Audi A7 Quattro,
- MY 2016 Audi A8,
- MY 2016 Audi A8 L,

---

[2] *See* Nov. 2, 2015 EPA News Release.

- MY 2016 Audi Q5, and
- MY 2015 Porsche Cayenne.

6. Discovery will reveal that illegal defeat devices were installed in additional vehicle models and model years. Indeed, in response to NOV II, Volkswagen has already issued stop sale orders not only for the specific vehicles mentioned in NOV II, but also for additional models and years. Presently, Volkswagen has issued stop sale orders for the following list of vehicles:

- MY 2013-2016 VW Touareg,
- MY 2014-2016 Audi A6,
- MY 2014-2016 Audi A7,
- MY 2014-2016 Audi A8,
- MY 2014-2016 Audi A8 L,
- MY 2014-2016 Audi Q5,
- MY 2013-2016 Audi Q7, and
- MY 2014-2016 Porsche Cayenne.

7. After issuing initial denials in response to NOV II, Volkswagen later admitted that the software that is the subject of NOV II exists in *all* 2009-2016 three-liter diesel models.[3]

8. The above-referenced makes and model years are collectively referred to as "NOV II Affected Vehicles."

9. Plaintiffs bring this action individually and on behalf of all other owners or lessees of NOV II Affected Vehicles at the time that Volkswagen's fraud was disclosed. Plaintiffs seek damages, injunctive relief, and equitable relief for the conduct of Volkswagen related to the defeat device. Specifically, Plaintiffs seek:

---

[3] *See* Mike Spector and William Boston, *More Volkswagen Vehicles Have Emissions Software Issues*, Wall Street Journal (Nov. 20, 2015), http://www.wsj.com/articles/volkswagen-says-more-vehicles-have-emissions-software-issues-1448046806.

an injunction ordering Volkswagen to buy the NOV II Affected Vehicles back from Plaintiffs; the return of the premium that Plaintiffs paid for a "clean" diesel vehicle over the cost of the same model with a gasoline engine; restitution of the purchase price of their car should any "fix" installed by Volkswagen result in a degradation of performance and/or fuel efficiency; compensation for any additional sums spent on fuel or maintenance as a result of any "fix"; restitution for purchase of extended warranties that will go unused; and a lump sum for remediation of the environmental damage Plaintiffs and the Class unwittingly contributed to by driving cars that they believed were clean, but were in fact in violation of state and EPA regulations and the Clean Air Act.

## II. FACTUAL ALLEGATIONS

10. EPA and state regulations exist in part to reduce pollutants that cause smog and harm public health.

11. Enacted in 1970, the Clean Air Act is a comprehensive federal law that regulates air emissions from stationary and mobile sources. 42 U.S.C. § 7401, *et seq*. (1970). Congress determined that "the increasing use of motor vehicles . . . has resulted in mounting dangers to the public health and welfare." CAA § 101(a)(2), 42 U.S.C. § 7401(a)(2). The Clean Air Act and the regulations promulgated pursuant to it, as well as state regulations, were passed to reduce the emission of $NO_X$ and other pollutants, thereby protecting human health and the environment.

12. $NO_X$ contribute to nitrogen dioxide, ground-level ozone, and fine particulate matter. When humans are exposed to nitrogen dioxide, they may be at a greater risk for serious health dangers, including asthma attacks and other respiratory illness requiring hospitalization. Ozone and particulate matter exposure have been associated with premature death due to respiratory-related or cardiovascular-related effects. Children, the elderly, and people with pre-existing respiratory illness are at an elevated risk for adverse health consequences associated with these pollutants.

13. The Clean Air Act requires car makers to certify that vehicles sold in the United States meet federal emissions standards. The EPA certifies conformity with regulations to car makers for vehicles that satisfy emissions regulations. To be sold in the United States, a vehicle must be certified by the EPA as compliant with its regulations.

14. The Clean Air Act makes it a violation for "any person to manufacture or sell, or offer to sell, or install, any part or component intended for use with, or as part of, any motor vehicle or motor vehicle engine, where a principal effect of the part or component is to bypass, defeat, or render inoperative any device or element of design installed on or in a motor vehicle or motor vehicle engine in compliance with regulations under this subchapter, and where the person knows or should know that such part or component is being offered for sale or installed for such use or put to such use." 42 U.S.C. § 7522(a)(3).

15. Under the Clean Air Act, a "defeat device" is one "that reduces the effectiveness of the emission control system under conditions which may reasonably be expected to be encountered in normal vehicle operation use." 40 C.F.R. § 86.004-2. A defeat device can bypass, defeat, or render inoperative elements of the vehicle's emission control system that are put in place to ensure compliance with the Clean Air Act. Motor vehicles that are equipped with defeat devices cannot be certified by the EPA.[4]

16. California's emission standards are more stringent than those of the EPA. Several other states have adopted California's standards and also demand even more from car makers than the EPA. The California emissions regulator is known as the California Air Resources Board ("CARB").

---

[4] EPA, Advisory Circular Number 24: Prohibition on use of Emission Control Defeat Device (Dec. 11, 1972).

**A. Volkswagen Falsely Portrays Itself as an Environmental Leader**

17. Volkswagen is a German automotive company that manufactures and sells vehicles under the Volkswagen, Audi, and Porsche (as well as other) brand names with operations in approximately 150 countries, including the United States. In the first half of 2015, Volkswagen surpassed Toyota as the world's largest automaker by sales, selling 5.04 million vehicles in the first six months of the year. As of July 2015, Volkswagen ranked eighth on the Fortune Global 500 list of the world's largest companies.

18. That Volkswagen's United States sales lagged was seen inside the company as an obstacle to its stated goal of becoming the world's largest automaker. Volkswagen sought to improve sales in the U.S. by touting the performance and reliability of its vehicles and its environmental leadership. Volkswagen's 2013 Annual Report emphasizes that "Volkswagen intends to become the global economic and environmental leader among automobile manufacturers by 2018" and that "[w]e are focusing in particular on the environmentally friendly orientation and profitability of our vehicle projects."

**B. Volkswagen Falsely Markets its Diesel Engine Systems as Clean**

19. Volkswagen boasted widely about the performance and environmental cleanliness of its diesel engine systems. In its press release unveiling the 2014 VW Touareg TDI, Volkswagen bragged:

> The 3.0-liter turbocharged V6 engine in the TDI® Clean Diesel model has an engine block that is constructed from compacted graphite iron (CGI). This material matches conventional cast iron for strength but allows for a significant reduction in mass to the tune of 55 pounds compared with the previous V6 TDI unit. The engine now produces 240 horsepower and delivers a mighty 406 lb-ft of torque from just 2000 rpm. It also delivers an EPA estimated 29 mpg on the highway and 20 mpg in city driving.

> To achieve its 50 state emissions qualification, a deNO$_X$ catalytic converter, augmented by a special injection system that sprays AdBlue® into the exhaust, helps reduce NO$_X$ emissions by up to 90 percent. This lets the engine meet the ULEV/Tier 2, BIN 5 standards imposed across all 50 U.S. states.[5]

The September 2013 statement releasing the 2014 Audi TDI line made similar claims:

> [New TV spots debuting] today on television and online, show drivers the benefits of clean diesel technology including increased performance and range, and cleaner emissions. For the 2014 model year Audi is expanding its lineup with the all-new A6, A7 and Q5 TDI, along with the newly-introduced A8 L TDI and highly successful Q7 TDI.
>
> 'Since the introduction of TDI in 2009, Audi has been at the forefront of clean diesel with an increased commitment to providing drivers with more options,' said Loren Angelo, Director of Marketing for Audi of America. 'As a demand for clean diesel is on the rise in the U.S., drivers do not have to compromise performance or design in order to achieve higher fuel consumption and increased range with our new 2014 TDI models.'[6]

20. Volkswagen marketed vehicles equipped with the 3.0 liter TDI engine as part of its CleanDiesel family alongside its 2.0 liter models, which it has admitted to equipping with a defeat device. Although Volkswagen removed promotional references to its TDI models from its website following NOV I, some Volkswagen dealers' websites still clearly picture the 3.0 liter models alongside Volkswagen's 2.0 liter CleanDiesel models. One such ad is below:

---

[5] *See* https://media.vw.com/release/571/ (last visited Nov. 7, 2015).

[6] *See* http://www.autoblog.com/2013/09/05/audi-tdi-models-ad-video/ (last visited Nov. 7, 2015).




This advertisement claimed that "[t]he **VW TDI® Clean Diesel** family ... comes with the promise of fuel-efficiency and high-performance. This German engineering proves that hybrids are not the only fuel-efficient vehicles on the road."[7]

21. Audi's 3.0 liter diesel vehicles were also marketed as part of the CleanDiesel family. In addition to promotional brochures for individual models, Audi published a brochure each year regarding the entire TDI line. The following images are representative pages from the 2015 TDI brochure:

[7] *See* http://www.flemingtonvw.com/2015-volkswagen-tdi.html (last visited Nov. 7, 2015) (emphasis in original).













22. Volkswagen repeatedly and specifically marketed its CleanDiesel models as extraordinarily clean, EPA certified in all 50 states, and powerful. For example, the following promotional material was used in a brochure for the 2014

Audi Q5 TDI, and similar materials were used to promote the other 3.0 liter CleanDiesel models:[8]




23. Volkswagen's CleanDiesel webpage touted the supposedly reduced greenhouse gas emission of the CleanDiesel engine system, materially misleading consumers.[9]

---

[8] *See* http://www.audiusa.com/content/dam/audiusa/Documents/2014-Audi-Q5-brochure.pdf.pdf.pdf at 22 (last visited Nov. 7, 2015).

[9] *See* http://www.audiusa.com/technology/efficiency/tdi?csref=116751439289858719 (last visited Sept. 21, 2015). The content has since been removed.




24. Through its "Think Blue" program, Volkswagen claimed to have a policy of being "more responsible on the road and more environmentally conscious—not just in our cars." In reality, Volkswagen was far more interested in lining its pockets at the expense of consumers than in protecting the environment.

25. On a website devoted to promoting its "clean" diesel technology, www.clearlybetterdiesel.org, Volkswagen falsely claimed that its CleanDiesel engine system reduces smog and "meets the highest standards in all 50 states, thanks to ultra-low sulfur diesel (ULSD) fuel and innovative engine technology that burns cleaner."

26. Volkswagen's purported concern for the environment extended beyond its CleanDiesel campaigns. On the "Environment" section of its website, Volkswagen claims that it takes "environmental responsibility very seriously. When it comes to making our cars as green as possible, Volkswagen has an integrated strategy focused on reducing fuel consumption and emissions, building the world's cleanest diesel engines and developing totally new power systems, which utilize new fuel alternatives."

27. The "Environment" section of the Porsche website makes similar claims: "We take our responsibilities seriously and continue to look to the future."

28. Volkswagen's advertising, which promised a unique combination of clean, efficient, and highly performing vehicles, was very effective. In fact, Volkswagen has become the largest seller of diesel passenger vehicles in the United States.[10]

29. In an October 2009 interview with *Business Insider*, when asked "[w]hat is the advantage of a diesel over a hybrid," VW of America's Chief Operating officer, Mark Barnes, stated: "It's also good for the environment because it puts out 25% less greenhouse gas emissions than what a gasoline engine would. And thanks to the uniqueness of the TDI motor, it cuts out the particulate emissions by 90% and the emissions of nitrous oxide are cut by 95%. So, a very clean running engine. Clean enough to be certified in all 50 states."[11]

30. Being highly efficient and "clean" are the central messages and recurring themes of Volkswagen's diesel engine advertising campaigns.

31. Audi also touted the performance of the TDI CleanDiesel. The brochure for the 2015 Q5 stated:

> A turbocharged, fuel-sipping variant, our TDI® clean diesel engines deliver uncompromising Audi performance with bold efficiency! Yes, it gets better mileage per gallon than comparable gasoline engines, but it also produces more low-end torque, which is best expressed in the elasticity you have when passing in the 30- to 60-mph range.

---

[10] Gayathri Vaidyanathan, *Volkswagen: Our Diesel Cars Whup The Prius And Other Hybrids*, The Business Insider, (Oct. 9, 2009), http://www.businessinsider.com/volkswagen-preps-for-adiesel-revolution-2009-10.

[11] *Id.*

32. Volkswagen made similar claims in the brochures for other 3.0 models with a TDI variant. In a 2013 interview Christian Winkelmann, an Audi designer, also boasted of the performance and fuel economy of the 2014 Audi A8 L TDI:[12]

> The Audi A8 L TDI is the clean diesel version of our luxury flagship sedan. We're proud to say that the A8 L TDI achieves the best fuel economy in its segment with an EPA estimated 24 city/36 highway/28 combined miles per gallon, exceeding that of diesel and hybrid competitors alike. At the same time, the 3.0 liter V6 turbocharged clean diesel engine generates an impressive 240 hp and 406 lb-ft. of torque and launches from 0-60 mph in 6.4 seconds. With more density than gasoline, diesel packs more energy content in the same amount of fuel, helping to maximize the miles per gallon when the energy is released during a more powerful combustion cycle. With the Audi A8L TDI – and all of our clean diesel vehicles – you get the best of both worlds: superior efficiency and top-notch performance, as well as leading technology and design. In addition to the A8 L TDI, we've also recently introduced the 2014 Audi A7, A6 and Q5 TDI clean diesel vehicles, and have updated our Q7 TDI model, marking the first time that Audi has featured a full lineup of TDI clean diesel vehicles in the U.S. Each TDI vehicle delivers up to 30% better fuel economy and 12% to 30% lower carbon dioxide emissions than gasoline engines, resulting in longer range and fewer trips to the fuel pump.

33. Volkswagen claimed that TDI CleanDiesel models "typically have a higher resale value versus comparable gasoline vehicles":

---

[12] *See* http://lifeandtimes.com/audis-christian-winkelmann-breaks-down-the-2014-a8-l-tdi (last visited Nov. 7, 2015).




34. Even after the EPA issued NOV I in September 2015, Volkswagen continued to sell its 3.0 liter models, despite the fact that they were equipped with a very similar defeat device to that identified in the smaller cars. The promotional materials for the 3.0 liter models were never changed and continued to tout Volkswagen's clean diesel technology in its 3.0 liter models.[13] Volkswagen sought to convince consumers that, despite having had to cheat to "meet" emissions requirements in its 2.0 liter vehicles, it was capable of doing so without cheating, and without sacrificing performance or fuel efficiency, in its larger, 3.0 liter models.

[13] *See, e.g.*, the 2016 Audi A7 Brochure, http://audilibrary.audiusa.com/pdf/en_US.audi.Brochures.2016.a7.pdf at 16 (last visited Nov. 7, 2015).

In fact, Volkswagen went so far as to accuse the U.S. Government of using the EPA to stifle competition in response to NOV II.[14]

**C. Volkswagen's CleanDiesel Engine Systems Are a Fraud**

35. The EPA's initial investigation of Volkswagen, which lead to NOV I, was prompted by a May 15, 2014, publication titled "In-Use Emissions Testing of Light-Duty Diesel Vehicles in the United States" by the Center for Alternative Fuels, Engines & Emissions ("CAFEE") of West Virginia University ("the CAFEE Report").

36. The International Council of Clean Transportation ("ICCT") hired CAFEE to conduct in-use testing of three light-duty diesel vehicles. According to the CAFEE Report, in the tested vehicles "real-world $NO_X$ emissions were found to exceed the US-EPA ... standard by a factor[s] of 5 to 35."

37. The findings of the CAFFE Report led the EPA to conduct its own further investigation, which ultimately revealed that, contrary to Volkswagen's efforts to promote itself as a "green" company with an extraordinary commitment to environmental protection, it was instead a liar and a cheat—its CleanDiesel technology was a fraud and its cars were gross polluters that were, in fact, not even legal to drive on U.S. roadways.

38. On September 18, 2015, the EPA issued to Volkswagen and its parent Volkswagen AG and Audi AG NOV I relating to certain 2.0 liter CleanDiesel models. NOV I explained the EPA's allegations that Volkswagen installed

---

[14] *See* Mike Spector and William Boston, *EPA, Volkswagen Spar Over New Emissions Claims*, Wall Street Journal (Nov. 4, 2015), http://www.wsj.com/articles/epa-notifies-volkswagen-of-added-emissions-violations-1446491504 ("A Volkswagen spokesman disputed the EPA's findings, saying the auto maker didn't install emissions-test evading software on any of the newly identified vehicles. 'It is a permissible software,' he said, adding: 'What's at issue here is clear: Does the U.S. want competition in the American market or not?'").

sophisticated software in the Volkswagen and Audi diesel vehicles sold in the United States that detects when the vehicle is undergoing official emissions testing and turns full emissions controls on only during the test.

39. On November 2, 2015, the EPA issued to Volkswagen Group of America, Volkswagen AG, Audi AG, Porsche Cars North America, and Porsche AG NOV II relating to larger, 3.0 liter, 6-cylinder models. NOV II explained that Volkswagen installed software in certain models using its 3.0 liter TDI engine, and that this software enabled the vehicles to pass emissions tests when, in reality, they were polluting at illegal, dangerous levels in real-world conditions. Although not identical, the cheating alleged in NOV II relied on essentially the same mechanism as that alleged, and admitted to, in NOV I.

40. The software in the 3.0 liter models detects when the vehicle is undergoing official emissions testing and causes the car to enter "temperature conditioning mode" ("TCM") during the initial phases of the test. The car is in "normal mode" for the remainder of the test, as it is when actually being driven, but by operating in TCM mode even during only a portion of the test, the vehicles appear to satisfy strict emissions requirements. When the car is in normal mode for the entire test (as it is at all times when actually being driven), however, pollution is freely released into the environment at levels that exceed those allowed by federal and state laws and regulations. The software produced and used by Volkswagen falls under the legal description of a defeat device, which is prohibited by the Clean Air Act.

41. Because modern cars include sophisticated computers and sensors throughout the car, modern emissions testing uses the car's own sensors and computer controls to measure the presence of pollutants and track compliance with EPA and state emissions standards. Emissions testing stations plug a diagnostic device into the car's on-board diagnostics ("OBD II") port and use the exhaust sensors installed in the car to measure the substances emitted. Some states, instead

of or in addition to an OBD II diagnostic device, use a probe inserted into the exhaust pipe to measure emissions.

42. Volkswagen's defeat device used software and sophisticated algorithms to detect when the cars were undergoing emissions testing, and only then engaged pollution suppression systems to ensure that emissions complied with regulatory standards. When the car was not being emissions tested—that is, under all other operating conditions—the electronic engine control systems operated the vehicle with no regard for regulatory emissions restrictions.

43. The result is that Volkswagen's 3.0 liter CleanDiesel vehicles would meet emissions standards in labs or testing stations, but at all other times emit $NO_X$ at *up to nine times the standard* allowed under United States laws and regulations.

44. On September 20, 2015, Volkswagen admitted that the EPA allegations in NOV I were true. It admitted using a defeat device in the NOV I Affected Vehicles. Prior to his resignation as a result of the disclosure of the emissions fraud, Volkswagen's CEO Martin Winterkorn stated: "I personally am deeply sorry that we have broken the trust of our customers and the public."

45. Remarkably, Volkswagen has not learned its lesson. After admitting the violations of NOV I, and after the EPA found clear results of almost identical cheating in its 3.0 liter CleanDiesel models, Volkswagen initially denied the allegations of NOV II, even attacking the integrity and impugning the motivations of the EPA.

46. But as Mary Nichols, chair of CARB, stated, "[i]t's almost impossible to explain something like that in any way other than something about the software that controls the operation." In response to Volkswagen's claim that the

irregularities the EPA discovered were part of a legitimate effort to warm up the system, she added, "[i]n all honesty that explanation doesn't make any sense."[15]

47. By manufacturing and selling NOV II Affected Vehicles that allowed for higher levels of emissions than were certified to the EPA, Volkswagen violated the Clean Air Act, defrauded its customers, placed in commerce vehicles that were illegal to drive on U.S. roadways, and engaged in unfair competition and false advertising under state and federal laws.

48. Volkswagen's fraud harmed not just the customers it duped into buying its heavily polluting, not-so-CleanDiesels, but also creates a substantial, ongoing harm to the environment. In addition to the 483,000 cars affected under NOV I, spewing up to 40 times the permitted level of $NO_X$ and other pollutants, NOV II identified another 10,000 cars emitting $NO_X$ in amounts up to nine times what is permitted over the last three years. Several weeks after NOV II, Volkswagen *admitted* that the same software was installed in *all* 2009-2016 3.0 liter diesel models—another 75,000 toxic cars (in addition to the 10,000 identified by NOV II). The emissions from these vehicles have harmed the air quality and environment and, as a result, harmed the United States and its citizens.

49. The harm Volkswagen has caused by selling its illegally polluting CleanDiesel cars is ongoing. Volkswagen appears willing to let it continue for many months, if not years. Mr. Horn testified before Congress on October 8, 2015, admitting the purposeful use of the defeat device by Volkswagen in its 2.0 liter diesel models to defraud regulators and its customers. He testified that any fix for at

---

15 *See* https://au.news.yahoo.com/world/a/29998440/latest-volkswagen-admission-threatens-real-impact-on-sales/ (last visited Nov. 7, 2015).

least 420,000 of the NOV I Affected Vehicles would require *software and hardware* changes and would take at least many months, and perhaps years to implement.[16]

50. Given that the cheat device now at issue under NOV II operates in effectively the same way as that under NOV I, the fix for the vehicles affected under NOV II will likely be no different. Despite the fact that months have gone by, Volkswagen has not offered replacement cars or a buyback program, forcing owners to knowingly spew noxious fumes into the environment (the very conduct they paid a premium to avoid) or make alternative arrangements at their own expense. Over two months after NOV I, there is no fix, buyback, or other remedial plan in sight. While meeting with regulators occurred on November 19 and 20, defrauded customers remain in the dark.

**D. Volkswagen Has Caused a Quantifiable Environmental Injury**

51. Ozone is a colorless and odorless gas, which directly affects asthmatics and has been shown to lead to increased incidence of pneumonia and bronchitis. It also has been demonstrated to negatively affect crops and natural vegetation. The public health literature has established a link between marginal short run fluctuations in ambient ozone concentrations and mortality rates.[17] Ozone itself is not directly emitted into the environment. It is "produced" by sunlight and warm temperatures and a reaction in the atmosphere between $NO_X$ and Volatile Organic Compounds (VOCs).

52. The reaction that produces ozone requires somewhat fixed proportions of $NO_X$ and VOCs, such that in regions where VOC concentrations are high, ozone

[16] *See* http://www.autonews.com/article/20151008/OEM02/151009826/older-vw-diesels-will-need-software-and-hardware-fixes-horn-tells (last visited Nov. 7, 2015).

[17] Bell *et al.* (2004) show evidence of a short-term 10 parts per billion (ppb) rise in ozone concentrations would result in 3,767 additional premature deaths across 95 urban areas in the U.S. For evidence regarding ozone's morbidity and environmental impacts, see EPA (2006), Moretti and Neidell (2008), and Neidell (2004, 2009).

formation is "$NO_X$-constrained," meaning that marginal increases in VOC emissions will not affect ozone concentrations, but marginal increases of $NO_X$ emissions will. Similarly, areas with relatively high $NO_X$ levels are called "VOC-constrained," which means that in these areas marginal increases in $NO_X$ emissions will not affect ozone concentrations, but marginal increases of VOCs emissions will.

53. There are multiple sources of $NO_X$ other than cars and trucks, *e.g.*, electric generation plants, industrial boilers, and kilns. Solvents and paints are major sources of VOC emissions, but the largest sources of VOCs are biogenic. Deciduous trees are major sources of VOC emissions, so ozone formation in rural (tree covered) areas is generally $NO_X$-constrained, while urban areas are frequently VOC-constrained (Sillman 1999, Blanchard 2001).[18] Local $NO_X$ emissions can impact ozone formation as much as 1,000 km downwind, whereas VOC emissions have only a local effect (Milford *et al*. 1989, Sillman 1999).

54. Tracing $NO_X$ emissions in one location into economic damages to health can be done through a model that translates the ground level emissions of $NO_X$ in one location into ozone damages everywhere as $NO_X$ travels and reacts in spatially heterogeneous ways across the country. One such model is the AP2 Model (Muller, 2015), which has county level resolution, translates $NO_X$ emissions at ground level (and a variety of other pollutants) into economic damage across all other counties in the US and aggregates the results.

55. Figure 1 below demonstrates an estimate of damages from a pollution increase caused by a representative VW Jetta, a model affected by NOV I. It uses the Bell et al. (2004) dose response curve for ozone and a conservative value of a statistical life (VSL) of $2 million as applied in Müller, Mendelsohn and Nordhaus (2011). The model does not include damages on crops or affects on morbidity, so

---

[18] There are some exceptions. Rural regions closeby and downwind of an urban center are sometimes VOC-limited. Urban regions in the wooded South, such as Atlanta, can be $NO_X$-limited.

the preliminary estimates should be treated as a strict lower bound on damages. The standard requires a $NO_X$ limit per kilometer of 0.043 grams. The lower range of the vehicle tested by WVU was 0.61 grams per kilometer and the upper bound 1.5 grams per kilometer.

56. It is possible to calculate the damages from a vehicle driven for 100,000 miles in any of the over 3,000 US counties. For the low end of the range of the Jetta test (0.61 g/km) a vehicle driven 100,000 miles would emit an additional 201 pounds of $NO_X$ above a compliant car. For the high end of the range of the Jetta test (1.5 g/km) a vehicle driven 100,000 miles would emit an additional 516 pounds of $NO_X$ above a compliant car. For the low end of the range of the Passat test (0.34 g/km) a vehicle driven 100,000 miles would emit an additional 105 pounds of $NO_X$ above a compliant car. For the high end of the range of the Passat test (0.67 g/km) a vehicle driven 100,000 miles would emit an additional 222 pounds of $NO_X$ above a compliant car. Figure 1 below applies these numbers to the AP2 Model to illustrate the physicality of ozone formation.

Figure 1: Marginal damages from driving a Jetta emitting 1.5g of $NO_X$/km for 100,000 miles.




57. Figure 1 (above) displays the spatial damage distribution across the US for the high emitting Jetta. Figure 2 (below) displays the distributions of damages for the low and high emitting versions of the Jetta and Passat as tested by WVU. The spatial patterns are not affected by the difference in emissions by vehicle type and emissions scenario, yet the overall range of damages is. The range of damages for the Jetta under the high emissions scenario is roughly $62 to $1,346. The range for the vehicle with lowest emissions (Passat, low) is roughly $13 to $274.

Figure 2: Marginal damages from driving the low and high emitting Jetta and Passat for 100,000 miles.




## E. Volkswagen Reaped Massive Profits From its Fraud

58. Volkswagen charged a substantial premium for the NOV II Affected Vehicles, misleadingly marketed as "CleanDiesel." For example, the 2016 A8 L diesel costs $3,700 more than its non-diesel counterpart. The MSRP for 2016 A8 L diesel is $85,200 compared to $81,500 for the non-diesel version. The diesel versions of the Volkswagen Touareg, the only model which offered the TDI in multiple trims, cost $3,500 more than its non-diesel counterparts at all 4 trim-levels. Touareg diesels cost from approximately $48,070 for the base model (after subtracting the cost of its built-in navigation, which does not come in the otherwise equivalent non-diesel version) to $61,435 for the top-line TDI Executive version.

59. These premiums occur across all of the models in which Volkswagen installed its defeat device for emissions testing, with an average premium of approximately $2,850. The table below sets forth the price premium in 2016 for numerous models:

**CleanDiesel Price Premiums**

| Model | Premium |
|---|---|
| *2016 VW Touareg (All Trims)* | $3,500 |
| *2016 Porsche Cayenne* | $3,600 |
| *2016 Audi A6* | $2,100 |
| *2016 Audi A7* | $2,100 |
| *2016 Audi A8 L* | $3,700 |
| *2016 Audi Q5* | $2,100 |

### F. Volkswagen's Fraud Has Harmed Owners and Drivers of NOV II Affected Vehicles

60. As set forth above, Class members paid large premiums for NOV II Affected Vehicles. They paid these premiums as a result of Volkswagen's false claims that the CleanDiesel engine system was, *inter alia*, environmentally friendly, clean, efficient and EPA complaint. Class members were harmed because from the day they drove their NOV II Affected Vehicle off the lot, they did not get what they paid for.

61. In addition, as a direct result of the disclosure of Volkswagen's CleanDiesel fraud, NOV II Affected Vehicles have sharply decreased in value and are presently unsellable. In fact, Volkswagen, Audi, and Porsche have halted all sales of NOV II Affected Vehicles, new or used, so that even dealers are stuck with tainted, stigmatized NOV II Affected Vehicles.

62. Within several weeks of the announcement of Volkswagen's emissions fraud relating to its 2.0 liter models, the value of NOV I Affected Vehicles was widely reported to have plummeted. By October 23, 2015, the value of NOV I Affected Vehicles had dropped an average of almost 16%.[19]

---

[19] *See* http://www.kbb.com/car-news/all-the-latest/this-week-in-car-buying-quality-ratings-muddy-car-buying-waters-vw-bumps-up-incentives-amid-scandal-

63. There is every reason to expect similar diminutions in the value of NOV II Affected Vehicles. While data regarding the affected 3.0 liter models is not yet available, their values will likely be similarly affected. Each Class member therefore suffered a direct pecuniary loss in the form of the decreased value of their NOV II Affected Vehicle.

64. The loss in value is particularly acute and affects Class members because they do not want to own cars that pollute and harm the environment. Environmental responsibility was the core of Volkswagen's marketing efforts and a driving factor in purchase decisions. Class members want to sell their NOV II Affected Vehicles but cannot without incurring substantial losses.

65. Moreover, many Class members purchased their vehicles with financing in the form of car loans or leases. The plunge in value of NOV II Affected Vehicles has caused the financing to be underwater, meaning that Class members will have to pay money, over and above whatever they can sell their car for, in order to get into a car that is actually legal to drive on United States roadways.

66. Volkswagen will not be able to make the NOV II Affected Vehicles comply with emissions standards without substantially degrading their performance characteristics, including their horsepower and their efficiency. As a result, even if Volkswagen is able to make the NOV II Affected Vehicles EPA compliant, Class members will nonetheless suffer actual harm and damages because their vehicles will no longer perform as they did when purchased and as advertised. This will necessarily result in a diminution in value of every NOV II Affected Vehicle and will cause owners of NOV II Affected Vehicles to pay more for fuel while using their NOV II Affected Vehicles.

---

prices-new-passat-ferrarimaserati-casino-store-closes/2000012570/ (last visited Nov. 8, 2015).

67. The harm described above is concrete, immediate, and quantifiable. In April 2015, Volkswagen issued a recall for one line of vehicles affected under NOV I, the Audi A3 diesel. Volkswagen claimed this was a “repair” that “improved” engine management software. But scores of Class members reported that immediately after having the recall repair performed, their vehicle performance and fuel efficiency precipitously dropped 10-20%. Although the vehicles affected under NOV II have larger engines, the underlying technology both of the engines themselves and their respective defeat devices are nearly identical, indicating that the “fix” will come at similar expense as it did for the A3.

68. Moreover, many Class members purchased very expensive extended warranties for their NOV II Affected Vehicles, intending to own the vehicles for many years beyond the initial warranty. Class members no longer want to own the NOV II Affected Vehicles, but when they sell them, in addition to losses from the cars being worth much less as a result of Volkswagen’s fraud, they will lose the value of the extended warranties that they purchased.

69. As a result of Volkswagen’s unfair, deceptive, and/or fraudulent business practices, and its failure to disclose that under normal operating conditions the NOV II Affected Vehicles emit up to nine times the allowed levels, owners and/or lessees of the NOV II Affected Vehicles have suffered losses in money and/or property. Had Plaintiffs and Class members known of the defeat device at the time they purchased or leased their NOV II Affected Vehicles, they would not have purchased or leased those vehicles, or would have paid substantially less for the vehicles than they did.

70. When and if Volkswagen recalls NOV II Affected Vehicles, and degrades the engine performance in order to make the NOV II Affected Vehicles compliant with EPA standards, all Plaintiffs and Class members will be required to pay extra for fuel and will not obtain the performance characteristics of their

vehicles when purchased. NOV II Affected Vehicles will necessarily be worth less in the marketplace because of the decrease in performance and efficiency.

71. As a result of Volkswagen's unfair, deceptive, and/or fraudulent business practices, and its failure to disclose that under normal operating conditions the NOV II Affected Vehicles emit up to nine times the allowed levels of pollutants, the environment and air quality in the United States has been harmed. If the EPA and other regulators had known of the true nature of the CleanDiesel engine system and the true levels of pollutants it emitted, it would not have certified it for use on the United States roadways and the air quality and environment in the United States would not have been harmed.

## G. Volkswagen Continues to Harm Consumers and the Environment By Refusing to Take Remedial Action

72. Volkswagen diesel consumers believed that their the purchase made a statement about contributing to a cleaner environment. Class members were conscious of their decision to purchase the vehicles with the "CleanDiesel" engine, including the Porsche Cayenne, VW Touareg, Audi A6, A7, A8, A8 L, Q5, and Q7. Owning and driving these cars was a source of pride.

73. Consumers paid thousands of extra dollars to own a vehicle with a "Clean Diesel" engine. In 2015, for example, the premiums ranged from $2,100 for diesel version of the Audi A6, A7, and Q5, to $5,100 for the Audi Q7. While VW claimed that these vehicles would have "a higher resale value versus comparable gasoline vehicles," *see supra* ¶ 33, the cars are, in fact, now virtually unsellable.

74. Consumer Reports has "suspend[ed] its recommendation of the Audi A7 TDI and Volkswagen Touareg TDI. The move comes after the Environmental Protection Agency said the cars used software, called "defeat devices," to cheat on

emissions tests."[20] Moreover, VW has halted all sales of NOV II Affected Vehicles, new or used, virtually guaranteeing that dealers will not accept these tainted vehicles as trade-ins.

75. But Volkswagen has offered no solution. More than two months after this ever-widening scandal originally erupted, Volkswagen has stated only that unidentified fixes are in development.[21] Volkswagen representatives have told lawmakers and the media that any remedy will take significant time. Mr. Horn told the congressional committee on October 8 that fixing the NOV I Affected Vehicles "will take years and require approval from regulators."[22] While a small number of vehicles will get by with a software fix, according to Mr. Horn, most affected cars will "require more extensive changes including possible installation of urea tanks

---

[20] *Consumer Reports Suspends Recommendations on Audi, Volkswagen V6 Diesels*, Consumer Reports (Nov. 10, 2015), http://www.consumerreports.org/cars/consumer-reports-suspends-recommendations-on-audi-volkswagen-v6 (noting that the "other four models—Audi A6, A8/A8L, and Q5 and Porsche Cayenne—were not tested by Consumer Reports in diesel form. We do not place recommended ratings on cars we haven't tested so there's no change in the status of those models.")

[21] The Associated Press, *VW May Compensate Owners of Diesel Cars for Loss of Value*, N.Y. Times (Oct. 9, 2015), http://www.nytimes.com/aponline/2015/10/08/us/ap-us-volkswagen-consumers.html. *See also* Angelo Young, *Volkswagen Diesel Scandal: Most Recalled Cars Will Require Work To Exhaust Systems, Not Just Software*, International Business Times (Oct. 8, 2015), http://www.ibtimes.com/volkswagen-diesel-scandal-most-recalled-cars-will-require-work-exhaust-systems-not-2132764.

[22] Reuters, *House Slams Regulators for Not Catching VW for Years*, N.Y. Times (Oct. 9, 2015), http://www.nytimes.com/reuters/2015/10/09/business/09reuters-volkswagen-emissions.html. *See also VW's U.S. chief tells Congress: no timetable to fix diesel cars*, The Dallas Morning News (Oct. 9, 2015), http://www.dallasnews.com/business/headlines/20151008-vws-u.s.-chief-tells-congress-no-timetable-to-fix-diesel-cars.ece ("Hundreds of thousands of owners of Volkswagen diesel cars that skirt emissions standards may have to wait a year or more to get their cars fixed, the head of the automaker's U.S. unit said at a contentious House hearing Thursday.").

that neutralize harmful emissions and particulates,"[23] which will not even get started until next year at the earliest and could take up to two years to complete.[24] Because this is a worldwide problem, with 480,000 vehicles under NOV I and an additional 85,000 under NOV II (and Volkswagen's related admissions) in the U.S. alone,[25] two years seems optimistic. Volkswagen's other recent confession—that it understated $CO_2$ emissions for up to 800,000 vehicles—casts additional doubt on its ability to fix all of these vehicles in a reasonable period of time.

76. Volkswagen has rejected suggestions that it provide loaner vehicles (with respect to the vehicles affected under NOV I) and has announced no plans to buy back the vehicles.[26] There is no indication that Volkswagen will take a different approach with respect to the vehicles implicated by NOV II, and any such program appears even less likely given that any admissions Volkswagen has made regarding the NOV II allegations have been even more guarded than its admissions regarding the NOV I allegations.

77. Although VW has offered a "goodwill package" to owners of NOV I affected vehicles consisting of $1,000—half of which must be spent at a VW dealership—the company has specifically excluded owners of NOV II Affected Vehicles from this offer.[27] And even if VW were to extend this offer to owners of

---

[23] Reuters, *House Slams Regulators*, *supra* note 22.

[24] Danielle Ivory and Keith Bradsher, *Regulators Investigating 2nd VW Computer Program on Emissions*, N.Y. Times (Oct. 8, 2015), http://www.nytimes.com/2015/10/09/business/international/vw-diesel-emissions-scandal-congressional-hearing.html.

[25] *Id*.

[26] Young, *supra* note 21; Ivory and Bradsher, *supra* note 24.

[27] Jay Ramey, *EPA Adds 75,000 3.0-Liter Diesel VW, Audi, and Porsche Models to Investigation*, Autoweek (Nov. 20, 2015), http://autoweek.com/article/vw-diesel-scandal/epa-30-liter-diesel-vw-audi-and-porsche-models-also-have-defeat-devices.

NOV II Affected Vehicles, many—including two sitting United States Senators—see this belated gesture as “insultingly inadequate” and “a fig leaf attempting to hide the true depths of Volkswagen’s deception.”[28]

78. Thus, consumers presently have no option that any reasonable person would consider satisfactory. Drivers of affected cars are presented with a Hobson’s choice: sideline their cars (which most people cannot possibly do) or emit up to nine times the legal limits for oxides of nitrogen. Consumers are justifiably outraged about the untenable position VW has foisted on them.

## III. JURISDICTION

79. This Court has jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because the proposed Class consists of 100 or more members; the amount in controversy exceeds $5,000,000, exclusive of costs and interest; and minimal diversity exists. This Court also has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

## IV. VENUE

80. Venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to Plaintiffs’ claims occurred in this District. Plaintiffs Yoon Kyo Han, Alexander Polillo, Todd Schwarz, and Nathan Stricker purchased their NOV II Affected Vehicles and are domiciled in this District. Volkswagen has its Test Center California located in this District “with a primary focus on powertrain and systems development, government compliance, and field quality testing.”[29] Volkswagen’s test center “support[s] several

[28] Joseph White and Paul Lienert, *Volkswagen Offers U.S. Diesel Owners $1,000 in Credit Cards*, Reuters (Nov. 9, 2015), http://www.reuters.com/article/2015/11/09/volkswagen-emissions-idUSL1N1341ET20151109#eARbZZJFylQvGmG1.99.

[29] *See* www.volkswagenag.com/content/vwcorp/info_center/en/themes/2012/08/Test_Center_California.html (last visited Nov. 9, 2015).

Volkswagen Group brands including Volkswagen, Audi, [and] Porsche." Volkswagen has marketed, advertised, sold, and leased the NOV II Affected Vehicles within this District.[30]

## V. PARTIES

### A. Arizona Plaintiff

81. Plaintiff Michael Guilbault is an individual domiciled in Waddell, Arizona. In August 2014, Plaintiff purchased a new 2014 Audi A6 Quattro from Audi Chandler of Arizona, an authorized Volkswagen dealer in Chandler, Arizona. Plaintiff still owns this vehicle. Unknown to Plaintiff at the time the vehicle was purchased, the vehicle was equipped with an emissions control defeat device which caused the vehicle to get an undue EPA certification and pass emissions tests, but at all other times emit up to nine times the allowed level of pollutants, including $NO_X$. The use of the defeat device by Volkswagen has caused Plaintiff out-of-pocket loss, future attempted repairs, future additional fuel costs, loss of warranty value, and diminished value of his vehicle. Volkswagen knew about and purposefully used the defeat device, but did not disclose the defeat device and its effects to Plaintiff, so Plaintiff purchased his vehicle on the reasonable, but mistaken, belief that his vehicle complied with United States emissions standards, was properly EPA certified, and would retain all of its operating characteristics throughout its useful life.

### B. California Plaintiffs

82. Plaintiff Cheryl DeWorken is an individual domiciled in Martinez, California. In November 2014, Plaintiff purchased a new 2014 Volkswagen Touareg from Sunnyvale Volkswagen in Sunnyvale, California. Plaintiff still owns this vehicle. Unknown to Plaintiff at the time the vehicle was purchased, the vehicle was equipped with an emissions control defeat device which caused the vehicle to

---

[30] *Id.*

get an undue EPA certification and pass emissions tests, but at all other times emit up to nine times the allowed level of pollutants, including $NO_X$. The use of the defeat device by Volkswagen has caused Plaintiff out-of-pocket loss, future attempted repairs, future additional fuel costs, loss of warranty value, and diminished value of her vehicle. Volkswagen knew about and purposefully used the defeat device, but did not disclose the defeat device and its effects to Plaintiff, so Plaintiff purchased her vehicle on the reasonable, but mistaken, belief that her vehicle complied with United States emissions standards, was properly EPA certified, and would retain all of its operating characteristics throughout its useful life.

83. Plaintiff Jaime Dreikosen is an individual domiciled in San Rafael, California. In October 2015, Plaintiff purchased a used 2015 Audi Q5 from Sonnen Audi Marin in San Rafael, California. Plaintiff still owns this vehicle. Unknown to Plaintiff at the time the vehicle was purchased, the vehicle was equipped with an emissions control defeat device which caused the vehicle to get an undue EPA certification and pass emissions tests, but at all other times emit up to nine times the allowed level of pollutants, including $NO_X$. The use of the defeat device by Volkswagen has caused Plaintiff out-of-pocket loss, future attempted repairs, future additional fuel costs, loss of warranty value, and diminished value of her vehicle. Volkswagen knew about and purposefully used the defeat device, but did not disclose the defeat device and its effects to Plaintiff, so Plaintiff purchased her vehicle on the reasonable, but mistaken, belief that her vehicle complied with United States emissions standards, was properly EPA certified, and would retain all of its operating characteristics throughout its useful life.

84. Plaintiff Tim Eldridge is an individual domiciled in Martinez, California. In June 2015, Plaintiff purchased a new 2015 VW Touareg from Team VW of Hayward in Hayward, California. Plaintiff still owns this vehicle. Unknown to Plaintiff at the time the vehicle was purchased, the vehicle was equipped with an

emissions control defeat device which caused the vehicle to get an undue EPA certification and pass emissions tests, but at all other times emit up to nine times the allowed level of pollutants, including $NO_X$. The use of the defeat device by Volkswagen has caused Plaintiff out-of-pocket loss, future attempted repairs, future additional fuel costs, loss of warranty value, and diminished value of his vehicle. Volkswagen knew about and purposefully used the defeat device, but did not disclose the defeat device and its effects to Plaintiff, so Plaintiff purchased his vehicle on the reasonable, but mistaken, belief that his vehicle complied with United States emissions standards, was properly EPA certified, and would retain all of its operating characteristics throughout its useful life.

85. Plaintiff Jerome Fohet is an individual domiciled in San Jose, California. In April 2014, Plaintiff purchased a new 2014 Porsche Cayenne from Fletchers Jones Motorcars in Fremont, California. Plaintiff still owns this vehicle. Unknown to Plaintiff at the time the vehicle was purchased, the vehicle was equipped with an emissions control defeat device which caused the vehicle to get an undue EPA certification and pass emissions tests, but at all other times emit up to nine times the allowed level of pollutants, including $NO_X$. The use of the defeat device by Volkswagen has caused Plaintiff out-of-pocket loss, future attempted repairs, future additional fuel costs, loss of warranty value, and diminished value of his vehicle. Volkswagen knew about and purposefully used the defeat device, but did not disclose the defeat device and its effects to Plaintiff, so Plaintiff purchased his vehicle on the reasonable, but mistaken, belief that his vehicle complied with United States emissions standards, was properly EPA certified, and would retain all of its operating characteristics throughout its useful life.

86. Plaintiff Josh Golden is an individual domiciled in Aptos, California. In December 2012, Plaintiff purchased a new 2013 Porsche Cayenne from Porsche of Monterey in Monterey, California. Plaintiff still owns this vehicle. Unknown to Plaintiff at the time the vehicle was purchased, the vehicle was equipped with an

emissions control defeat device which caused the vehicle to get an undue EPA certification and pass emissions tests, but at all other times emit up to nine times the allowed level of pollutants, including $NO_X$. The use of the defeat device by Volkswagen has caused Plaintiff out-of-pocket loss, future attempted repairs, future additional fuel costs, loss of warranty value, and diminished value of his vehicle. Volkswagen knew about and purposefully used the defeat device, but did not disclose the defeat device and its effects to Plaintiff, so Plaintiff purchased his vehicle on the reasonable, but mistaken, belief that his vehicle complied with United States emissions standards, was properly EPA certified, and would retain all of its operating characteristics throughout its useful life.

87. Plaintiff Chisepe Gwarada is an individual domiciled in Sacramento, California. In June 2015, Plaintiff purchased a new 2015 Volkswagen Touareg from Hanlees Hilltop Volkswagen in Richmond, California. Plaintiff still owns this vehicle. Unknown to Plaintiff at the time the vehicle was purchased, the vehicle was equipped with an emissions control defeat device which caused the vehicle to get an undue EPA certification and pass emissions tests, but at all other times emit up to nine times the allowed level of pollutants, including $NO_X$. The use of the defeat device by Volkswagen has caused Plaintiff out-of-pocket loss, future attempted repairs, future additional fuel costs, loss of warranty value, and diminished value of her vehicle. Volkswagen knew about and purposefully used the defeat device, but did not disclose the defeat device and its effects to Plaintiff, so Plaintiff purchased her vehicle on the reasonable, but mistaken, belief that her vehicle complied with United States emissions standards, was properly EPA certified, and would retain all of its operating characteristics throughout its useful life.

88. Plaintiff Yoon Kyo Han is an individual domiciled in Fullerton, California. In June 2015, Plaintiff purchased a new 2015 Porsche Cayenne from Rusnak Pasadena Porsche in Pasadena, California. Plaintiff still owns this vehicle.

Unknown to Plaintiff at the time the vehicle was purchased, the vehicle was equipped with an emissions control defeat device which caused the vehicle to get an undue EPA certification and pass emissions tests, but at all other times emit up to nine times the allowed level of pollutants, including $NO_X$. The use of the defeat device by Volkswagen has caused Plaintiff out-of-pocket loss, future attempted repairs, future additional fuel costs, loss of warranty value, and diminished value of his vehicle. Volkswagen knew about and purposefully used the defeat device, but did not disclose the defeat device and its effects to Plaintiff, so Plaintiff purchased his vehicle on the reasonable, but mistaken, belief that his vehicle complied with United States emissions standards, was properly EPA certified, and would retain all of its operating characteristics throughout its useful life.

89. Plaintiff Erik Mikkelsen is an individual domiciled in Folsom, California. In September 2014, Plaintiff purchased a used 2014 Audi Q5 from Niello Audi in Sacramento, California. Plaintiff still owns this vehicle. Unknown to Plaintiff at the time the vehicle was purchased, the vehicle was equipped with an emissions control defeat device which caused the vehicle to get an undue EPA certification and pass emissions tests, but at all other times emit up to nine times the allowed level of pollutants, including $NO_X$. The use of the defeat device by Volkswagen has caused Plaintiff out-of-pocket loss, future attempted repairs, future additional fuel costs, loss of warranty value, and diminished value of his vehicle. Volkswagen knew about and purposefully used the defeat device, but did not disclose the defeat device and its effects to Plaintiff, so Plaintiff purchased his vehicle on the reasonable, but mistaken, belief that his vehicle complied with United States emissions standards, was properly EPA certified, and would retain all of its operating characteristics throughout its useful life.

90. Plaintiff Alexander Polillo is an individual domiciled in Los Angeles, California. In January 2015, Plaintiff purchased a new 2015 Audi Q5 from Beverly Hills Audi in Beverly Hills, California. Plaintiff still owns this vehicle. Unknown

to Plaintiff at the time the vehicle was purchased, the vehicle was equipped with an emissions control defeat device which caused the vehicle to get an undue EPA certification and pass emissions tests, but at all other times emit up to nine times the allowed level of pollutants, including $NO_X$. The use of the defeat device by Volkswagen has caused Plaintiff out-of-pocket loss, future attempted repairs, future additional fuel costs, loss of warranty value, and diminished value of his vehicle. Volkswagen knew about and purposefully used the defeat device, but did not disclose the defeat device and its effects to Plaintiff, so Plaintiff purchased his vehicle on the reasonable, but mistaken, belief that his vehicle complied with United States emissions standards, was properly EPA certified, and would retain all of its operating characteristics throughout its useful life.

91. Plaintiff Todd Schwarz is an individual domiciled in Chatsworth, California. In November 2014, Plaintiff purchased a new 2014 Audi A6 Quattro from The Auto Gallery in Woodland Hills, California. Plaintiff still owns this vehicle. Unknown to Plaintiff at the time the vehicle was purchased, the vehicle was equipped with an emissions control defeat device which caused the vehicle to get an undue EPA certification and pass emissions tests, but at all other times emit up to nine times the allowed level of pollutants, including $NO_X$. The use of the defeat device by Volkswagen has caused Plaintiff out-of-pocket loss, future attempted repairs, future additional fuel costs, loss of warranty value, and diminished value of his vehicle. Volkswagen knew about and purposefully used the defeat device, but did not disclose the defeat device and its effects to Plaintiff, so Plaintiff purchased his vehicle on the reasonable, but mistaken, belief that his vehicle complied with United States emissions standards, was properly EPA certified, and would retain all of its operating characteristics throughout its useful life.

92. Plaintiff Douglas Stewart is an individual domiciled in Santa Cruz, California. In May 2015, Plaintiff purchased a new 2015 Porsche Cayenne from

Carlsen Porsche in Redwood City, California. Plaintiff still owns this vehicle. Unknown to Plaintiff at the time the vehicle was purchased, the vehicle was equipped with an emissions control defeat device which caused the vehicle to get an undue EPA certification and pass emissions tests, but at all other times emit up to nine times the allowed level of pollutants, including $NO_X$. The use of the defeat device by Volkswagen has caused Plaintiff out-of-pocket loss, future attempted repairs, future additional fuel costs, loss of warranty value, and diminished value of his vehicle. Volkswagen knew about and purposefully used the defeat device, but did not disclose the defeat device and its effects to Plaintiff, so Plaintiff purchased his vehicle on the reasonable, but mistaken, belief that his vehicle complied with United States emissions standards, was properly EPA certified, and would retain all of its operating characteristics throughout its useful life.

93. Plaintiff Nathan Stricker is an individual domiciled in Los Angeles, California. In November 2014, Plaintiff purchased a new 2014 Volkswagen Touareg from Pasadena Volkswagen in Pasadena, California. Plaintiff still owns this vehicle. Unknown to Plaintiff at the time the vehicle was purchased, the vehicle was equipped with an emissions control defeat device which caused the vehicle to get an undue EPA certification and pass emissions tests, but at all other times emit up to nine times the allowed level of pollutants, including $NO_X$. The use of the defeat device by Volkswagen has caused Plaintiff out-of-pocket loss, future attempted repairs, future additional fuel costs, loss of warranty value, and diminished value of his vehicle. Volkswagen knew about and purposefully used the defeat device, but did not disclose the defeat device and its effects to Plaintiff, so Plaintiff purchased his vehicle on the reasonable, but mistaken, belief that his vehicle complied with United States emissions standards, was properly EPA certified, and would retain all of its operating characteristics throughout its useful life.

94. Plaintiff Constance Wolfson is an individual domiciled in Danville, California. In May 2015, Plaintiff purchased a new 2014 Porsche Cayenne from Michael Stead Porsche in Walnut Creek, California. Plaintiff still owns this vehicle. Unknown to Plaintiff at the time the vehicle was purchased, the vehicle was equipped with an emissions control defeat device which caused the vehicle to get an undue EPA certification and pass emissions tests, but at all other times emit up to nine times the allowed level of pollutants, including $NO_X$. The use of the defeat device by Volkswagen has caused Plaintiff out-of-pocket loss, future attempted repairs, future additional fuel costs, loss of warranty value, and diminished value of her vehicle. Volkswagen knew about and purposefully used the defeat device, but did not disclose the defeat device and its effects to Plaintiff, so Plaintiff purchased her vehicle on the reasonable, but mistaken, belief that her vehicle complied with United States emissions standards, was properly EPA certified, and would retain all of its operating characteristics throughout its useful life.

**C. Colorado Plaintiffs**

95. Plaintiff Patricio Burillo is an individual domiciled in Vail, Colorado. In August 2014, Plaintiff purchased a used 2014 Porsche Cayenne from Prestige Imports in Lakewood, Colorado. Plaintiff still owns this vehicle. Unknown to Plaintiff at the time the vehicle was purchased, the vehicle was equipped with an emissions control defeat device which caused the vehicle to get an undue EPA certification and pass emissions tests, but at all other times emit up to nine times the allowed level of pollutants, including $NO_X$. The use of the defeat device by Volkswagen has caused Plaintiff out-of-pocket loss, future attempted repairs, future additional fuel costs, loss of warranty value, and diminished value of her vehicle. Volkswagen knew about and purposefully used the defeat device, but did not disclose the defeat device and its effects to Plaintiff, so Plaintiff purchased her vehicle on the reasonable, but mistaken, belief that her vehicle complied with United

States emissions standards, was properly EPA certified, and would retain all of its operating characteristics throughout its useful life.

96. Plaintiff Roman Zvyagelsky is an individual domiciled in Lakewood, Colorado. In August 2015, Plaintiff purchased a new 2015 Audi Q5 from Prestige Imports in Lakewood, Colorado. Plaintiff still owns this vehicle. Unknown to Plaintiff at the time the vehicle was purchased, the vehicle was equipped with an emissions control defeat device which caused the vehicle to get an undue EPA certification and pass emissions tests, but at all other times emit up to nine times the allowed level of pollutants, including $NO_X$. The use of the defeat device by Volkswagen has caused Plaintiff out-of-pocket loss, future attempted repairs, future additional fuel costs, loss of warranty value, and diminished value of his vehicle. Volkswagen knew about and purposefully used the defeat device, but did not disclose the defeat device and its effects to Plaintiff, so Plaintiff purchased his vehicle on the reasonable, but mistaken, belief that his vehicle complied with United States emissions standards, was properly EPA certified, and would retain all of its operating characteristics throughout its useful life.

**D. Florida Plaintiff**

97. Plaintiff Dennis Burden is an individual domiciled in Dade City, Florida. In January 2014, Plaintiff purchased a new 2014 VW Touareg from Lokey Volkswagen in Clearwater, Florida. Plaintiff still owns this vehicle. Unknown to Plaintiff at the time the vehicle was purchased, the vehicle was equipped with an emissions control defeat device which caused the vehicle to get an undue EPA certification and pass emissions tests, but at all other times emit up to nine times the allowed level of pollutants, including $NO_X$. The use of the defeat device by Volkswagen has caused Plaintiff out-of-pocket loss, future attempted repairs, future additional fuel costs, loss of warranty value, and diminished value of his vehicle. Volkswagen knew about and purposefully used the defeat device, but did not disclose the defeat device and its effects to Plaintiff, so Plaintiff purchased his

vehicle on the reasonable, but mistaken, belief that his vehicle complied with United States emissions standards, was properly EPA certified, and would retain all of its operating characteristics throughout its useful life.

**E. Georgia Plaintiff**

98. Plaintiff Richard Remington is an individual domiciled in Cumming, Georgia. In May 2014, Plaintiff purchased a new 2014 Audi A6 Quattro from Audi of North Atlanta in Roswell, Georgia. Plaintiff still owns this vehicle. Unknown to Plaintiff at the time the vehicle was purchased, the vehicle was equipped with an emissions control defeat device which caused the vehicle to get an undue EPA certification and pass emissions tests, but at all other times emit up to nine times the allowed level of pollutants, including $NO_X$. The use of the defeat device by Volkswagen has caused Plaintiff out-of-pocket loss, future attempted repairs, future additional fuel costs, loss of warranty value, and diminished value of his vehicle. Volkswagen knew about and purposefully used the defeat device, but did not disclose the defeat device and its effects to Plaintiff, so Plaintiff purchased his vehicle on the reasonable, but mistaken, belief that his vehicle complied with United States emissions standards, was properly EPA certified, and would retain all of its operating characteristics throughout its useful life.

**F. Idaho Plaintiff**

99. Plaintiff Robert Rifkin is an individual domiciled in Seattle, Washington. In September 2014, Plaintiff purchased a new 2015 Audi Q5 from VW/Audi of Boise in Boise, Idaho. Plaintiff still owns this vehicle. Unknown to Plaintiff at the time the vehicle was purchased, the vehicle was equipped with an emissions control defeat device which caused the vehicle to get an undue EPA certification and pass emissions tests, but at all other times emit up to nine times the allowed level of pollutants, including $NO_X$. The use of the defeat device by Volkswagen has caused Plaintiff out-of-pocket loss, future attempted repairs, future additional fuel costs, loss of warranty value, and diminished value of his vehicle.

Volkswagen knew about and purposefully used the defeat device, but did not disclose the defeat device and its effects to Plaintiff, so Plaintiff purchased his vehicle on the reasonable, but mistaken, belief that his vehicle complied with United States emissions standards, was properly EPA certified, and would retain all of its operating characteristics throughout its useful life.

**G. Illinois Plaintiffs**

100. Plaintiff Samuel Clark is an individual domiciled in Chicago, Illinois. In July 2015, Plaintiff purchased a used 2014 VW Touareg from Pugi Volkswagen in Downers Grove, Illinois. Plaintiff still owns this vehicle. Unknown to Plaintiff at the time the vehicle was purchased, the vehicle was equipped with an emissions control defeat device which caused the vehicle to get an undue EPA certification and pass emissions tests, but at all other times emit up to nine times the allowed level of pollutants, including $NO_X$. The use of the defeat device by Volkswagen has caused Plaintiff out-of-pocket loss, future attempted repairs, future additional fuel costs, loss of warranty value, and diminished value of his vehicle. Volkswagen knew about and purposefully used the defeat device, but did not disclose the defeat device and its effects to Plaintiff, so Plaintiff purchased his vehicle on the reasonable, but mistaken, belief that his vehicle complied with United States emissions standards, was properly EPA certified, and would retain all of its operating characteristics throughout its useful life.

101. Plaintiff Morton Kent Taylor is an individual domiciled in Oak Park, Illinois. In April 2015, Plaintiff purchased a new 2016 Audi A6 Quattro from Westmont Audi in Westmont, Illinois. Plaintiff still owns this vehicle. Unknown to Plaintiff at the time the vehicle was purchased, the vehicle was equipped with an emissions control defeat device which caused the vehicle to get an undue EPA certification and pass emissions tests, but at all other times emit up to nine times the allowed level of pollutants, including $NO_X$. The use of the defeat device by Volkswagen has caused Plaintiff out-of-pocket loss, future attempted repairs, future

additional fuel costs, loss of warranty value, and diminished value of his vehicle. Volkswagen knew about and purposefully used the defeat device, but did not disclose the defeat device and its effects to Plaintiff, so Plaintiff purchased his vehicle on the reasonable, but mistaken, belief that his vehicle complied with United States emissions standards, was properly EPA certified, and would retain all of its operating characteristics throughout its useful life.

**H. Indiana Plaintiff**

102. Plaintiff Matthew Snyder is an individual domiciled in Fort Wayne, Indiana. In December 2012, Plaintiff purchased a used 2013 VW Touareg from Vorderman VW in Fort Wayne, Indiana. Plaintiff still owns this vehicle. Unknown to Plaintiff at the time the vehicle was purchased, the vehicle was equipped with an emissions control defeat device which caused the vehicle to get an undue EPA certification and pass emissions tests, but at all other times emit up to nine times the allowed level of pollutants, including $NO_X$. The use of the defeat device by Volkswagen has caused Plaintiff out-of-pocket loss, future attempted repairs, future additional fuel costs, loss of warranty value, and diminished value of his vehicle. Volkswagen knew about and purposefully used the defeat device, but did not disclose the defeat device and its effects to Plaintiff, so Plaintiff purchased his vehicle on the reasonable, but mistaken, belief that his vehicle complied with United States emissions standards, was properly EPA certified, and would retain all of its operating characteristics throughout its useful life.

**I. Massachusetts Plaintiff**

103. Plaintiff Qiang Feng is an individual domiciled in Natick, Massachusetts. In December 2014, Plaintiff purchased a new 2014 VW Touareg from Quirk VW Braintree in Braintree, Massachusetts. Plaintiff still owns this vehicle. Unknown to Plaintiff at the time the vehicle was purchased, the vehicle was equipped with an emissions control defeat device which caused the vehicle to get an undue EPA certification and pass emissions tests, but at all other times emit

up to nine times the allowed level of pollutants, including $NO_X$. The use of the defeat device by Volkswagen has caused Plaintiff out-of-pocket loss, future attempted repairs, future additional fuel costs, loss of warranty value, and diminished value of his vehicle. Volkswagen knew about and purposefully used the defeat device, but did not disclose the defeat device and its effects to Plaintiff, so Plaintiff purchased his vehicle on the reasonable, but mistaken, belief that his vehicle complied with United States emissions standards, was properly EPA certified, and would retain all of its operating characteristics throughout its useful life.

**J. New Jersey Plaintiff**

104. Plaintiff Nathan Forbes is an individual domiciled in Clifton Park, New York. In May 2014, Plaintiff purchased a used 2012 VW Touareg from Burlington VW in Burlington, New Jersey. Plaintiff still owns this vehicle. Unknown to Plaintiff at the time the vehicle was purchased, the vehicle was equipped with an emissions control defeat device which caused the vehicle to get an undue EPA certification and pass emissions tests, but at all other times emit up to nine times the allowed level of pollutants, including $NO_X$. The use of the defeat device by Volkswagen has caused Plaintiff out-of-pocket loss, future attempted repairs, future additional fuel costs, loss of warranty value, and diminished value of his vehicle. Volkswagen knew about and purposefully used the defeat device, but did not disclose the defeat device and its effects to Plaintiff, so Plaintiff purchased his vehicle on the reasonable, but mistaken, belief that his vehicle complied with United States emissions standards, was properly EPA certified, and would retain all of its operating characteristics throughout its useful life.

**K. North Carolina Plaintiff**

105. Plaintiff Andrew Walker is an individual domiciled in Raleigh, North Carolina. In March 2015, Plaintiff purchased a new 2014 VW Touareg from Leith VW in Raleigh, North Carolina. Plaintiff still owns this vehicle. Unknown to

Plaintiff at the time the vehicle was purchased, the vehicle was equipped with an emissions control defeat device which caused the vehicle to get an undue EPA certification and pass emissions tests, but at all other times emit up to nine times the allowed level of pollutants, including $NO_X$. The use of the defeat device by Volkswagen has caused Plaintiff out-of-pocket loss, future attempted repairs, future additional fuel costs, loss of warranty value, and diminished value of his vehicle. Volkswagen knew about and purposefully used the defeat device, but did not disclose the defeat device and its effects to Plaintiff, so Plaintiff purchased his vehicle on the reasonable, but mistaken, belief that his vehicle complied with United States emissions standards, was properly EPA certified, and would retain all of its operating characteristics throughout its useful life.

**L. Ohio Plaintiff**

106. Plaintiff Penghui Xue is an individual domiciled in Oxford, Ohio. In February 2015, Plaintiff purchased a new 2015 Porsche Cayenne from Porsche of Kings Automall in Cincinnati, Ohio. Plaintiff still owns this vehicle. Unknown to Plaintiff at the time the vehicle was purchased, the vehicle was equipped with an emissions control defeat device which caused the vehicle to get an undue EPA certification and pass emissions tests, but at all other times emit up to nine times the allowed level of pollutants, including NOx. The use of the defeat device by Volkswagen has caused Plaintiff out-of-pocket loss, future attempted repairs, future additional fuel costs, loss of warranty value, and diminished value of his vehicle. Volkswagen knew about and purposefully used the defeat device, but did not disclose the defeat device and its effects to Plaintiff, so Plaintiff purchased his vehicle on the reasonable, but mistaken, belief that his vehicle complied with United States emissions standards, was properly EPA certified, and would retain all of its operating characteristics throughout its useful life.

**M. Oregon Plaintiffs**

107. Plaintiff John Chapman is an individual domiciled in Portland, Oregon. In December 2013, Plaintiff purchased a new 2014 Audi Q5 from Wilsonville Audi in Wilsonville, Oregon. Plaintiff still owns this vehicle. Unknown to Plaintiff at the time the vehicle was purchased, the vehicle was equipped with an emissions control defeat device which caused the vehicle to get an undue EPA certification and pass emissions tests, but at all other times emit up to nine times the allowed level of pollutants, including $NO_X$. The use of the defeat device by Volkswagen has caused Plaintiff out-of-pocket loss, future attempted repairs, future additional fuel costs, loss of warranty value, and diminished value of his vehicle. Volkswagen knew about and purposefully used the defeat device, but did not disclose the defeat device and its effects to Plaintiff, so Plaintiff purchased his vehicle on the reasonable, but mistaken, belief that his vehicle complied with United States emissions standards, was properly EPA certified, and would retain all of its operating characteristics throughout its useful life.

108. Plaintiff Coby Cohen is an individual domiciled in Portland, Oregon. In August 2015, Plaintiff purchased a new 2015 Audi Q5 from Sunset Audi in Beaverton, Oregon. Plaintiff still owns this vehicle. Unknown to Plaintiff at the time the vehicle was purchased, the vehicle was equipped with an emissions control defeat device which caused the vehicle to get an undue EPA certification and pass emissions tests, but at all other times emit up to nine times the allowed level of pollutants, including $NO_X$. The use of the defeat device by Volkswagen has caused Plaintiff out-of-pocket loss, future attempted repairs, future additional fuel costs, loss of warranty value, and diminished value of his vehicle. Volkswagen knew about and purposefully used the defeat device, but did not disclose the defeat device and its effects to Plaintiff, so Plaintiff purchased his vehicle on the reasonable, but mistaken, belief that his vehicle complied with United States emissions standards,

was properly EPA certified, and would retain all of its operating characteristics throughout its useful life.

**N. Pennsylvania Plaintiff**

109. Plaintiff Peter Harper is an individual domiciled in Yardley, Pennsylvania. In November 2014, Plaintiff purchased a new 2015 Audi A7 Quattro from Thompson Audi in Warrington, Pennsylvania. Plaintiff still owns this vehicle. Unknown to Plaintiff at the time the vehicle was purchased, the vehicle was equipped with an emissions control defeat device which caused the vehicle to get an undue EPA certification and pass emissions tests, but at all other times emit up to nine times the allowed level of pollutants, including $NO_X$. The use of the defeat device by Volkswagen has caused Plaintiff out-of-pocket loss, future attempted repairs, future additional fuel costs, loss of warranty value, and diminished value of his vehicle. Volkswagen knew about and purposefully used the defeat device, but did not disclose the defeat device and its effects to Plaintiff, so Plaintiff purchased his vehicle on the reasonable, but mistaken, belief that his vehicle complied with United States emissions standards, was properly EPA certified, and would retain all of its operating characteristics throughout its useful life.

**O. Rhode Island Plaintiff**

110. Plaintiff Paul-Matthieu Coste is an individual domiciled in Jamestown, Rhode Island. In November 2014, Plaintiff purchased a new 2014 VW Touareg from Balise Volkswagen in West Warwick, Rhode Island. Plaintiff still owns this vehicle. Unknown to Plaintiff at the time the vehicle was purchased, the vehicle was equipped with an emissions control defeat device which caused the vehicle to get an undue EPA certification and pass emissions tests, but at all other times emit up to nine times the allowed level of pollutants, including $NO_X$. The use of the defeat device by Volkswagen has caused Plaintiff out-of-pocket loss, future attempted repairs, future additional fuel costs, loss of warranty value, and diminished value of his vehicle. Volkswagen knew about and purposefully used the

defeat device, but did not disclose the defeat device and its effects to Plaintiff, so Plaintiff purchased his vehicle on the reasonable, but mistaken, belief that his vehicle complied with United States emissions standards, was properly EPA certified, and would retain all of its operating characteristics throughout its useful life.

**P. Texas Plaintiff**

111. Plaintiff Jeremy Coder is an individual domiciled in Allen, Texas. In March 2014, Plaintiff purchased a new 2013 Porsche Cayenne from Porsche of Plano in Plano, Texas. Plaintiff still owns this vehicle. Unknown to Plaintiff at the time the vehicle was purchased, the vehicle was equipped with an emissions control defeat device which caused the vehicle to get an undue EPA certification and pass emissions tests, but at all other times emit up to nine times the allowed level of pollutants, including $NO_X$. The use of the defeat device by Volkswagen has caused Plaintiff out-of-pocket loss, future attempted repairs, future additional fuel costs, loss of warranty value, and diminished value of his vehicle. Volkswagen knew about and purposefully used the defeat device, but did not disclose the defeat device and its effects to Plaintiff, so Plaintiff purchased his vehicle on the reasonable, but mistaken, belief that his vehicle complied with United States emissions standards, was properly EPA certified, and would retain all of its operating characteristics throughout its useful life.

**Q. Virginia Plaintiff**

112. Plaintiff Russell Cronquist is an individual domiciled in Alexandria, Virginia. In December 2013, Plaintiff purchased a new 2014 Volkswagen Touareg from Alexandria Volkswagen in Alexandria, Virginia. Plaintiff still owns this vehicle. Unknown to Plaintiff at the time the vehicle was purchased, the vehicle was equipped with an emissions control defeat device which caused the vehicle to get an undue EPA certification and pass emissions tests, but at all other times emit up to nine times the allowed level of pollutants, including $NO_X$. The use of the

defeat device by Volkswagen has caused Plaintiff out-of-pocket loss, future attempted repairs, future additional fuel costs, loss of warranty value, and diminished value of his vehicle. Volkswagen knew about and purposefully used the defeat device, but did not disclose the defeat device and its effects to Plaintiff, so Plaintiff purchased his vehicle on the reasonable, but mistaken, belief that his vehicle complied with United States emissions standards, was properly EPA certified, and would retain all of its operating characteristics throughout its useful life.

**R. Vermont Plaintiff**

113. Plaintiff Susan Keohan is an individual domiciled in Wallingford, Vermont. In July 2014, Plaintiff purchased a new 2014 Audi Q5 from Kinney Audi in Rutland, Vermont. Plaintiff still owns this vehicle. Unknown to Plaintiff at the time the vehicle was purchased, the vehicle was equipped with an emissions control defeat device which caused the vehicle to get an undue EPA certification and pass emissions tests, but at all other times emit up to nine times the allowed level of pollutants, including $NO_X$. The use of the defeat device by Volkswagen has caused Plaintiff out-of-pocket loss, future attempted repairs, future additional fuel costs, loss of warranty value, and diminished value of her vehicle. Volkswagen knew about and purposefully used the defeat device, but did not disclose the defeat device and its effects to Plaintiff, so Plaintiff purchased her vehicle on the reasonable, but mistaken, belief that her vehicle complied with United States emissions standards, was properly EPA certified, and would retain all of its operating characteristics throughout its useful life.

**S. Washington Plaintiffs**

114. Plaintiff Jonathan Huggett is an individual domiciled in Blaine, Washington. In May 2014, Plaintiff purchased a new 2014 VW Touareg from University Volkswagen in Seattle, Washington. Plaintiff still owns this vehicle. Unknown to Plaintiff at the time the vehicle was purchased, the vehicle was

equipped with an emissions control defeat device which caused the vehicle to get an undue EPA certification and pass emissions tests, but at all other times emit up to nine times the allowed level of pollutants, including $NO_X$. The use of the defeat device by Volkswagen has caused Plaintiff out-of-pocket loss, future attempted repairs, future additional fuel costs, loss of warranty value, and diminished value of his vehicle. Volkswagen knew about and purposefully used the defeat device, but did not disclose the defeat device and its effects to Plaintiff, so Plaintiff purchased his vehicle on the reasonable, but mistaken, belief that his vehicle complied with United States emissions standards, was properly EPA certified, and would retain all of its operating characteristics throughout its useful life.

115. Plaintiff Ryan Hurst is an individual domiciled in Woodinville, Washington. In October 2014, Plaintiff purchased a new 2015 Audi Q5 from Barrier Audi in Bellevue, Washington. Plaintiff purchased, and still owns, this vehicle. Unknown to Plaintiff at the time the vehicle was purchased, the vehicle was equipped with an emissions control defeat device which caused the vehicle to get an undue EPA certification and pass emissions tests, but at all other times emit up to nine times the allowed level of pollutants, including $NO_X$. The use of the defeat device by Volkswagen has caused Plaintiff out-of-pocket loss, future attempted repairs, future additional fuel costs, loss of warranty value, and diminished value of his vehicle. Volkswagen knew about and purposefully used the defeat device, but did not disclose the defeat device and its effects to Plaintiff, so Plaintiff purchased his vehicle on the reasonable, but mistaken, belief that his vehicle complied with United States emissions standards, was properly EPA certified, and would retain all of its operating characteristics throughout its useful life.

**T. Defendants**

116. Volkswagen Group of America, Inc. is a corporation doing business in all 50 states (including the District of Columbia) organized under the laws of the

State of New Jersey, with its principal place of business located at 2200 Ferdinand Porsche Dr., Herndon, Virginia 20171.

117. Volkswagen Aktiengesellschaft, doing business as Volkswagen Group and/or Volkswagen AG ("Volkswagen AG"), has its principal place of business in Wolfsburg, Germany. Volkswagen AG is a corporation organized under the laws of Germany and is the parent corporation of Volkswagen Group of America, Audi AG, and Porsche AG.

118. Audi of America, Inc. is a "fictitious name" of Volkswagen Group of America, Inc. through which Volkswagen distributes Audi cars in the United States.

119. Audi Aktiengesellschaft, doing business as Audi AG ("Audi AG"), has its principal place of business in Ingolstadt, Germany. Audi AG is a corporation organized under the laws of Germany.

120. Porsche Cars North America, Inc. is a corporation doing business in all 50 states and the District of Columbia and is organized under the laws of the State of Delaware, with its principal place of business located at 1 Porsche Dr., Atlanta, Georgia 30354.

121. Porsche Aktiengesellschaft, doing business as Porsche AG ("Porsche AG"), has its principal place of business in Stuttgart, Germany. Porsche AG is a corporation organized under the laws of Germany and is the parent corporation of Porsche Cars North America, Inc.

122. Volkswagen Group of America, Inc., Volkswagen AG, Audi AG, Porsche Cars North America, and Porsche AG were and are at all times relevant to the allegations in this complaint working in concert under the common objective to engage in the emissions scheme described in this complaint. Each of the Defendants were and are the agents of each other and have acted and act for their common goals and profit. Therefore, all acts and knowledge ascribed to one of the defendants are properly imputed to the other. The defendants are referred to collectively herein as Volkswagen or "VW."

123. At all times relevant to this action, Volkswagen manufactured, distributed, sold, leased, and warranted the NOV II Affected Vehicles under the Volkswagen, Audi, and Porsche brand names throughout the United States. Volkswagen and/or its parents, affiliates and agents designed, manufactured, and installed the CleanDiesel engine systems in the NOV II Affected Vehicles, which included the "defeat device." Volkswagen and/or its parents, affiliates and agents developed and disseminated the owner's manuals and warranty booklets, advertisements, and other promotional materials relating to the NOV II Affected Vehicles.

## VI. TOLLING OF THE STATUTE OF LIMITATIONS

### A. Discovery Rule Tolling

124. Class members had no way of knowing about Volkswagen's deception with respect to its CleanDiesel engine system and "defeat device." Only with sophisticated, costly investigations were the EPA and CARB able to uncover Volkswagen's deception, which involved sophisticated software manipulation on Volkswagen's part. As reported by the *Los Angeles Times*, CARB testing employed a special dynamometer in a laboratory, open road testing using portable equipment, and the use of special testing devised by the Board to uncover Volkswagen's scheme and to detect how software on the engine's electronic control module was deceiving emissions certifications tests. Plainly, Volkswagen was intent on expressly hiding its behavior from regulators and consumers.

125. Within the time period of any applicable statutes of limitation, Plaintiffs and members of the proposed classes could not have discovered through the exercise of reasonable diligence that Volkswagen was concealing the conduct complained of herein and misrepresenting its true position with respect to the emission qualities of its vehicles.

126. Plaintiffs and the other Class members did not discover, and did not know of facts that would have caused a reasonable person to suspect, that

Volkswagen did not report information within its knowledge to federal and state authorities, its dealerships, or consumers; nor would a reasonable and diligent investigation have disclosed that Volkswagen had information in its possession about the existence of its sophisticated emissions scheme and that it opted to conceal that information, which was discovered by Plaintiffs only shortly before this action was filed. Nor in any event would such an investigation on the part of Plaintiffs and other Class members have disclosed that Volkswagen valued profits over compliance with federal and state law, or the trust that Plaintiffs and other Class members had placed in its representations, or that, necessarily, Volkswagen actively discouraged its personnel from raising or disclosing issues with regard to the true quality and quantity of the emissions, and the emissions software, of its vehicles, or of Volkswagen's emissions scheme.

127. For these reasons, all applicable statutes of limitation have been tolled by operation of the discovery rule with respect to claims as to all vehicles identified herein.

**B. Fraudulent Concealment Tolling**

128. All applicable statutes of limitation have also been tolled by Volkswagen's knowing and active fraudulent concealment and denial of the facts alleged herein throughout the time period relevant to this action.

129. Instead of disclosing its emissions scheme, or that the quality and quantity of emissions from the subject vehicles were far worse than represented, and of its disregard of federal and state law, Volkswagen falsely represented that its vehicles complied with federal and state emissions standards, and that it was a reputable manufacturer whose representations could be trusted.

**C. Estoppel**

130. Volkswagen was under a continuous duty to disclose to Plaintiffs and the other Class members the true character, quality, and nature of emissions from

the vehicles at issue, and of those vehicles' emissions systems, and of the compliance of those systems with applicable federal and state law.

131. Volkswagen knowingly, affirmatively, and actively concealed the true nature, quality, and character of the emissions systems, and the emissions, of the vehicles at issue.

132. Volkswagen was also under a continuous duty to disclose to Plaintiffs and Class members that it had engaged in the scheme complained of herein to evade federal and state emissions and clean air standards, and that it systematically devalued compliance with, and deliberately flouted, federal and state laws regulating vehicle emissions and clean air.

133. Based on the foregoing, Volkswagen is estopped from relying on any statutes of limitations in defense of this action.

## VII. CLASS ALLEGATIONS

134. Plaintiffs bring this action pursuant to the provisions of Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, on behalf of themselves and the following class and subclasses (collectively, the "Classes"):

**The Nationwide Class**

All persons or entities in the United States who, as of November 2, 2015, owned and/or leased a NOV II Affected Vehicle, including, without limitation: MY 2013-2016 VW Touareg, MY 2014-2016 Audi A6, MY 2014-2016 Audi A7, MY 2014-2016 Audi A8, MY 2014-2016 Audi A8 L, MY 2014-2016 Audi Q5, MY 2013-2016 Audi Q7, MY 2014-2016 Porsche Cayenne, and all other Volkswagen, Audi, and Porsche 3.0 liter MY 2009-2016 diesel vehicles.

**The Arizona Subclass**

All persons or entities in the state of Arizona who owned and/or leased a NOV II Affected Vehicle as of November 2, 2015.

**The California Subclass**

All persons or entities in the state of California who owned and/or leased a NOV II Affected Vehicle as of November 2, 2015.

**The Colorado Subclass**

All persons or entities in the state of Colorado who owned and/or leased a NOV II Affected Vehicle as of November 2, 2015.

**The Florida Subclass**

All persons or entities in the state of Florida who owned and/or leased a NOV II Affected Vehicle as of November 2, 2015.

**The Georgia Subclass**

All persons or entities in the state of Georgia who owned and/or leased a NOV II Affected Vehicle as of November 2, 2015.

**The Idaho Subclass**

All persons or entities in the state of Idaho who owned and/or leased a NOV II Affected Vehicle as of November 2, 2015.

**The Illinois Subclass**

All persons or entities in the state of Illinois who owned and/or leased a NOV II Affected Vehicle as of November 2, 2015.

**The Indiana Subclass**

All persons or entities in the state of Indiana who owned and/or leased a NOV II Affected Vehicle as of November 2, 2015.

**The Massachusetts Subclass**

All persons or entities in the state of Massachusetts who owned and/or leased a NOV II Affected Vehicle as of November 2, 2015.

**The New Jersey Subclass**

All persons or entities in the state of New Jersey who owned and/or leased a NOV II Affected Vehicle as of November 2, 2015.

**The North Carolina Subclass**

All persons or entities in the state of North Carolina who owned and/or leased a NOV II Affected Vehicle as of November 2, 2015.

**The Ohio Subclass**

All persons or entities in the state of Ohio who owned and/or leased a NOV II Affected Vehicle as of November 2, 2015.

**The Oregon Subclass**

All persons or entities in the state of Oregon who owned and/or leased a NOV II Affected Vehicle as of November 2, 2015.

**The Pennsylvania Subclass**

All persons or entities in the state of Pennsylvania who owned and/or leased a NOV II Affected Vehicle as of November 2, 2015.

**The Rhode Island Subclass**

All persons or entities in the state of Rhode Island who owned and/or leased a NOV II Affected Vehicle as of November 2, 2015.

**The Texas Subclass**

All persons or entities in the state of Texas who owned and/or leased a NOV II Affected Vehicle as of November 2, 2015.

**The Virginia Subclass**

All persons or entities in the state of Virginia who owned and/or leased a NOV II Affected Vehicle as of November 2, 2015.

**The Vermont Subclass**

All persons or entities in the state of Vermont who owned and/or leased a NOV II Affected Vehicle as of November 2, 2015.

**The Washington Subclass**

All persons or entities in the state of Washington who owned and/or leased a NOV II Affected Vehicle as of November 2, 2015.

135. Excluded from the Classes are individuals who have personal injury claims resulting from the installation of the defeat device in the CleanDiesel engine system. Also excluded from the Classes are Volkswagen and its subsidiaries and affiliates; all persons who make a timely election to be excluded from the Classes;

governmental entities; and the judge to whom this case is assigned and his/her immediate family. Plaintiffs reserve the right to revise the class definitions based upon information learned through discovery.

136. Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claim.

137. This action has been brought and may be properly maintained on behalf of each of the Classes proposed herein under Federal Rule of Civil Procedure 23.

138. Numerosity. Federal Rule of Civil Procedure 23(a)(1): The members of the Classes are so numerous and geographically dispersed that individual joinder of all Class members is impracticable. While Plaintiffs are informed and believe that there are not less than tens of thousands of members of the Class, and at least hundreds of members of each subclass, the precise number of Class and Subclass members is unknown to Plaintiffs, but may be ascertained from Volkswagen's books and records. Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. mail, electronic mail, Internet postings, and/or published notice.

139. Commonality and Predominance: Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3): This action involves common questions of law and fact, which predominate over any questions affecting individual Class members, including, without limitation:

a) Whether Volkswagen engaged in the conduct alleged herein;

b) Whether Volkswagen designed, advertised, marketed, distributed, leased, sold, or otherwise placed NOV II Affected Vehicles into the stream of commerce in the United States;

c) Whether the CleanDiesel engine system in the NOV II Affected Vehicles contains a defect in that it does not comply with U.S. EPA requirements and federal and state emissions regulations;

d) Whether the CleanDiesel engine systems in NOV II Affected Vehicles can be made to comply with EPA and state standards without substantially degrading their performance and/or efficiency;

e) Whether Volkswagen knew about the defeat device and, if so, how long Volkswagen has known;

f) Whether Volkswagen designed, manufactured, marketed, and distributed NOV II Affected Vehicles with a defeat device;

g) Whether Volkswagen's conduct violates consumer protection statutes, false advertising laws, sales contracts, warranty laws, and other laws as asserted herein;

h) Whether Plaintiffs and the other Class members overpaid for their NOV II Affected Vehicles;

i) Whether Plaintiffs and the other Class members are entitled to equitable relief, including, but not limited to, restitution or injunctive relief; and

j) Whether Plaintiffs and the other Class members are entitled to damages and other monetary relief and, if so, in what amount.

140. Typicality: Federal Rule of Civil Procedure 23(a)(3): Plaintiffs' claims are typical of the other Class members' claims because, among other things, all Class members were comparably injured through Volkswagen's wrongful conduct as described above.

141. Adequacy: Federal Rule of Civil Procedure 23(a)(4): Plaintiffs are adequate Class representative because their interests do not conflict with the interests of the other members of the Classes they seek to represent; Plaintiffs have

retained counsel competent and experienced in complex class action litigation; and Plaintiffs intend to prosecute this action vigorously. The Classes' interests will be fairly and adequately protected by Plaintiffs and their counsel.

142. Declaratory and Injunctive Relief: Federal Rule of Civil Procedure 23(b)(2): Volkswagen has acted or refused to act on grounds generally applicable to Plaintiffs and the other members of the Classes, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to the Class as a whole.

143. Superiority: Federal Rule of Civil Procedure 23(b)(3): A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiffs and the other Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Volkswagen, so it would be impracticable for the members of the Classes to individually seek redress for Volkswagen's wrongful conduct. Even if Class members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## VIII. VIOLATIONS ALLEGED

### A. Claims Brought on Behalf of the Nationwide Class

**COUNT I**
**VIOLATION OF MAGNUSON-MOSS WARRANTY ACT**
**(15 U.S.C. § 2301, et seq.)**

144. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

145. This claim is brought on behalf of the Nationwide Class.

146. Plaintiffs are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

147. Volkswagen is a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)-(5).

148. The NOV II Affected Vehicles are "consumer products" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

149. 15 U.S.C. § 2301(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with a written or implied warranty.

150. Volkswagen's express warranties are written warranties within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(6). The NOV II Affected Vehicles' implied warranties are covered under 15 U.S.C. § 2301(7).

151. Volkswagen breached these warranties as described in more detail above. Without limitation, the NOV II Affected Vehicles are equipped with non-EPA complaint CleanDiesel engine systems and a defeat device. The NOV II Affected Vehicles share a common design defect in that the CleanDiesel engine system fails to operate as represented by Volkswagen.

152. Plaintiffs and the other Nationwide Class members have had sufficient direct dealings with either Volkswagen or its agents (dealerships and technical support) to establish privity of contract between Volkswagen, on one hand, and Plaintiffs and each of the other Nationwide Class members on the other hand. Nonetheless, privity is not required here because Plaintiffs and each of the other Nationwide Class members are intended third-party beneficiaries of contracts between Volkswagen and its dealers, and specifically, of Volkswagen's implied warranties. The dealers were not intended to be the ultimate consumers of the NOV II Affected Vehicles and have no rights under the warranty agreements provided

with the NOV II Affected Vehicles; the warranty agreements were designed for and intended to benefit the consumers only.

153. Affording Volkswagen a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile here. Indeed, Plaintiffs have already done so, and Volkswagen has failed, after numerous attempts, to cure the defects. Moreover, Volkswagen has admitted that it will not even attempt to recall and fix NOV II Affected Vehicles until at least 2016, and the process may take years.

154. At the time of sale or lease of each NOV II Affected Vehicle, Volkswagen knew, should have known, or was reckless in not knowing of its misrepresentations and omissions concerning the NOV II Affected Vehicles' inability to perform as warranted, but nonetheless failed to rectify the situation and/or disclose the defective design. Under the circumstances, the remedies available under any informal settlement procedure would be inadequate and any requirement that Plaintiffs resort to an informal dispute resolution procedure and/or afford Volkswagen a reasonable opportunity to cure its breach of warranties is excused and thereby deemed satisfied.

155. Plaintiffs and the other Nationwide Class members would suffer economic hardship if they returned their NOV II Affected Vehicles but did not receive the return of all payments made by them. Because Volkswagen is refusing to acknowledge any revocation of acceptance and return immediately any payments made, Plaintiffs and the other Nationwide Class members have not re-accepted their NOV II Affected Vehicles by retaining them.

156. The amount in controversy of Plaintiffs' individual claims meets or exceeds the sum of $25. The amount in controversy of this action exceeds the sum of $50,000, exclusive of interest and costs, computed on the basis of all claims to be determined in this lawsuit.

157. Plaintiffs, individually and on behalf of the other Nationwide Class members, seek all damages permitted by law, including diminution in value of the NOV II Affected Vehicles, in an amount to be proven at trial.

**B. Claims Brought on Behalf of the Arizona Subclass**

**COUNT I**
**VIOLATIONS OF THE CONSUMER FRAUD ACT**
**(ARIZ. REV. STAT. §§ 44-1521, et seq.)**

158. Plaintiff Michael Guilbault ("Plaintiff," for purposes of all Arizona Subclass Counts) incorporates by reference all preceding allegations as though fully set forth herein.

159. Plaintiff brings this Count on behalf of the Arizona Subclass.

160. Plaintiff and Volkswagen are each "persons" as defined by ARIZ. REV. STAT. § 44-1521(6). The NOV II Affected Vehicles are "merchandise" as defined by ARIZ. REV. STAT. § 44-1521(5).

161. The Arizona Consumer Fraud Act proscribes "[t]he act, use or employment by any person of any deception, deceptive act or practice, fraud, false pretense, false promise, misrepresentation, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise whether or not any person has in fact been misled, deceived or damaged thereby." ARIZ. REV. STAT. § 44-1522(A).

162. By failing to disclose and actively concealing that the CleanDiesel engine systems were not EPA-compliant and used a "defeat device" in the NOV II Affected Vehicles, Volkswagen engaged in deceptive business practices prohibited by the Arizona Consumer Fraud Act, ARIZ. REV. STAT. § 44-1522(A), including (1) representing that NOV II Affected Vehicles have characteristics, uses, benefits, and qualities which they do not have, (2) representing that NOV II Affected Vehicles are of a particular standard, quality, and grade when they are not, (3) advertising NOV II Affected Vehicles with the intent not to sell them as

advertised, and (4) engaging in acts or practices which are otherwise unfair, misleading, false, or deceptive to the consumer.

163. As alleged above, Volkswagen made numerous material statements about the benefits and characteristics of the CleanDiesel system that were either false or misleading. Each of these statements contributed to the deceptive context of Volkswagen's unlawful advertising and representations as a whole.

164. Volkswagen knew that the CleanDiesel engine systems in the NOV II Affected Vehicles were defectively designed or manufactured, did not comply with EPA regulations, used a "defeat device," and were not suitable for their intended use. Volkswagen nevertheless failed to warn Plaintiff about these defects despite having a duty to do so.

165. Volkswagen owed Plaintiff a duty to disclose the defective nature of the CleanDiesel engine system in the NOV II Affected Vehicles, because Volkswagen:

i) Possessed exclusive knowledge of the defects rendering the NOV II Affected Vehicles illegal under EPA regulations;

ii) Intentionally concealed the defects associated with CleanDiesel engine systems through its deceptive marketing campaigns and use of the "defeat device" that it designed to hide the defects in the CleanDiesel engine system; and/or

iii) Made incomplete representations about the characteristics and performance of the CleanDiesel engine system generally, while purposefully withholding material facts from Plaintiff that contradicted these representations.

166. Volkswagen's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiff, about the true

performance and characteristics of the CleanDiesel engine system in NOV II Affected Vehicles.

167. As a result of its violations of the Arizona Consumer Fraud Act detailed above, Volkswagen caused actual damage to Plaintiff and, if not stopped, will continue to harm Plaintiff. Plaintiff currently owns or leases, or within the class period has owned or leased, a NOV II Affected Vehicle that is defective. Defects associated with the CleanDiesel engine system have caused the value of NOV II Affected Vehicles to decrease.

168. Plaintiff and the Class sustained damages as a result of the Volkswagen's unlawful acts and are, therefore, entitled to damages and other relief as provided under the Arizona Consumer Fraud Act.

169. Plaintiff also seeks court costs and attorneys' fees as a result of Volkswagen's violation of the Arizona Consumer Fraud Act as provided in ARIZ. REV. STAT. § 12-341.01.

**COUNT II**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**(ARIZ. REV. STAT. § 47-2314)**

170. Plaintiff incorporates by reference all allegations of the preceding paragraphs as though fully set forth herein.

171. Plaintiff brings this Count on behalf of the Arizona Subclass.

172. Volkswagen is and was at all relevant times a merchant with respect to motor vehicles under Ariz. Rev. Stat. § 47-2014.

173. A warranty that the NOV II Affected Vehicles were in merchantable condition is implied by law in the instant transactions. The NOV II Affected Vehicles, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which cars are used. Specifically, the NOV II Affected Vehicles are inherently defective in that they do not comply with federal and state emissions standards, rendering certain safety and emissions

functions inoperative; and the CleanDiesel engine system was not adequately designed, manufactured, and tested.

174. Volkswagen was provided notice of these issues by the investigations of the EPA and individual state regulators, numerous complaints filed against it including the instant complaint, and by numerous individual letters and communications sent by Plaintiffs and other Class members before or within a reasonable amount of time after the allegations of NOV II Affected Vehicle defects became public.

175. As a direct and proximate result of Volkswagen's breach of the warranties of merchantability, Plaintiffs and the other Class members have been damaged in an amount to be proven at trial.

**COUNT III**
**BREACH OF CONTRACT**
**(BASED ON ARIZONA LAW)**

176. Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

177. Plaintiff brings this Count on behalf of new vehicle or certified pre-owned vehicle purchasers in the Arizona Subclass.

178. Volkswagen's misrepresentations and omissions alleged herein, including Volkswagen's failure to disclose the existence of the CleanDiesel engine system's defect and/or defective design as alleged herein, caused Plaintiff and the other Arizona Subclass members to make their purchases or leases of their NOV II Affected Vehicles. Absent those misrepresentations and omissions, Plaintiff and the other Arizona Subclass members would not have purchased or leased the NOV II Affected Vehicles, would not have purchased or leased the NOV II Affected Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain the CleanDiesel engine system and which were not marketed as including such a system. Accordingly, Plaintiff

and the other Arizona Subclass members overpaid for their NOV II Affected Vehicles and did not receive the benefit of their bargain.

179. Each and every sale or lease of a NOV II Affected Vehicle by an authorized Volkswagen dealer constitutes a contract between Volkswagen and the purchaser or lessee. Volkswagen breached these contracts by selling or leasing Plaintiff and the other Arizona Subclass members defective NOV II Affected Vehicles and by misrepresenting or failing to disclose the existence of the CleanDiesel engine system's defect and/or defective design, including information known to Volkswagen rendering each NOV II Affected Vehicle non EPA-compliant, and thus less valuable, than vehicles not equipped with a CleanDiesel engine system.

180. As a direct and proximate result of Volkswagen's breach of contract, Plaintiff and the Arizona Subclass have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

**COUNT IV**
**FRAUDULENT CONCEALMENT**
**(BASED ON ARIZONA LAW)**

181. Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

182. Plaintiff brings this Count on behalf of the Arizona Subclass.

183. Volkswagen intentionally concealed that the CleanDiesel engine systems were not EPA-compliant and used a "defeat device," or acted with reckless disregard for the truth, and denied Plaintiff and the other Class members information that is highly relevant to their purchasing decision.

184. Volkswagen further affirmatively misrepresented to Plaintiff in advertising and other forms of communication, including standard and uniform material provided with each car, that the NOV II Affected Vehicles it was selling

were new, had no significant defects, complied with EPA regulations and would perform and operate properly when driven in normal usage.

185. Volkswagen knew these representations were false when made.

186. The NOV II Affected Vehicles purchased or leased by Plaintiff and the other Class members were, in fact, defective, non-EPA compliant, unsafe, and unreliable because the NOV II Affected Vehicles contained faulty and defective CleanDiesel engine system, as alleged herein.

187. Volkswagen had a duty to disclose that the NOV II Affected Vehicles were defective, unsafe, non-EPA compliant and unreliable in that certain crucial emissions functions of the NOV II Affected Vehicles would be rendered inoperative due to the "defeat device" installed in the defective CleanDiesel engine system, because Plaintiff and the other Class members relied on Volkswagen's material representations that the NOV II Affected Vehicles they were purchasing were safe, environmentally clean, efficient and free from defects.

188. The aforementioned concealment was material because if it had been disclosed Plaintiff and the other Class members would not have bought or leased the NOV II Affected Vehicles, or would not have bought or leased those Vehicles at the prices they paid.

189. The aforementioned representations were material because they were facts that would typically be relied on by a person purchasing or leasing a new motor vehicle. Volkswagen knew or recklessly disregarded that its representations were false because it knew that it had to use the "defeat device" in order for NOV II Affected Vehicles to pass EPA emissions requirements. Volkswagen intentionally made the false statements in order to sell NOV II Affected Vehicles.

190. Plaintiff and the other Class members relied on Volkswagen's reputation—along with Volkswagen's failure to disclose the faulty and defective nature of the CleanDiesel engine system and Volkswagen's affirmative assurance

that its NOV II Affected Vehicles were safe and reliable, and other similar false statements—in purchasing or leasing NOV II Affected Vehicles.

191. As a result of their reliance, Plaintiff and the other Class members have been injured in an amount to be proven at trial, including, but not limited to, their lost benefit of the bargain and overpayment at the time of purchase or lease and/or the diminished value of their NOV II Affected Vehicles.

192. Volkswagen's conduct was knowing, intentional, with malice, demonstrated a complete lack of care, and was in reckless disregard for the rights of Plaintiff and the other Class members. Plaintiff and the other Class members are therefore entitled to an award of punitive damages to the extent permitted under applicable law.

## C. Claims Brought on Behalf of the California Subclass

### COUNT I
### VIOLATION OF CALIFORNIA UNFAIR COMPETITION LAW
### (CAL. BUS. & PROF. CODE §§ 17200, et seq.)

193. Plaintiffs Cheryl DeWorken, Jaime Dreikosen, Tim Eldridge, Jerome Fohet, Josh Golden, Chisepe Gwarada, Yoon Kyo Han, Erik Mikkelsen, Alexander Polillo, Todd Schwarz, Douglas Stewart, Nathan Stricker, and Constance Wolfson ("Plaintiffs," for purposes of all California Subclass Counts) incorporate by reference all preceding allegations as though fully set forth herein.

194. Plaintiffs bring this Count on behalf of the California Subclass.

195. California's Unfair Competition Law ("UCL"), CAL. BUS. & PROF. CODE §§ 17200, *et seq.*, proscribes acts of unfair competition, including "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising."

196. Volkswagen's conduct, as described herein, was and is in violation of the UCL. Volkswagen's conduct violates the UCL in at least the following ways:

i. By knowingly and intentionally concealing from Plaintiffs and the other California Subclass members that the NOV II Affected Vehicles

suffer from a design defect while obtaining money from Plaintiffs and the Class;

ii. By marketing NOV II Affected Vehicles as possessing functional and defect-free, EPA-compliant CleanDiesel engine systems;

iii. By purposefully installing an illegal "defeat device" in the NOV II Affected Vehicles to fraudulently obtain EPA certification and cause NOV II Affected Vehicles to pass emissions tests when in truth and fact they did not pass such tests;

iv. By violating federal laws, including the Clean Air Act; and

v. By violating other California laws, including California laws governing vehicle emissions and emission testing requirements.

197. Volkswagen's misrepresentations and omissions alleged herein caused Plaintiffs and the other California Subclass members to make their purchases or leases of their NOV II Affected Vehicles. Absent those misrepresentations and omissions, Plaintiffs and the other California Subclass members would not have purchased or leased these vehicles, would not have purchased or leased the NOV II Affected Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain CleanDiesel engine systems that failed to comply with EPA and California emissions standards.

198. Accordingly, Plaintiffs and the other California Subclass members have suffered injury-in-fact including lost money or property as a result of Volkswagen's misrepresentations and omissions.

199. Plaintiffs seek to enjoin further unlawful, unfair, and/or fraudulent acts or practices by Volkswagen under CAL. BUS. & PROF. CODE § 17200.

200. Plaintiffs requests that this Court enter such orders or judgments as may be necessary to enjoin Volkswagen from continuing its unfair, unlawful, and/or deceptive practices and to restore to Plaintiffs and members of the Class any money it acquired by unfair competition, including restitution and/or restitutionary

disgorgement, as provided in CAL. BUS. & PROF. CODE § 17203 and CAL. BUS. & PROF. CODE § 3345; and for such other relief set forth below.

**COUNT II**
**VIOLATION OF CALIFORNIA CONSUMERS LEGAL REMEDIES ACT (CAL. BUS. & PROF. CODE §§ 1750, et seq.)**

201. Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

202. Plaintiffs bring this Count on behalf of the California Subclass.

203. California's Consumers Legal Remedies Act ("CLRA"), Cal. Bus. & Prof. Code §§ 1750, *et seq.*, proscribes "unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer."

204. The NOV II Affected Vehicles are "goods" as defined in Cal. Bus. & Prof. Code § 1761(a).

205. Plaintiffs and the other California Subclass members are "consumers" as defined in Cal. Bus. & Prof. Code § 1761(d), and Plaintiffs, the other California Subclass members, and Volkswagen are "persons" as defined in Cal. Bus. & Prof. Code § 1761(c).

206. As alleged above, Volkswagen made numerous representations concerning the benefits, efficiency, performance and safety features of CleanDiesel engine systems that were misleading.

207. In purchasing or leasing the NOV II Affected Vehicles, Plaintiffs and the other California Subclass members were deceived by Volkswagen's failure to disclose that the NOV II Affected Vehicles were equipped with defective CleanDiesel engine systems that failed EPA and California emissions standards.

208. Volkswagen's conduct, as described hereinabove, was and is in violation of the CLRA. Volkswagen's conduct violates at least the following enumerated CLRA provisions:

i. Cal. Civ. Code § 1770(a)(2): Misrepresenting the approval or certification of goods;

ii. Cal. Civ. Code § 1770(a)(3): Misrepresenting the certification by another;

iii. Cal. Civ. Code § 1770(a)(5): Representing that goods have sponsorship, approval, characteristics, uses, benefits, or quantities which they do not have;

iv. Cal. Civ. Code § 1770(a)(7): Representing that goods are of a particular standard, quality, or grade, if they are of another;

v. Cal. Civ. Code § 1770(a)(9): Advertising goods with intent not to sell them as advertised; and

vi. Cal. Civ. Code § 1770(a)(16): Representing that goods have been supplied in accordance with a previous representation when they have not.

209. Plaintiffs and the other California Subclass members have suffered injury in fact and actual damages resulting from Volkswagen's material omissions and misrepresentations because they paid an inflated purchase or lease price for the NOV II Affected Vehicles and because they stand to pay additional fuel costs if and when their NOV II Affected Vehicles are made to comply with emissions standards.

210. Volkswagen knew, should have known, or was reckless in not knowing of the defective design and/or manufacture of the CleanDiesel engine systems, and that the NOV II Affected Vehicles were not suitable for their intended use.

211. The facts concealed and omitted by Volkswagen to Plaintiffs and the other California Subclass members are material in that a reasonable consumer would have considered them to be important in deciding whether to purchase or lease the NOV II Affected Vehicles or pay a lower price. Had Plaintiffs and the other California Subclass members known about the defective nature of the NOV II

Affected Vehicles, they would not have purchased or leased the NOV II Affected Vehicles or would not have paid the prices they paid.

212. In accordance with Cal. Civ. Code § 1780(a), Plaintiffs and members of the Class seek injunctive relief for Volkswagen's violations of the CLRA.

213. While Plaintiffs do not seek to recover damages under the CLRA in this initial Complaint, after mailing appropriate notice and demand in accordance with Civil Code § 1782(a) & (d), Plaintiffs will subsequently amend this Complaint to also include a request for compensatory and punitive damages.

**COUNT III**
**VIOLATION OF CALIFORNIA FALSE ADVERTISING LAW**
**(CAL. BUS. & PROF. CODE §§ 17500, et seq.)**

214. Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

215. Plaintiffs bring this Count on behalf of the California Subclass.

216. California Bus. & Prof. Code § 17500 states: "It is unlawful for any … corporation … with intent directly or indirectly to dispose of real or personal property … to induce the public to enter into any obligation relating thereto, to make or disseminate or cause to be made or disseminated … from this state before the public in any state, in any newspaper or other publication, or any advertising device, … or in any other manner or means whatever, including over the Internet, any statement … which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading."

217. Volkswagen caused to be made or disseminated through California and the United States, through advertising, marketing and other publications, statements that were untrue or misleading, and which were known, or which by the exercise of reasonable care should have been known to Volkswagen, to be untrue and misleading to consumers, including Plaintiffs and the other Class members.

218. Volkswagen has violated § 17500 because the misrepresentations and omissions regarding the safety, reliability, and functionality of NOV II Affected

Vehicles as set forth in this Complaint were material and likely to deceive a reasonable consumer.

219. Plaintiffs and the other Class members have suffered an injury in fact, including the loss of money or property, as a result of Volkswagen's unfair, unlawful, and/or deceptive practices. In purchasing or leasing their NOV II Affected Vehicles, Plaintiffs and the other Class members relied on the misrepresentations and/or omissions of Volkswagen with respect to the safety, performance and reliability of the NOV II Affected Vehicles. Volkswagen's representations turned out not to be true because the NOV II Affected Vehicles are distributed with faulty and defective CleanDiesel engine systems, rendering certain safety and emissions functions inoperative. Had Plaintiffs and the other Class members known this, they would not have purchased or leased their NOV II Affected Vehicles and/or paid as much for them. Accordingly, Plaintiffs and the other Class members overpaid for their NOV II Affected Vehicles and did not receive the benefit of their bargain.

220. All of the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of Volkswagen's business. Volkswagen's wrongful conduct is part of a pattern or generalized course of conduct that is still perpetuated and repeated, both in the State of California and nationwide.

221. Plaintiffs, individually and on behalf of the other Class members, requests that this Court enter such orders or judgments as may be necessary to enjoin Volkswagen from continuing their unfair, unlawful, and/or deceptive practices and to restore to Plaintiffs and the other Class members any money Volkswagen acquired by unfair competition, including restitution and/or restitutionary disgorgement, and for such other relief set forth below.

**COUNT IV**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**(CAL. COM. CODE § 2314)**

222. Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

223. Plaintiffs bring this Count on behalf of the California Subclass.

224. Volkswagen is and was at all relevant times a merchant with respect to motor vehicles under Cal. Com. Code § 2014.

225. A warranty that the NOV II Affected Vehicles were in merchantable condition is implied by law in the instant transactions, pursuant to Cal. Com. Code § 2314. These NOV II Affected Vehicles, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which cars are used. Specifically, the NOV II Affected Vehicles are inherently defective in that they do not comply with federal and state emissions standards, rendering certain safety and emissions functions inoperative; and the CleanDiesel engine system was not adequately designed, manufactured, and tested.

226. Volkswagen was provided notice of these issues by the investigations of the EPA and individual state regulators, numerous complaints filed against it including the instant complaint, and by numerous individual letters and communications sent by Plaintiffs and other Class members before or within a reasonable amount of time after the allegations of NOV II Affected Vehicle defects became public.

227. As a direct and proximate result of Volkswagen's breach of the warranties of merchantability, Plaintiffs and the other Class members have been damaged in an amount to be proven at trial.

**COUNT V**
**VIOLATION OF SONG-BEVERLY CONSUMER WARRANTY ACT FOR BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**(CAL. CIV. CODE §§ 1791.1 & 1792)**

228. Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

229. Plaintiffs bring this Count on behalf of the California Subclass.

230. Plaintiffs and the other Class members who purchased or leased the NOV II Affected Vehicles in California are "buyers" within the meaning of Cal. Civ. Code § 1791(b).

231. The NOV II Affected Vehicles are "consumer goods" within the meaning of Cal. Civ. Code § 1791(a).

232. Volkswagen is a "manufacturer" of the NOV II Affected Vehicles within the meaning of Cal. Civ. Code § 1791(j).

233. Volkswagen impliedly warranted to Plaintiffs and the other Class members that its NOV II Affected Vehicles were "merchantable" within the meaning of Cal. Civ. Code §§ 1791.1(a) & 1792, however, the NOV II Affected Vehicles do not have the quality that a buyer would reasonably expect.

234. Cal. Civ. Code § 1791.1(a) states:

> "Implied warranty of merchantability" or "implied warranty that goods are merchantable" means that the consumer goods meet each of the following:
>
> (1) Pass without objection in the trade under the contract description.
>
> (2) Are fit for the ordinary purposes for which such goods are used.
>
> (3) Are adequately contained, packaged, and labeled.
>
> (4) Conform to the promises or affirmations of fact made on the container or label.

235. The NOV II Affected Vehicles would not pass without objection in the automotive trade because of the defects in the NOV II Affected Vehicles'

CleanDiesel engine system. Specifically, the NOV II Affected Vehicles do not comply with federal and state emissions standards, rendering certain safety and emissions functions inoperative. In addition, the CleanDiesel engine system was not adequately designed, manufactures, and tested.

236. Because of the defects in the NOV II Affected Vehicles' CleanDiesel engine system, they are not in merchantable condition and thus not fit for ordinary purposes.

237. The NOV II Affected Vehicles are not adequately labeled because the labeling fails to disclose the defects in the NOV II Affected Vehicles' CleanDiesel engine system.

238. Volkswagen breached the implied warranty of merchantability by manufacturing and selling NOV II Affected Vehicles containing defects associated with the CleanDiesel engine system. Furthermore, these defects have caused Plaintiffs and the other Class members to not receive the benefit of their bargain and have caused NOV II Affected Vehicles to depreciate in value.

239. As a direct and proximate result of Volkswagen's breach of the implied warranty of merchantability, Plaintiffs and the other Class members received goods whose defective condition substantially impairs their value to Plaintiffs and the other Class members. Plaintiffs and the other Class members have been damaged as a result of the diminished value of Volkswagen's products, the products' malfunctioning, and the nonuse of their NOV II Affected Vehicles.

240. Pursuant to Cal. Civ. Code §§ 1791.1(d) & 1794, Plaintiffs and the other Class members are entitled to damages and other legal and equitable relief including, at their election, the purchase price of their NOV II Affected Vehicles, or the overpayment or diminution in value of their NOV II Affected Vehicles.

241. Pursuant to Cal. Civ. Code § 1794, Plaintiffs and the other Class members are entitled to costs and attorneys' fees.

**COUNT VI**
**BREACH OF CONTRACT**
**(BASED ON CALIFORNIA LAW)**

242. Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

243. Plaintiffs bring this Count on behalf of new vehicle or certified pre-owned vehicle purchasers in the California Subclass.

244. Volkswagen's misrepresentations and omissions alleged herein, including Volkswagen's failure to disclose the existence of the "defeat device" and/or defective design as alleged herein, caused Plaintiffs and the other California Subclass members to make their purchases or leases of their NOV II Affected Vehicles. Absent those misrepresentations and omissions, Plaintiffs and the other California Subclass members would not have purchased or leased these NOV II Affected Vehicles, would not have purchased or leased the NOV II Affected Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain the CleanDiesel engine system and the "defeat device." Accordingly, Plaintiffs and the other California Subclass members overpaid for their NOV II Affected Vehicles and did not receive the benefit of their bargain.

245. Each and every sale or lease of a NOV II Affected Vehicle by an authorized Volkswagen dealer constitutes a contract between Volkswagen and the purchaser or lessee. Volkswagen breached these contracts by selling or leasing Plaintiffs and the other California Subclass members defective NOV II Affected Vehicles and by misrepresenting or failing to disclose the existence of the "defeat device" and/or defective design, including information known to Volkswagen rendering each NOV II Affected Vehicle less safe and emissions compliant, and thus less valuable, than vehicles not equipped with CleanDiesel engine systems and "defeat devices."

246. As a direct and proximate result of Volkswagen's breach of contract, Plaintiffs and the California Subclass have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

**COUNT VII**
**FRAUD BY CONCEALMENT**
**(BASED ON CALIFORNIA LAW)**

247. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

248. This claim is brought on behalf of California Subclass members.

249. Volkswagen intentionally concealed and suppressed material facts concerning the quality of the NOV II Affected Vehicles. As alleged in this Complaint, notwithstanding references in the very model names of the subject vehicles as "CleanDiesel," or to their engines as "TDI Clean Diesel" engines, Volkswagen engaged in a secret scheme to evade federal and state vehicle emissions standards by installing software designed to conceal its vehicles' emissions of the pollutant nitrogen oxide, which contributes to the creation of ozone and smog. The software installed on the vehicles at issue was designed nefariously to kick-in during emissions certification testing, such that the vehicles would show far lower emissions than when actually operating on the road. The result was what Volkswagen intended: vehicles passed emissions certifications by way of deliberately induced false readings. Reportedly, Volkswagen's deliberate, secret scheme resulted in noxious emissions from these vehicles at up to nine times applicable standards.

250. Plaintiffs and California Subclass members reasonably relied upon Volkswagen's false representations. They had no way of knowing that Volkswagen's representations were false and gravely misleading. As alleged herein, Volkswagen employed extremely sophisticated methods of deception. Plaintiffs and

California Subclass members did not, and could not, unravel Volkswagen's deception on their own.

251. Volkswagen concealed and suppressed material facts concerning what is evidently the true culture of Volkswagen – one characterized by an emphasis on profits and sales above compliance with federal and state clean air laws, and emissions regulations that are meant to protect the public and consumers. It also emphasized profits and sales over the trust that Plaintiffs and California Subclass members placed in its representations.

252. Necessarily, Volkswagen also took steps to ensure that its employees did not reveal the details of its scheme to regulators or consumers, including Plaintiffs and California Subclass Members. Volkswagen did so in order to boost the reputations of its vehicles and to falsely assure purchasers and lessors of its vehicles, including previously owned vehicles, that Volkswagen is a reputable manufacturer that complies with applicable law, including federal and state clean air laws and emissions regulations, and that its vehicles likewise comply with applicable law and regulations. Volkswagen's false representations were material to consumers, both because they concerned the quality of the NOV II Affected Vehicles, including their compliance with applicable federal and state laws and regulations regarding clean air and emissions, and also because the representations played a significant role in the value of the vehicles. As Volkswagen well knew, its customers, including Plaintiffs and California Subclass Members, highly valued that the vehicles they were purchasing or leasing were clean diesel cars, and they paid accordingly.

253. Volkswagen had a duty to disclose the emissions scheme it engaged in with respect to the NOV II Affected Vehicles because knowledge of the scheme and its details were known and/or accessible only to Volkswagen, because Volkswagen had exclusive knowledge as to implementation and maintenance of its scheme, and because Volkswagen knew the facts were not known to or reasonably discoverable

by Plaintiffs or California Subclass Members. Volkswagen also had a duty to disclose because it made general affirmative representations about the qualities of its vehicles with respect to emissions standards, starting with references to them as clean diesel cars, or cars with clean diesel engines, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding its emissions scheme, the actual emissions of its vehicles, its actual philosophy with respect to compliance with federal and state clean air laws and emissions regulations, and its actual practices with respect to the vehicles at issue. Having volunteered to provide information to Plaintiffs, Volkswagen had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the NOV II Affected Vehicles purchased or leased by Plaintiffs and California Subclass members. Whether a manufacturer's products comply with federal and state clean air laws and emissions regulations, and whether that manufacturer tells the truth with respect to such compliance or non-compliance, are material concerns to a consumer, including with respect to the emissions certification testing their vehicles must pass. Volkswagen represented to Plaintiffs and California Subclass members that they were purchasing clean diesel vehicles, and certification testing appeared to confirm this—except that, secretly, Volkswagen had subverted the testing process.

254. Volkswagen actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles did not or could not comply with federal and state laws governing clean air and emissions, which perception would hurt the brand's image and cost Volkswagen money, and it did so at the expense of Plaintiffs and California Subclass members.

255. On information and belief, Volkswagen has still not made full and adequate disclosures, and continues to defraud Plaintiffs and California Subclass members by concealing material information regarding the emission qualities of its vehicles and its emissions scheme.

256. Plaintiffs and California Subclass members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly "clean" diesel cars manufactured by Volkswagen, and/or would not have continued to drive their heavily polluting vehicles, or would have taken other affirmative steps in light of the information concealed from them. Plaintiffs' and California Subclass members' actions were justified. Volkswagen was in exclusive control of the material facts, and such facts were not known to the public, Plaintiffs, or California Subclass Members.

257. Because of the concealment and/or suppression of the facts, Plaintiffs and California Subclass members have sustained damage because they own vehicles that are diminished in value as a result of Volkswagen's concealment of the true quality and quantity of those vehicles' emissions and Volkswagen's failure to timely disclose the actual emission qualities and quantities of millions of Volkswagen, Audi, and Porsche-branded vehicles and the serious issues engendered by Volkswagen's corporate policies. Had Plaintiffs and California Subclass members been aware of Volkswagen's emissions scheme, and the company's callous disregard for compliance with applicable federal and state laws and regulations, Plaintiffs and California Subclass members who purchased or leased new or previously owned vehicles would have paid less for their vehicles or would not have purchased or leased them at all.

258. The value of Plaintiffs' and California Subclass Members' vehicles has diminished as a result of Volkswagen's fraudulent concealment of its emissions scheme, which has greatly tarnished the Volkswagen, Audi, and Porsche brand names attached to Plaintiffs' and California Subclass members' vehicles and made any reasonable consumer reluctant to purchase any of the NOV II Affected Vehicles, let alone pay what otherwise would have been fair market value for the

vehicles. In addition, Class members are entitled to damages for loss of use, costs of additional fuel, costs of unused warranties, and other damages to be proved at trial.

259. Accordingly, Volkswagen is liable to Plaintiffs and California Subclass members for damages in an amount to be proven at trial.

260. Volkswagen's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and California Subclass members' rights and the representations that Volkswagen made to them, in order to enrich Volkswagen. Volkswagen's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## D. Claims Brought on Behalf of the Colorado Subclass

### COUNT I
### VIOLATIONS OF THE COLORADO CONSUMER PROTECTION ACT
### (COLO. REV. STAT. §§ 6-1-101, et seq.)

261. Plaintiffs Patricio Burillo and Roman Zvyagelsky ("Plaintiffs," for purposes of all Colorado Subclass Counts) incorporate by reference all preceding allegations as though fully set forth herein.

262. Plaintiffs bring this Count on behalf of the Colorado Subclass.

263. Colorado's Consumer Protection Act (the "CCPA") prohibits a person from engaging in a "deceptive trade practice," which includes knowingly making "a false representation as to the source, sponsorship, approval, or certification of goods," or "a false representation as to the characteristics, ingredients, uses, benefits, alterations, or quantities of goods." COLO. REV. STAT. § 6-1-105(1)(b), (e). The CCPA further prohibits "represent[ing] that goods … are of a particular standard, quality, or grade … if he knows or should know that they are of another," and "advertis[ing] goods … with intent not to sell them as advertised." COLO. REV. STAT. § 6-1-105(1)(g), (i).

264. Defendants are each a "person" under § 6-1-102(6) of the Colorado CPA, COL. REV. STAT. § 6-1-101, *et seq.*

265. Plaintiffs and Colorado Class members are "consumers" for the purpose of COL. REV. STAT. § 6-1-113(1)(a) who purchased or leased one or more NOV II Affected Vehicles.

266. In the course of Volkswagen's business, it willfully misrepresented and failed to disclose, and actively concealed, that the CleanDiesel Engine System was non-EPA compliant, and the use of the "defeat device" in NOV II Affected Vehicles as described above. Accordingly, Volkswagen engaged in unlawful trade practices, including representing that NOV II Affected Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that NOV II Affected Vehicles are of a particular standard and quality when they are not; advertising NOV II Affected Vehicles with the intent not to sell them as advertised; and otherwise engaging in conduct likely to deceive.

267. In purchasing or leasing the NOV II Affected Vehicles, Plaintiffs and the other Colorado Subclass members were deceived by Volkswagen's failure to disclose that the NOV II Affected Vehicles were equipped with defective CleanDiesel engine systems that failed EPA and Colorado emissions standards.

268. Plaintiffs and Colorado Subclass members reasonably relied upon Volkswagen's false misrepresentations. They had no way of knowing that Volkswagen's representations were false and gravely misleading. As alleged herein, Volkswagen engaged in extremely sophisticated methods of deception. Plaintiffs and Colorado Subclass members did not, and could not, unravel Volkswagen's deception on their own.

269. Volkswagen intentionally and knowingly misrepresented material facts regarding the NOV II Affected Vehicles with an intent to mislead Plaintiffs and the Colorado Subclass.

270. Volkswagen knew or should have known that its conduct violated the Colorado CPA.

271. Volkswagen's actions as set forth above occurred in the conduct of trade or commerce.

272. Volkswagen's conduct proximately caused injuries to Plaintiffs and the other Class members.

273. Plaintiffs and the other Class members were injured as a result of Volkswagen's conduct in that Plaintiffs and the other Class members overpaid for their NOV II Affected Vehicles and did not receive the benefit of their bargain, and their NOV II Affected Vehicles have suffered a diminution in value. These injuries are the direct and natural consequence of Volkswagen's misrepresentations and omissions.

274. Pursuant to Col. Rev. Stat. § 6-1-113, Plaintiffs and the Colorado Subclass seek monetary relied against Volkswagen measured as the greater of (a) actual damages in an amount to be determined at trial and the discretionary trebling of such damages, or (b) statutory damages in the amount of $500 for each Plaintiffs and each Colorado Subclass member.

275. Plaintiffs also seek an order enjoining Volkswagen's unfair, unlawful, and/or deceptive practices, declaratory relief, attorneys' fees, and any other just and proper relief available under the Colorado CPA.

**COUNT II**
**STRICT PRODUCT LIABILITY**
**(BASED ON COLORADO LAW)**

276. Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

277. Plaintiffs bring this Count on behalf of the Colorado Subclass.

278. Colorado law recognizes an action for product defects that complements Colorado's Product Liability Statute, COLO. REV. STAT. TITLE 13, Article 21, Part 4.

279. Volkswagen is a "manufacturer" and "seller" of the NOV II Affected Vehicles within the meaning of COLO. REV. STAT. § 13-21-401(1).

280. Volkswagen manufactured and sold the NOV II Affected Vehicles in a defective condition and in a condition that was unreasonably dangerous to drivers, other motorists, pedestrians, and others or to their property, including persons who may reasonably be expected to use, consume, or be affected by them, in at least the following respects: (i) the NOV II Affected Vehicles were defectively designed, assembled, fabricated, produced, and constructed in that they were not EPA compliant and used a "defeat device"; and (ii) the NOV II Affected Vehicles were not accompanied by adequate warnings about their defective nature.

281. The NOV II Affected Vehicles were defective and unreasonably dangerous at the time they were sold by Volkswagen and were intended to and did reach Plaintiffs and the other Class members in substantially the same condition as they were in when they were manufactured, sold, and left the control of Volkswagen.

282. Plaintiffs and the other Class members are persons who were reasonably expected to use, consume, or be affected by the NOV II Affected Vehicles.

283. As a direct and proximate result of the defective and illegal conditions of the NOV II Affected Vehicles, Plaintiffs and the other Class members have suffered damages.

**COUNT III**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**(COLO. REV. STAT. § 4-2-314)**

284. Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

285. Plaintiffs bring this Count on behalf of the Colorado Subclass.

286. Volkswagen is and was at all relevant times a merchant with respect to motor vehicles.

287. A warranty that the NOV II Affected Vehicles were in merchantable condition is implied by law in the instant transactions. The NOV II Affected

Vehicles, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which cars are used. Specifically, the NOV II Affected Vehicles are inherently defective in that they do not comply with federal and state emissions standards, rendering certain safety and emissions functions inoperative; and the CleanDiesel engine system was not adequately designed, manufactured, and tested.

288. Volkswagen was provided notice of these issues by the investigations of the EPA and individual state regulators, numerous complaints filed against it including the instant complaint, and by numerous individual letters and communications sent by Plaintiffs and other Class members before or within a reasonable amount of time after the allegations of NOV II Affected Vehicle defects became public.

289. As a direct and proximate result of Volkswagen's breach of the warranties of merchantability, Plaintiffs and the other Class members have been damaged in an amount to be proven at trial.

**COUNT IV**
**BREACH OF CONTRACT**
**(BASED ON COLORADO LAW)**

290. Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

291. Plaintiffs bring this Count on behalf of new vehicle or certified pre-owned vehicle purchasers in the Colorado Subclass.

292. Volkswagen's misrepresentations and omissions alleged herein, including Volkswagen's failure to disclose the existence of the CleanDiesel engine system's defect and/or defective design as alleged herein, caused Plaintiff and the other Colorado Subclass members to make their purchases or leases of their NOV II Affected Vehicles. Absent those misrepresentations and omissions, Plaintiffs and the other Colorado Subclass members would not have purchased or leased these NOV II Affected Vehicles, would not have purchased or leased the NOV II Affected

Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain the CleanDiesel engine system and which were not marketed as including such a system. Accordingly, Plaintiffs and the other Colorado Subclass members overpaid for their NOV II Affected Vehicles and did not receive the benefit of their bargain.

293. Each and every sale or lease of a NOV II Affected Vehicle by an authorized Volkswagen dealer constitutes a contract between Volkswagen and the purchaser or lessee. Volkswagen breached these contracts by selling or leasing Plaintiffs and the other Colorado Subclass members defective NOV II Affected Vehicles and by misrepresenting or failing to disclose the existence of the CleanDiesel engine system's defect and/or defective design, including information known to Volkswagen rendering each NOV II Affected Vehicle non EPA-compliant, and thus less valuable, than vehicles not equipped with a CleanDiesel engine system.

294. As a direct and proximate result of Volkswagen's breach of contract, Plaintiffs and the Colorado Subclass have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

**COUNT V**
**FRAUDULENT CONCEALMENT**
**(BASED ON COLORADO LAW)**

295. Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

296. Plaintiffs bring this Count on behalf of the Colorado Subclass.

297. Volkswagen concealed and suppressed material facts concerning the quality of its vehicles and the Volkswagen brand.

298. Volkswagen intentionally concealed that the CleanDiesel engine systems were not EPA-compliant and used a "defeat device", or acted with reckless

disregard for the truth, and denied Plaintiffs and the other Class members information that is highly relevant to their purchasing decision.

299. Volkswagen further affirmatively misrepresented to Plaintiffs in advertising and other forms of communication, including standard and uniform material provided with each car, that the NOV II Affected Vehicles it was selling were new, had no significant defects, complied with EPA regulations and would perform and operate properly when driven in normal usage.

300. Volkswagen knew these representations were false when made.

301. The NOV II Affected Vehicles purchased or leased by Plaintiffs and the other Class members were, in fact, defective, non-EPA compliant, unsafe, and unreliable because the NOV II Affected Vehicles contained faulty and defective CleanDiesel engine system, as alleged herein.

302. Volkswagen had a duty to disclose that these NOV II Affected Vehicles were defective, unsafe, non-EPA compliant and unreliable in that certain crucial emissions functions of the NOV II Affected Vehicles would be rendered inoperative due to the "defeat device" installed in the defective CleanDiesel engine system, because Plaintiffs and the other Class members relied on Volkswagen's material representations that the NOV II Affected Vehicles they were purchasing were safe, environmentally clean, efficient and free from defects.

303. The aforementioned concealment was material because if it had been disclosed Plaintiffs and the other Class members would not have bought or leased the NOV II Affected Vehicles, or would not have bought or leased those Vehicles at the prices they paid.

304. The aforementioned representations were material because they were facts that would typically be relied on by a person purchasing or leasing a new motor vehicle. Volkswagen knew or recklessly disregarded that its representations were false because it knew that it had to use the "defeat device" in order for NOV II

Affected Vehicles to pass EPA emissions requirements. Volkswagen intentionally made the false statements in order to sell NOV II Affected Vehicles.

305. Plaintiffs and the other Class members relied on Volkswagen's reputation—along with Volkswagen's failure to disclose the faulty and defective nature of the CleanDiesel engine system and Volkswagen's affirmative assurance that its NOV II Affected Vehicles were safe and reliable, and other similar false statements—in purchasing or leasing Volkswagen's NOV II Affected Vehicles.

306. As a result of their reliance, Plaintiffs and the other Class members have been injured in an amount to be proven at trial, including, but not limited to, their lost benefit of the bargain and overpayment at the time of purchase or lease and/or the diminished value of their NOV II Affected Vehicles.

307. Volkswagen's conduct was knowing, intentional, with malice, demonstrated a complete lack of care, and was in reckless disregard for the rights of Plaintiffs and the other Class members. Plaintiffs and the other Class members are therefore entitled to an award of punitive damages to the extent permitted under applicable law.

**E. Claims Brought on Behalf of the Florida Subclass**

**COUNT I**
**VIOLATIONS OF THE FLORIDA DECEPTIVE & UNFAIR TRADE PRACTICES ACT**
**(FLA. STAT. §§ 501.201, et seq.)**

308. Plaintiff Dennis Burden ("Plaintiff," for purposes of all Florida Subclass Counts) incorporates by reference all preceding allegations as though fully set forth herein.

309. Plaintiff brings this Count on behalf of the Florida Subclass.

310. Plaintiff is a "consumer" within the meaning of Florida Unfair and Deceptive Trade Practices Act, FLA. STAT. § 501.203(7).

311. Volkswagen engaged in "trade or commerce" within the meaning of FLA. STAT. § 501.203(8).

312. Florida's Deceptive and Unfair Trade Practices Act prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." FLA. STAT. § 501.204(1). Volkswagen participated in unfair and deceptive trade practices that violated the FUDTPA as described herein.

313. In the course of Volkswagen's business, it willfully failed to disclose and actively concealed that the CleanDiesel Engine System was non-EPA compliant, and the use of the "defeat device" in NOV II Affected Vehicles as described above. Accordingly, Volkswagen engaged in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices as defined in FLA. STAT. § 501.204(1), including representing that NOV II Affected Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that NOV II Affected Vehicles are of a particular standard and quality when they are not; advertising NOV II Affected Vehicles with the intent not to sell them as advertised; and otherwise engaging in conduct likely to deceive.

314. In the course of its business, Volkswagen installed the "defeat device" and concealed that its CleanDiesel systems failed EPA regulations as described herein and otherwise engaged in activities with a tendency or capacity to deceive. Volkswagen also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of NOV II Affected Vehicles.

315. Volkswagen has known of its use of the "defeat device" and the true nature of its CleanDiesel engine system for at least six years, but concealed all of that information until recently.

316. Volkswagen was also aware that it valued profits over environmental cleanliness, efficiency, and lawfulness, and that it was manufacturing, selling and

distributing vehicles throughout the United States that did not comply with EPA regulations. Volkswagen concealed this information as well.

317. By failing to disclose and by actively concealing the "defeat device" and the true cleanliness and performance of the CleanDiesel engine system, by marketing its vehicles as safe, reliable, environmentally clean, efficient, and of high quality, and by presenting itself as a reputable manufacturer that valued safety, environmental cleanliness and efficiency, and stood behind its vehicles after they were sold, Volkswagen engaged in deceptive business practices in violation of the FUDTPA.

318. In the course of Volkswagen's business, it willfully failed to disclose and actively concealed the use of the "defeat device" and true cleanliness and efficiency of the CleanDiesel engine system and serious defects discussed above. Volkswagen compounded the deception by repeatedly asserting that the NOV II Affected Vehicles were safe, reliable, environmentally clean, efficient, and of high quality, and by claiming to be a reputable manufacturer that valued safety, environmental cleanliness and efficiency, and stood behind its vehicles once they are on the road.

319. Volkswagen's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiff, about the true cleanliness and efficiency of the CleanDiesel engine system, the quality of the Volkswagen, Audi, and Porsche brands, the devaluing of environmental cleanliness and integrity at Volkswagen, and the true value of the NOV II Affected Vehicles.

320. Volkswagen intentionally and knowingly misrepresented material facts regarding the NOV II Affected Vehicles with an intent to mislead Plaintiff and the Florida Subclass.

321. Volkswagen knew or should have known that its conduct violated the FUDTPA.

322. As alleged above, Volkswagen made material statements about the safety, cleanliness, efficiency and reliability of the NOV II Affected Vehicles and the Volkswagen, Audi, and Porsche brands that were either false or misleading.

323. Volkswagen owed Plaintiff a duty to disclose the true safety, cleanliness, efficiency and reliability of the NOV II Affected Vehicles and the devaluing of environmental cleanliness and integrity at Volkswagen, because Volkswagen:

a. Possessed exclusive knowledge that it valued profits over environmental cleanliness, efficiency, and lawfulness, and that it was manufacturing, selling and distributing vehicles throughout the United States that did not comply with EPA regulations;

b. Intentionally concealed the foregoing from Plaintiff; and/or

c. Made incomplete representations about the safety, cleanliness, efficiency and reliability of the NOV II Affected Vehicles generally, and the "defeat device" and true nature of the CleanDiesel engine system in particular, while purposefully withholding material facts from Plaintiff that contradicted these representations.

324. Because Volkswagen fraudulently concealed the "defeat device" and the true cleanliness and performance of the CleanDiesel engine system, resulting in a raft of negative publicity once the use of the "defeat device" and true characteristics of the CleanDiesel engine system finally began to be disclosed, the value of the NOV II Affected Vehicles has greatly diminished. In light of the stigma attached to those vehicles by Volkswagen's conduct, they are now worth significantly less than they otherwise would be.

325. Volkswagen's fraudulent use of the "defeat device" and its concealment of the true characteristics of the CleanDiesel engine system were material to Plaintiffs and the Florida Subclass. A vehicle made by a reputable manufacturer of environmentally friendly vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of environmentally dirty vehicles that conceals its polluting engines rather than promptly remedying them.

326. Plaintiff and the Florida Subclass suffered ascertainable loss caused by Volkswagen's misrepresentations and its concealment of and failure to disclose material information. Class members who purchased the NOV II Affected Vehicles either would have paid less for their vehicles or would not have purchased or leased them at all.

327. Volkswagen had an ongoing duty to all Volkswagen, Audi, and Porsche customers to refrain from unfair and deceptive acts or practices under the FUDTPA. All owners of NOV II Affected Vehicles suffered ascertainable loss in the form of diminished value of their vehicles as a result of Volkswagen's deceptive and unfair acts and practices made in the course of Volkswagen's business.

328. Volkswagen's violations present a continuing risk to Plaintiff as well as to the general public. Volkswagen's unlawful acts and practices complained of herein affect the public interest.

329. As a direct and proximate result of Volkswagen's violations of the FUDTPA, Plaintiffs and the Florida Subclass have suffered injury-in-fact and/or actual damage.

330. Volkswagen's actions as set forth above occurred in the conduct of trade or commerce.

331. Plaintiff and the other Class members were injured as a result of Volkswagen's conduct in that Plaintiff and the other Class members overpaid for their NOV II Affected Vehicles and did not receive the benefit of their bargain, and their NOV II Affected Vehicles have suffered a diminution in value. These injuries are the direct and natural consequence of Volkswagen's misrepresentations and omissions.

**COUNT II**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**(FLA. STAT. § 672.314)**

332. Plaintiff incorporates by reference all allegations of the preceding paragraphs as though fully set forth herein.

333. Plaintiff brings this Count on behalf of the Florida Subclass.

334. Volkswagen is and was at all relevant times a merchant with respect to motor vehicles.

335. A warranty that the NOV II Affected Vehicles were in merchantable condition is implied by law in the instant transactions. The NOV II Affected Vehicles, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which cars are used. Specifically, the NOV II Affected Vehicles are inherently defective in that they do not comply with federal and state emissions standards, rendering certain safety and emissions functions inoperative; and the CleanDiesel engine system was not adequately designed, manufactured, and tested.

336. Volkswagen was provided notice of these issues by the investigations of the EPA and individual state regulators, numerous complaints filed against it including the instant complaint, and by numerous individual letters and communications sent by Plaintiff and other Class members before or within a reasonable amount of time after the allegations of NOV II Affected Vehicle defects became public.

337. As a direct and proximate result of Volkswagen's breach of the warranties of merchantability, Plaintiff and the other Class members have been damaged in an amount to be proven at trial.

**COUNT III**
**BREACH OF CONTRACT**
**(BASED ON FLORIDA LAW)**

338. Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

339. Plaintiff brings this Count on behalf of new vehicle or certified pre-owned vehicle purchasers in the Florida Subclass.

340. Volkswagen's misrepresentations and omissions alleged herein, including Volkswagen's failure to disclose the existence of the CleanDiesel engine

system's defect and/or defective design as alleged herein, caused Plaintiff and the other Florida Subclass members to make their purchases or leases of their NOV II Affected Vehicles. Absent those misrepresentations and omissions, Plaintiff and the other Florida Subclass members would not have purchased or leased these NOV II Affected Vehicles, would not have purchased or leased the NOV II Affected Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain the CleanDiesel engine system and which were not marketed as including such a system. Accordingly, Plaintiff and the other Florida Subclass members overpaid for their NOV II Affected Vehicles and did not receive the benefit of their bargain.

341. Each and every sale or lease of a NOV II Affected Vehicle by an authorized Volkswagen dealer constitutes a contract between Volkswagen and the purchaser or lessee. Volkswagen breached these contracts by selling or leasing Plaintiff and the other Florida Subclass members defective NOV II Affected Vehicles and by misrepresenting or failing to disclose the existence of the CleanDiesel engine system's defect and/or defective design, including information known to Volkswagen rendering each NOV II Affected Vehicle non EPA-compliant, and thus less valuable, than vehicles not equipped with a CleanDiesel engine system.

342. As a direct and proximate result of Volkswagen's breach of contract, Plaintiff and the Florida Subclass have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

**COUNT IV**
**FRAUDULENT CONCEALMENT**
**(BASED ON FLORIDA LAW)**

343. Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

344. Plaintiff brings this Count on behalf of the Florida Subclass.

345. Volkswagen intentionally concealed that the CleanDiesel engine systems were not EPA-compliant and used a "defeat device," or acted with reckless disregard for the truth, and denied Plaintiff and the other Class members information that is highly relevant to their purchasing decision.

346. Volkswagen further affirmatively misrepresented to Plaintiff in advertising and other forms of communication, including standard and uniform material provided with each car, that the NOV II Affected Vehicles it was selling were new, had no significant defects, complied with EPA regulations and would perform and operate properly when driven in normal usage.

347. Volkswagen knew these representations were false when made.

348. The NOV II Affected Vehicles purchased or leased by Plaintiff and the other Class members were, in fact, defective, non-EPA-compliant, unsafe, and unreliable because the NOV II Affected Vehicles contained faulty and defective CleanDiesel engine system, as alleged herein.

349. Volkswagen had a duty to disclose that these NOV II Affected Vehicles were defective, unsafe, non-EPA compliant and unreliable in that certain crucial emissions functions of the NOV II Affected Vehicles would be rendered inoperative due to the "defeat device" installed in the defective CleanDiesel engine system, because Plaintiff and the other Class members relied on Volkswagen's material representations that the NOV II Affected Vehicles they were purchasing were safe, environmentally clean, efficient and free from defects.

350. The aforementioned concealment was material because if it had been disclosed Plaintiff and the other Class members would not have bought or leased the NOV II Affected Vehicles, or would not have bought or leased those Vehicles at the prices they paid.

351. The aforementioned representations were material because they were facts that would typically be relied on by a person purchasing or leasing a new motor vehicle. Volkswagen knew or recklessly disregarded that its representations

were false because it knew that it had to use the "defeat device" in order for NOV II Affected Vehicles to pass EPA emissions requirements. Volkswagen intentionally made the false statements in order to sell NOV II Affected Vehicles.

352. Plaintiff and the other Class members relied on Volkswagen's reputation – along with Volkswagen's failure to disclose the faulty and defective nature of the CleanDiesel engine system and Volkswagen's affirmative assurance that its NOV II Affected Vehicles were safe and reliable, and other similar false statements – in purchasing or leasing Volkswagen's NOV II Affected Vehicles.

353. As a result of their reliance, Plaintiff and the other Class members have been injured in an amount to be proven at trial, including, but not limited to, their lost benefit of the bargain and overpayment at the time of purchase or lease and/or the diminished value of their NOV II Affected Vehicles.

354. Volkswagen's conduct was knowing, intentional, with malice, demonstrated a complete lack of care, and was in reckless disregard for the rights of Plaintiff and the other Class members. Plaintiff and the other Class members are therefore entitled to an award of punitive damages.

## F. Claims Brought on Behalf of the Georgia Subclass

### COUNT I
### VIOLATIONS OF GEORGIA'S FAIR BUSINESS PRACTICES ACT
### (GA. Code Ann. § 10-1-390, et seq.)

355. Plaintiff Richard Remington ("Plaintiff," for purposes of all Georgia Subclass Counts) incorporates by reference all preceding allegations as though fully set forth herein.

356. Plaintiff intends to assert a claim under the Georgia Fair Business Practices Act ("Georgia FBPA") which declares "[u]nfair or deceptive acts or practices in the conduct of consumer transactions and consumer acts or practices in trade or commerce" to be unlawful, GA. CODE ANN. § 10-1-393(a), including but not limited to "representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have,"

"[r]epresenting that goods or services are of a particular standard, quality, or grade … if they are of another," and "[a]dvertising goods or services with intent not to sell them as advertised." GA. CODE ANN. § 10-1-393(b). Plaintiffs will make a demand in satisfaction of GA. CODE ANN. § 10-1-399, and may amend this Complaint to assert claims under the Georgia FBPA once the required 30 days have elapsed. This paragraph is included for purposes of notice only and is not intended to actually assert a claim under the Georgia FBPA.

**COUNT II**
**VIOLATIONS OF GEORGIA'S UNIFORM DECEPTIVE TRADE PRACTICES ACT**
**(Ga. Code Ann. § 10-1-370, et seq.)**

357. Plaintiff realleges and incorporates by reference all paragraphs as though fully set forth herein.

358. This claim is brought only on behalf of the Georgia Subclass.

359. Volkswagen, Plaintiff, and the Georgia Subclass are "persons' within the meaning of Georgia Uniform Deceptive Trade Practices Act ("Georgia UDTPA"), GA. CODE ANN. § 10-1-371(5).

360. The Georgia UDTPA prohibits "deceptive trade practices," which include the "misrepresentation of standard or quality of goods or services," and "engaging in any other conduct which similarly creates a likelihood of confusion or of misunderstanding." GA. CODE ANN. § 10-1-372(a). By fraudulently installing the "defeat device" to make it appear that its CleanDiesel engine systems complied with EPA regulations, Volkswagen engaged in deceptive trade practices prohibited by the Georgia UDTPA.

361. In the course of its business, Volkswagen installed the "defeat device" and concealed that its CleanDiesel systems failed EPA regulations as described herein and otherwise engaged in activities with a tendency or capacity to deceive. Volkswagen also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression

or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of NOV II Affected Vehicles.

362. Volkswagen has known of its use of the "defeat device" and the true nature of its CleanDiesel engine system for at least six years, but concealed all of that information until recently.

363. Volkswagen was also aware that it valued profits over environmental cleanliness, efficiency, and lawfulness, and that it was manufacturing, selling and distributing vehicles throughout the United States that did not comply with EPA regulations. Volkswagen concealed this information as well.

364. By failing to disclose and by actively concealing the "defeat device" and the true cleanliness and performance of the CleanDiesel engine system, by marketing its vehicles as safe, reliable, environmentally clean, efficient, and of high quality, and by presenting itself as a reputable manufacturer that valued safety, environmental cleanliness and efficiency, and stood behind its vehicles after they were sold, Volkswagen engaged in deceptive business practices in violation of the Georgia UDTPA.

365. In the course of Volkswagen's business, it willfully failed to disclose and actively concealed the use of the "defeat device" and true cleanliness and efficiency of the CleanDiesel engine system and serious defects discussed above. Volkswagen compounded the deception by repeatedly asserting that the NOV II Affected Vehicles were safe, reliable, environmentally clean, efficient, and of high quality, and by claiming to be a reputable manufacturer that valued safety, environmental cleanliness and efficiency, and stood behind its vehicles once they are on the road.

366. Volkswagen's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiff, about the true cleanliness and efficiency of the CleanDiesel engine system, the quality of the

Volkswagen, Audi, and Porsche brands, the devaluing of environmental cleanliness and integrity at Volkswagen, and the true value of the NOV II Affected Vehicles.

367. Volkswagen intentionally and knowingly misrepresented material facts regarding the NOV II Affected Vehicles with an intent to mislead Plaintiff and the Georgia Subclass.

368. Volkswagen knew or should have known that its conduct violated the Georgia UDTPA.

369. As alleged above, Volkswagen made material statements about the safety, cleanliness, efficiency and reliability of the NOV II Affected Vehicles and the Volkswagen, Audi, and Porsche brands that were either false or misleading.

370. Volkswagen owed Plaintiffs a duty to disclose the true safety, cleanliness, efficiency and reliability of the NOV II Affected Vehicles and the devaluing of environmental cleanliness and integrity at Volkswagen, because Volkswagen:

a. Possessed exclusive knowledge that it valued profits over environmental cleanliness, efficiency, and lawfulness, and that it was manufacturing, selling and distributing vehicles throughout the United States that did not comply with EPA regulations;

b. Intentionally concealed the foregoing from Plaintiff; and/or

c. Made incomplete representations about the safety, cleanliness, efficiency and reliability of the NOV II Affected Vehicles generally, and the "defeat device" and true nature of the CleanDiesel engine system in particular, while purposefully withholding material facts from Plaintiff that contradicted these representations.

371. Because Volkswagen fraudulently concealed the "defeat device" and the true cleanliness and performance of the CleanDiesel engine system, resulting in a raft of negative publicity once the use of the "defeat device" and true characteristics of the CleanDiesel engine system finally began to be disclosed, the value of the NOV II Affected Vehicles has greatly diminished. In light of the stigma attached to those vehicles by Volkswagen's conduct, they are now worth significantly less than they otherwise would be.

372. Volkswagen's fraudulent use of the "defeat device" and its concealment of the true characteristics of the CleanDiesel engine system were material to Plaintiffs and the Georgia Subclass. A vehicle made by a reputable manufacturer of environmentally friendly vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of environmentally dirty vehicles that conceals its polluting engines rather than promptly remedying them.

373. Plaintiffs and the Georgia Subclass suffered ascertainable loss caused by Volkswagen's misrepresentations and its concealment of and failure to disclose material information. Class members who purchased the NOV II Affected Vehicles either would have paid less for their vehicles or would not have purchased or leased them at all.

374. Volkswagen had an ongoing duty to all Volkswagen, Audi, and Porsche customers to refrain from unfair and deceptive acts or practices under the Georgia UDTPA. All owners of NOV II Affected Vehicles suffered ascertainable loss in the form of diminished value of their vehicles as a result of Volkswagen's deceptive and unfair acts and practices made in the course of Volkswagen's business.

375. Volkswagen's violations present a continuing risk to Plaintiffs as well as to the general public. Volkswagen's unlawful acts and practices complained of herein affect the public interest.

376. As a direct and proximate result of Volkswagen's violations of the Georgia UDTPA, Plaintiffs and the Georgia Subclass have suffered injury-in-fact and/or actual damage.

377. Plaintiffs seek an order enjoining Volkswagen's unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under the Georgia UDTPA per GA. CODE ANN. § 10-1-373.

**COUNT III**
**FRAUD BY CONCEALMENT**

378. Plaintiff realleges and incorporates by reference all paragraphs as though fully set forth herein.

379. This claim is brought on behalf of the Georgia Subclass.

380. Volkswagen intentionally concealed and suppressed material facts concerning the quality of the NOV II Affected Vehicles. As alleged in this Complaint, notwithstanding references in the very model names of the subject vehicles as "CleanDiesel," or to their engines as "TDI Clean Diesel" engines, Volkswagen engaged in a secret scheme to evade federal and state vehicle emissions standards by installing software designed to conceal its vehicles' emissions of the pollutant nitrogen oxide, which contributes to the creation of ozone and smog. The software installed on the vehicles at issue was designed nefariously to kick-in during emissions certification testing, such that the vehicles would show far lower emissions than when actually operating on the road. The result was what Volkswagen intended: vehicles passed emissions certifications by way of deliberately induced false readings. Reportedly, Volkswagen's deliberate, secret scheme resulted in noxious emissions from these vehicles at up to 40 times applicable standards.

381. Plaintiff and Georgia Subclass members reasonably relied upon Volkswagen's false representations. They had no way of knowing that Volkswagen's representations were false and gravely misleading. As alleged herein, Volkswagen employed extremely sophisticated methods of deception. Plaintiff and Georgia Subclass members did not, and could not, unravel Volkswagen's deception on their own.

382. Volkswagen concealed and suppressed material facts concerning what is evidently the true culture of Volkswagen – one characterized by an emphasis on profits and sales above compliance with federal and state clean air laws, and emissions regulations that are meant to protect the public and consumers. It also

emphasized profits and sales over the trust that Plaintiff and Georgia Subclass members placed in its representations.

383. Necessarily, Volkswagen also took steps to ensure that its employees did not reveal the details of its scheme to regulators or consumers, including Plaintiff and Georgia Subclass members. Volkswagen did so in order to boost the reputations of its vehicles and to falsely assure purchasers and lessors of its vehicles, including previously owned vehicles, that Volkswagen is a reputable manufacturer that complies with applicable law, including federal and state clean air laws and emissions regulations, and that its vehicles likewise comply with applicable law and regulations. Volkswagen's false representations were material to consumers, both because they concerned the quality of the NOV II Affected Vehicles, including their compliance with applicable federal and state laws and regulations regarding clean air and emissions, and also because the representations played a significant role in the value of the vehicles. As Volkswagen well knew, its customers, including Plaintiff and Georgia Subclass members, highly valued that the vehicles they were purchasing or leasing were *clean* diesel cars, and they paid accordingly.

384. Volkswagen had a duty to disclose its emissions scheme because knowledge of the scheme and its details were known and/or accessible only to Volkswagen, because Volkswagen had exclusive knowledge as to implementation and maintenance of its scheme, and because Volkswagen knew the facts were not known to or reasonably discoverable by Plaintiff or Georgia Subclass members. Volkswagen also had a duty to disclose because it made general affirmative representations about the qualities of its vehicles with respect to emissions standards, starting with references to them as *clean* diesel cars, or cars with *clean* diesel engines, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding its emissions scheme, the actual emissions of its vehicles, its actual philosophy with respect to compliance with federal and state clean air laws and emissions regulations, and its actual

practices with respect to the vehicles at issue. Having volunteered to provide information to Plaintiffs, Volkswagen had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of NOV II Affected Vehicles purchased or leased by Plaintiff and Georgia Subclass members. Whether a manufacturer's products comply with federal and state clean air laws and emissions regulations, and whether that manufacturer tells the truth with respect to such compliance or non-compliance, are material concerns to a consumer, including with respect to the emissions certification testing their vehicles must pass. Volkswagen represented to Plaintiff and Georgia Subclass members that they were purchasing *clean* diesel vehicles, and certification testing appeared to confirm this—except that, secretly, Volkswagen had subverted the testing process.

385. Volkswagen actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles did not or could not comply with federal and state laws governing clean air and emissions, which perception would hurt the brand's image and cost Volkswagen money, and it did so at the expense of Plaintiff and Georgia Subclass members.

386. On information and belief, Volkswagen has still not made full and adequate disclosures, and continues to defraud Plaintiff and Georgia Subclass members by concealing material information regarding the emission qualities of its vehicles and its emissions scheme.

387. Plaintiff and Georgia Subclass members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly "clean" diesel cars manufactured by Volkswagen, and/or would not have continued to drive their heavily polluting vehicles, or would have taken other affirmative steps in light of the information concealed from them. Plaintiff's and Georgia Subclass members' actions were justified. Volkswagen was

in exclusive control of the material facts, and such facts were not known to the public, Plaintiff, or Georgia Subclass members.

388. Because of the concealment and/or suppression of the facts, Plaintiff and Georgia Subclass members have sustained damage because they own vehicles that are diminished in value as a result of Volkswagen's concealment of the true quality and quantity of those vehicles' emissions and Volkswagen's failure to timely disclose the actual emission qualities and quantities of hundreds of thousands of Volkswagen, Audi, and Porsche-branded vehicles and the serious issues engendered by Volkswagen's corporate policies. Had Plaintiff and Georgia Subclass members been aware of Volkswagen's emissions scheme, and the company's callous disregard for compliance with applicable federal and state laws and regulations, Plaintiff and Georgia Subclass members who purchased or leased new or previously owned vehicles would have paid less for their vehicles or would not have purchased or leased them at all.

389. The value of Plaintiff's and Georgia Subclass members' vehicles has diminished as a result of Volkswagen's fraudulent concealment of its emissions scheme, which has greatly tarnished the Volkswagen, Audi, and Porsche brand names attached to Plaintiff's and Georgia Subclass members' vehicles and made any reasonable consumer reluctant to purchase any of the NOV II Affected Vehicles, let alone pay what otherwise would have been fair market value for the vehicles. In addition, Class members are entitled to damages for loss of use, costs of additional fuel, costs of unused warranties, and other damages to be proved at trial.

390. Accordingly, Volkswagen is liable to Plaintiffs and Class members for damages in an amount to be proven at trial.

391. Volkswagen's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff's and Georgia Subclass members' rights and the representations that Volkswagen made to them, in order to enrich Volkswagen. To the extent permitted under applicable law,

Volkswagen's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**COUNT IV**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**(GA. CODE ANN. § 11-2-314)**

392. Plaintiff incorporates by reference all allegations of the preceding paragraphs as though fully set forth herein.

393. Plaintiff brings this Count on behalf of the Georgia Subclass.

394. Volkswagen is and was at all relevant times a merchant with respect to motor vehicles.

395. A warranty that the NOV II Affected Vehicles were in merchantable condition is implied by law in the instant transactions. These NOV II Affected Vehicles, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which cars are used. Specifically, the NOV II Affected Vehicles are inherently defective in that they do not comply with federal and state emissions standards, rendering certain safety and emissions functions inoperative; and the CleanDiesel engine system was not adequately designed, manufactured, and tested.

396. Volkswagen was provided notice of these issues by the investigations of the EPA and individual state regulators, numerous complaints filed against it including the instant complaint, and by numerous individual letters and communications sent by Plaintiffs and other Class members before or within a reasonable amount of time after the allegations of NOV II Affected Vehicle defects became public.

397. As a direct and proximate result of Volkswagen's breach of the warranties of merchantability, Plaintiffs and the other Class members have been damaged in an amount to be proven at trial.

**COUNT V**

**BREACH OF CONTRACT**
**(Based on Georgia Law)**

398. Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

399. Plaintiff brings this Count on behalf of new vehicle or certified preowned vehicle purchasers in the Georgia Subclass.

400. Volkswagen's misrepresentations and omissions alleged herein, including Volkswagen's failure to disclose the existence of the CleanDiesel engine system's defect and/or defective design as alleged herein, caused Plaintiff and the other Georgia Subclass members to make their purchases or leases of their NOV II Affected Vehicles. Absent those misrepresentations and omissions, Plaintiff and the other Georgia Subclass members would not have purchased or leased these NOV II Affected Vehicles, would not have purchased or leased these NOV II Affected Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain the CleanDiesel engine system and which were not marketed as including such a system. Accordingly, Plaintiff and the other Georgia Subclass members overpaid for their NOV II Affected Vehicles and did not receive the benefit of their bargain.

401. Each and every sale or lease of a NOV II Affected Vehicle by an authorized Volkswagen dealer constitutes a contract between Volkswagen and the purchaser or lessee. Volkswagen breached these contracts by selling or leasing Plaintiff and the other Georgia Subclass members defective NOV II Affected Vehicles and by misrepresenting or failing to disclose the existence of the CleanDiesel engine system's defect and/or defective design, including information known to Volkswagen rendering each NOV II Affected Vehicle non EPA-compliant, and thus less valuable, than vehicles not equipped with a CleanDiesel engine system.

402. As a direct and proximate result of Volkswagen's breach of contract, Plaintiff and the Georgia Subclass have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

**G. Claims Brought on Behalf of the Idaho Subclass**

**COUNT I**
**VIOLATION OF THE IDAHO CONSUMER PROTECTION ACT (IDAHO CIV. CODE § 48-601, et seq.)**

403. Plaintiff Robert Rifkin ("Plaintiff," for purposes of all Idaho Subclass Counts) incorporates by reference all preceding allegations as though fully set forth herein.

404. This claim is brought only on behalf of the Idaho Subclass.

405. Defendants are each a "person" under the Idaho Consumer Protection Act ("Idaho CPA"), IDAHO CIV. CODE § 48-602(1).

406. Volkswagen's acts or practices as set forth above occurred in the conduct of "trade" or "commerce" under IDAHO CIV. CODE § 48-602(2).

407. Volkswagen participated in misleading, false, or deceptive acts that violated the Idaho CPA. By fraudulently installing the "defeat device" to make it appear that its CleanDiesel engine systems complied with EPA regulations, Volkswagen engaged in deceptive business practices prohibited by the Idaho CPA, including: (1) representing that the NOV II Affected Vehicles have characteristics, uses, and benefits which they do not have; (2) representing that the NOV II Affected Vehicles are of a particular standard, quality, and grade when they are not; (3) advertising the NOV II Affected Vehicles with the intent not to sell them as advertised; (4) engaging in acts or practices which are otherwise misleading, false, or deceptive to the consumer; and (5) engaging in any unconscionable method, act or practice in the conduct of trade or commerce. *See* IDAHO CIV. CODE § 48-603.

408. In the course of its business, Volkswagen installed the "defeat device" and concealed that its CleanDiesel systems failed EPA regulations as described

herein and otherwise engaged in activities with a tendency or capacity to deceive. Volkswagen also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of NOV II Affected Vehicles.

409. Volkswagen has known of its use of the "defeat device" and the true nature of its CleanDiesel engine system for at least six years, but concealed all of that information until recently.

410. Volkswagen was also aware that it valued profits over environmental cleanliness, efficiency, and lawfulness, and that it was manufacturing, selling and distributing vehicles throughout the United States that did not comply with EPA regulations. Volkswagen concealed this information as well.

411. By failing to disclose and by actively concealing the "defeat device" and the true cleanliness and performance of the CleanDiesel engine system, by marketing its vehicles as safe, reliable, environmentally clean, efficient, and of high quality, and by presenting itself as a reputable manufacturer that valued safety, environmental cleanliness and efficiency, and stood behind its vehicles after they were sold, Volkswagen engaged in deceptive business practices in violation of the Idaho CPA.

412. In the course of Volkswagen's business, it willfully failed to disclose and actively concealed the use of the "defeat device" and true cleanliness and efficiency of the CleanDiesel engine system and serious defects discussed above. Volkswagen compounded the deception by repeatedly asserting the NOV II Affected Vehicles were safe, reliable, environmentally clean, efficient, and of high quality, and by claiming to be a reputable manufacturer that valued safety, environmental cleanliness and efficiency, and stood behind its vehicles once they are on the road.

413. Volkswagen's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiff, about the true cleanliness and efficiency of the CleanDiesel engine system, the quality of the Volkswagen, Audi, and Porsche brands, the devaluing of environmental cleanliness and integrity at Volkswagen, and the true value of the NOV II Affected Vehicles.

414. Volkswagen intentionally and knowingly misrepresented material facts regarding the NOV II Affected Vehicles with an intent to mislead Plaintiff and the Idaho Subclass.

415. Volkswagen knew or should have known that its conduct violated the Idaho CPA.

416. As alleged above, Volkswagen made material statements about the safety, cleanliness, efficiency and reliability of the NOV II Affected Vehicles and the Volkswagen, Audi, and Porsche brands that were either false or misleading.

417. Volkswagen owed Plaintiffs a duty to disclose the true safety, cleanliness, efficiency and reliability of the NOV II Affected Vehicles and the devaluing of environmental cleanliness and integrity at Volkswagen, because Volkswagen:

a. Possessed exclusive knowledge that it valued profits over environmental cleanliness, efficiency, and lawfulness, and that it was manufacturing, selling and distributing vehicles throughout the United States that did not comply with EPA regulations;

b. Intentionally concealed the foregoing from Plaintiff; and/or

c. Made incomplete representations about the safety, cleanliness, efficiency and reliability of the NOV II Affected Vehicles generally, and the use of the "defeat device" and true nature of the CleanDiesel engine system in particular, while purposefully withholding material facts from Plaintiff that contradicted these representations.

418. Because Volkswagen fraudulently concealed the "defeat device" and the true cleanliness and performance of the CleanDiesel engine system, resulting in a raft of negative publicity once the use of the "defeat device" and true characteristics of the CleanDiesel engine system finally began to be disclosed, the

value of the NOV II Affected Vehicles has greatly diminished. In light of the stigma attached to those vehicles by Volkswagen's conduct, they are now worth significantly less than they otherwise would be.

419. Volkswagen's fraudulent use of the "defeat device" and its concealment of the true characteristics of the CleanDiesel engine system were material to Plaintiffs and the Idaho Subclass. A vehicle made by a reputable manufacturer of environmentally friendly vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of environmentally dirty vehicles that conceals its polluting engines rather than promptly remedying them.

420. Plaintiffs and the Idaho Subclass suffered ascertainable loss caused by Volkswagen's misrepresentations and its concealment of and failure to disclose material information. Class members who purchased the NOV II Affected Vehicles either would have paid less for their vehicles or would not have purchased or leased them at all.

421. Volkswagen had an ongoing duty to all Volkswagen, Audi, and Porsche customers to refrain from unfair and deceptive acts or practices under the Idaho CPA. All owners of NOV II Affected Vehicles suffered ascertainable loss in the Illinois form of the diminished value of their vehicles as a result of Volkswagen's deceptive and unfair acts and practices made in the course of Volkswagen's business.

422. Volkswagen's violations present a continuing risk to Plaintiffs as well as to the general public. Volkswagen's unlawful acts and practices complained of herein affect the public interest.

423. As a direct and proximate result of Volkswagen's violations of the Idaho CPA, Plaintiffs and the Idaho Subclass have suffered injury-in-fact and/or actual damage.

424. Pursuant to IDAHO CODE § 48-608, Plaintiff and the Idaho Subclass seek monetary relief against Volkswagen measured as the greater of (a) actual

damages in an amount to be determined at trial and (b) statutory damages in the amount of $1,000 for each Plaintiff and each Idaho Subclass member.

425. Plaintiff also seeks an order enjoining Volkswagen's unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under the Idaho CPA.

426. Plaintiff and Idaho Subclass Members also seek punitive damages against Volkswagen because Volkswagen's conduct evidences an extreme deviation from reasonable standards. Volkswagen flagrantly, maliciously, and fraudulently misrepresented the cleanliness, efficiency and reliability of the NOV II Affected Vehicles, deceived Class Members, and concealed material facts that only they knew, all to avoid the expense and public relations nightmare of its vehicles were profound polluters when it repeatedly promised Class Members they were clean. Volkswagen's unlawful conduct constitutes malice, oppression, and fraud warranting punitive damages.

**COUNT II**
**FRAUD BY CONCEALMENT**

427. Plaintiff realleges and incorporates by reference all paragraphs as though fully set forth herein.

428. This claim is brought on behalf of the Idaho Subclass.

429. Volkswagen intentionally concealed and suppressed material facts concerning the quality of the NOV II Affected Vehicles. As alleged in this Complaint, notwithstanding references in the very model names of the subject vehicles as "Clean Diesel," or to their engines as "TDI Clean Diesel" engines, Volkswagen engaged in a secret scheme to evade federal and state vehicle emissions standards by installing software designed to conceal its vehicles' emissions of the pollutant nitrogen oxide, which contributes to the creation of ozone and smog. The software installed on the vehicles at issue was designed nefariously to kick-in during emissions certification testing, such that the vehicles would show far lower

emissions than when actually operating on the road. The result was what Volkswagen intended: vehicles passed emissions certifications by way of deliberately induced false readings. Reportedly, Volkswagen's deliberate, secret scheme resulted in noxious emissions from these vehicles at up to nine times applicable standards.

430. Plaintiff and Idaho Subclass members reasonably relied upon Volkswagen's false representations. They had no way of knowing that Volkswagen's representations were false and gravely misleading. As alleged herein, Volkswagen employed extremely sophisticated methods of deception. Plaintiff and Idaho Subclass members did not, and could not, unravel Volkswagen's deception on their own.

431. Volkswagen concealed and suppressed material facts concerning what is evidently the true culture of Volkswagen—one characterized by an emphasis on profits and sales above compliance with federal and state clean air laws, and emissions regulations that are meant to protect the public and consumers. It also emphasized profits and sales over the trust that Plaintiff and Idaho Subclass members placed in its representations.

432. Necessarily, Volkswagen also took steps to ensure that its employees did not reveal the details of its scheme to regulators or consumers, including Plaintiff and Idaho Subclass members. Volkswagen did so in order to boost the reputations of its vehicles and to falsely assure purchasers and lessors of its vehicles, including previously owned vehicles, that Volkswagen is a reputable manufacturer that complies with applicable law, including federal and state clean air laws and emissions regulations, and that its vehicles likewise comply with applicable law and regulations. Volkswagen's false representations were material to consumers, both because they concerned the quality of the NOV II Affected Vehicles, including their compliance with applicable federal and state laws and regulations regarding clean air and emissions, and also because the representations played a significant role in

the value of the vehicles. As Volkswagen well knew, its customers, including Plaintiff and Idaho Subclass members, highly valued that the vehicles they were purchasing or leasing were *clean* diesel cars, and they paid accordingly.

433. Volkswagen had a duty to disclose its emissions scheme because knowledge of the scheme and its details were known and/or accessible only to Volkswagen, because Volkswagen had exclusive knowledge as to implementation and maintenance of its scheme, and because Volkswagen knew the facts were not known to or reasonably discoverable by Plaintiff or Idaho Subclass members. Volkswagen also had a duty to disclose because it made general affirmative representations about the qualities of its vehicles with respect to emissions standards, starting with references to them as *clean* diesel cars, or cars with *clean* diesel engines, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding its emissions scheme, the actual emissions of its vehicles, its actual philosophy with respect to compliance with federal and state clean air laws and emissions regulations, and its actual practices with respect to the vehicles at issue. Having volunteered to provide information to Plaintiff, Volkswagen had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the NOV II Affected Vehicles purchased or leased by Plaintiff and Idaho Subclass members. Whether a manufacturer's products comply with federal and state clean air laws and emissions regulations, and whether that manufacturer tells the truth with respect to such compliance or non-compliance, are material concerns to a consumer, including with respect to the emissions certification testing their vehicles must pass. Volkswagen represented to Plaintiff and Idaho Subclass members that they were purchasing *clean* diesel vehicles, and certification testing appeared to confirm this—except that, secretly, Volkswagen had subverted the testing process.

434. Volkswagen actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles did not or could not comply with federal and state laws governing clean air and emissions, which perception would hurt the brand's image and cost Volkswagen money, and it did so at the expense of Plaintiff and Idaho Subclass members.

435. On information and belief, Volkswagen has still not made full and adequate disclosures, and continues to defraud Plaintiff and Idaho Subclass members by concealing material information regarding the emissions qualities of its vehicles and its emissions scheme.

436. Plaintiff and Idaho Subclass members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly "clean" diesel cars manufactured by Volkswagen, and/or would not have continued to drive their heavily polluting vehicles, or would have taken other affirmative steps in light of the information concealed from them. Plaintiff's and Idaho Subclass members' actions were justified. Volkswagen was in exclusive control of the material facts, and such facts were not known to the public, Plaintiff, or Idaho Subclass members.

437. Because of the concealment and/or suppression of the facts, Plaintiff and Idaho Subclass members have sustained damage because they own vehicles that are diminished in value as a result of Volkswagen's concealment of the true quality and quantity of those vehicles' emissions and Volkswagen's failure to timely disclose the actual emissions qualities and quantities of hundreds of thousands of Volkswagen, Audi and Porsche-branded vehicles and the serious issues engendered by Volkswagen's corporate policies. Had Plaintiff and Idaho Subclass members been aware of Volkswagen's emissions scheme, and the company's callous disregard for compliance with applicable federal and state laws and regulations, Plaintiff and Idaho Subclass members who purchased or leased new or previously

owned vehicles would have paid less for their vehicles or would not have purchased or leased them at all.

438. The value of Plaintiff's and Idaho Subclass members' vehicles has diminished as a result of Volkswagen's fraudulent concealment of its emissions scheme, which has greatly tarnished the Volkswagen, Audi, and Porsche brand names attached to Plaintiff's and Idaho Subclass members' vehicles and made any reasonable consumer reluctant to purchase any of the NOV II Affected Vehicles, let alone pay what otherwise would have been fair market value for the vehicles. In addition, Class members are entitled to damages for loss of use, costs of additional fuel, costs of unused warranties, and other damages to be proved at trial.

439. Accordingly, Volkswagen is liable to Plaintiff and Idaho Subclass members for damages in an amount to be proven at trial.

440. Volkswagen's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff's and Idaho Subclass members' rights and the representations that Volkswagen made to them, in order to enrich Volkswagen. To the extent permitted under applicable law, Volkswagen's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**COUNT III**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**(IDAHO COM. CODE § 28-2-314)**

441. Plaintiff incorporates by reference all allegations of the preceding paragraphs as though fully set forth herein.

442. Plaintiff brings this Count on behalf of the Idaho Subclass.

443. Volkswagen is and was at all relevant times a merchant with respect to motor vehicles.

444. A warranty that the NOV II Affected Vehicles were in merchantable condition is implied by law in the instant transactions. These NOV II Affected

Vehicles, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which cars are used. Specifically, the NOV II Affected Vehicles are inherently defective in that they do not comply with federal and state emissions standards, rendering certain safety and emissions functions inoperative; and the CleanDiesel engine system was not adequately designed, manufactured, and tested.

445. Volkswagen was provided notice of these issues by the investigations of the EPA and individual state regulators, numerous complaints filed against it including the instant complaint, and by numerous individual letters and communications sent by Plaintiffs and other Class members before or within a reasonable amount of time after the allegations of Affected Vehicle defects became public.

446. As a direct and proximate result of Volkswagen's breach of the warranties of merchantability, Plaintiffs and the other Class members have been damaged in an amount to be proven at trial.

**COUNT IV**
**BREACH OF CONTRACT**
**(BASED ON IDAHO LAW)**

447. Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

448. Plaintiff brings this Count on behalf of new vehicle or certified preowned vehicle purchasers in the Idaho Subclass.

449. Volkswagen's misrepresentations and omissions alleged herein, including Volkswagen's failure to disclose the existence of the CleanDiesel engine system's defect and/or defective design as alleged herein, caused Plaintiff and the other Idaho Subclass members to make their purchases or leases of their NOV II Affected Vehicles. Absent those misrepresentations and omissions, Plaintiff and the other Idaho Subclass members would not have purchased or leased these NOV II Affected Vehicles, would not have purchased or leased these NOV II Affected

Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain the CleanDiesel engine system and which were not marketed as including such a system. Accordingly, Plaintiff and the other Idaho Subclass members overpaid for their NOV II Affected Vehicles and did not receive the benefit of their bargain.

450. Each and every sale or lease of a NOV II Affected Vehicle by an authorized Volkswagen dealer constitutes a contract between Volkswagen and the purchaser or lessee. Volkswagen breached these contracts by selling or leasing Plaintiff and the other Idaho Subclass members defective NOV II Affected Vehicles and by misrepresenting or failing to disclose the existence of the CleanDiesel engine system's defect and/or defective design, including information known to Volkswagen rendering each NOV II Affected Vehicle non EPA-compliant, and thus less valuable, than vehicles not equipped with a CleanDiesel engine system.

451. As a direct and proximate result of Volkswagen's breach of contract, Plaintiff and the Idaho Subclass have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

## H. Claims Brought on Behalf of the Illinois Subclass

### COUNT I
### VIOLATION OF ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT
### (815 ILCS 505/1, et seq. and 720 ILCS 295/1A)

452. Plaintiffs Samuel Clark and Morton Kent Taylor ("Plaintiffs," for purposes of all Illinois Subclass Counts) incorporate by reference all preceding allegations as though fully set forth herein.

453. This claim is brought only on behalf of the Illinois Subclass.

454. Defendants are each a "person" as that term is defined in 815 ILCS 505/1(c).

455. Plaintiffs and the Illinois Subclass are "consumers" as that term is defined in 815 ILCS 505/1(e).

456. The Illinois Consumer Fraud and Deceptive Business Practices Act ("Illinois CFA") prohibits "unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact … in the conduct of trade or commerce … whether any person has in fact been misled, deceived or damaged thereby." 815 ILCS 505/2.

457. Volkswagen participated in misleading, false, or deceptive acts that violated the Illinois CFA. By fraudulently installing the "defeat device" to make it appear that its CleanDiesel engine systems complied with EPA regulations, Volkswagen engaged in deceptive business practices prohibited by the Illinois CFA.

458. In the course of its business, Volkswagen installed the "defeat device" and concealed that its CleanDiesel systems failed EPA regulations as described herein and otherwise engaged in activities with a tendency or capacity to deceive. Volkswagen also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of NOV II Affected Vehicles.

459. Volkswagen has known of its use of the "defeat device" and the true nature of its CleanDiesel engine system for at least six years, but concealed all of that information until recently.

460. Volkswagen was also aware that it valued profits over environmental cleanliness, efficiency, and lawfulness, and that it was manufacturing, selling and distributing vehicles throughout the United States that did not comply with EPA regulations. Volkswagen concealed this information as well.

461. By failing to disclose and by actively concealing the "defeat device" and the true cleanliness and performance of the CleanDiesel engine system, by marketing its vehicles as safe, reliable, environmentally clean, efficient, and of high quality, and by presenting itself as a reputable manufacturer that valued safety, environmental cleanliness and efficiency, and stood behind its vehicles after they were sold, Volkswagen engaged in unfair and deceptive business practices in violation of the Illinois CFA.

462. In the course of Volkswagen's business, it willfully failed to disclose and actively concealed the use of the "defeat device" and true cleanliness and efficiency of the CleanDiesel engine system and serious defects discussed above. Volkswagen compounded the deception by repeatedly asserting that the NOV II Affected Vehicles were safe, reliable, environmentally clean, efficient, and of high quality, and by claiming to be a reputable manufacturer that valued safety, environmental cleanliness and efficiency, and stood behind its vehicles once they are on the road.

463. Volkswagen's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true cleanliness and efficiency of the CleanDiesel engine system, the quality of the Volkswagen, Audi, and Porsche brands, the devaluing of environmental cleanliness and integrity at Volkswagen, and the true value of the NOV II Affected Vehicles.

464. Volkswagen intentionally and knowingly misrepresented material facts regarding the NOV II Affected Vehicles with an intent to mislead Plaintiffs and the Illinois Subclass.

465. Volkswagen knew or should have known that its conduct violated the Illinois CFA.

466. As alleged above, Volkswagen made material statements about the safety, cleanliness, efficiency and reliability of the NOV II Affected Vehicles and the Volkswagen, Audi, and Porsche brands that were either false or misleading.

467. Volkswagen owed Plaintiffs a duty to disclose the true safety, cleanliness, efficiency and reliability of the NOV II Affected Vehicles and the devaluing of environmental cleanliness and integrity at Volkswagen, because Volkswagen:

a. Possessed exclusive knowledge that it valued profits over environmental cleanliness, efficiency, and lawfulness, and that it was manufacturing, selling and distributing vehicles throughout the United States that did not comply with EPA regulations;

b. Intentionally concealed the foregoing from Plaintiffs; and/or

c. Made incomplete representations about the safety, cleanliness, efficiency and reliability of the NOV II Affected Vehicles generally, and the use of the "defeat device" and true nature of the CleanDiesel engine system in particular, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

468. Because Volkswagen fraudulently concealed the "defeat device" and the true cleanliness and performance of the CleanDiesel engine system, resulting in a raft of negative publicity once the use of the "defeat device" and true characteristics of the CleanDiesel engine system finally began to be disclosed, the value of the NOV II Affected Vehicles has greatly diminished. In light of the stigma attached to those vehicles by Volkswagen's conduct, they are now worth significantly less than they otherwise would be.

469. Volkswagen's fraudulent use of the "defeat device" and its concealment of the true characteristics of the CleanDiesel engine system were material to Plaintiffs and the Illinois Subclass. A vehicle made by a reputable manufacturer of environmentally friendly vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of environmentally dirty vehicles that conceals its polluting engines rather than promptly remedying them.

470. Plaintiffs and the Illinois Subclass suffered ascertainable loss caused by Volkswagen's misrepresentations and its concealment of and failure to disclose material information. Class members who purchased the NOV II Affected Vehicles

either would have paid less for their vehicles or would not have purchased or leased them at all.

471. Volkswagen had an ongoing duty to all Volkswagen, Audi, and Porsche customers to refrain from unfair and deceptive acts or practices under the Illinois CFA. All owners of NOV II Affected Vehicles suffered ascertainable loss in the form of the diminished value of their vehicles as a result of Volkswagen's deceptive and unfair acts and practices made in the course of Volkswagen's business.

472. Volkswagen's violations present a continuing risk to Plaintiffs as well as to the general public. Volkswagen's unlawful acts and practices complained of herein affect the public interest.

473. As a direct and proximate result of Volkswagen's violations of the Illinois CFA, Plaintiffs and the Illinois Subclass have suffered injury-in-fact and/or actual damage.

474. Pursuant to 815 ILCS 505/10a(a), Plaintiffs and the Illinois Subclass seek monetary relief against Volkswagen in the amount of actual damages, as well as punitive damages because Volkswagen acted with fraud and/or malice and/or was grossly negligent.

475. Plaintiffs also seek an order enjoining Volkswagen's unfair and/or deceptive acts or practices, punitive damages, and attorneys' fees, and any other just and proper relief available under 815 ILCS § 505/1 *et seq.*

**COUNT II**
**FRAUD BY CONCEALMENT**

476. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

477. This claim is brought on behalf of the Illinois Subclass.

478. Volkswagen intentionally concealed and suppressed material facts concerning the quality of the NOV II Affected Vehicles. As alleged in this

Complaint, notwithstanding references in the very model names of the subject vehicles as "Clean Diesel," or to their engines as "TDI Clean Diesel" engines, Volkswagen engaged in a secret scheme to evade federal and state vehicle emissions standards by installing software designed to conceal its vehicles' emissions of the pollutant nitrogen oxide, which contributes to the creation of ozone and smog. The software installed on the vehicles at issue was designed nefariously to kick-in during emissions certification testing, such that the vehicles would show far lower emissions than when actually operating on the road. The result was what Volkswagen intended: vehicles passed emissions certifications by way of deliberately induced false readings. Reportedly, Volkswagen's deliberate, secret scheme resulted in noxious emissions from these vehicles at up to nine times applicable standards.

479. Plaintiffs and Illinois Subclass members reasonably relied upon Volkswagen's false representations. They had no way of knowing that Volkswagen's representations were false and gravely misleading. As alleged herein, Volkswagen employed extremely sophisticated methods of deception. Plaintiffs and Illinois Subclass members did not, and could not, unravel Volkswagen's deception on their own.

480. Volkswagen concealed and suppressed material facts concerning what is evidently the true culture of Volkswagen – one characterized by an emphasis on profits and sales above compliance with federal and state clean air laws, and emissions regulations that are meant to protect the public and consumers. It also emphasized profits and sales over the trust that Plaintiffs and Illinois Subclass members placed in its representations.

481. Necessarily, Volkswagen also took steps to ensure that its employees did not reveal the details of its scheme to regulators or consumers, including Plaintiffs and Illinois Subclass members. Volkswagen did so in order to boost the reputations of its vehicles and to falsely assure purchasers and lessors of its vehicles,

including previously owned vehicles, that Volkswagen is a reputable manufacturer that complies with applicable law, including federal and state clean air laws and emissions regulations, and that its vehicles likewise comply with applicable law and regulations. Volkswagen's false representations were material to consumers, both because they concerned the quality of the NOV II Affected Vehicles, including their compliance with applicable federal and state laws and regulations regarding clean air and emissions, and also because the representations played a significant role in the value of the vehicles. As Volkswagen well knew, its customers, including Plaintiffs and Illinois Subclass members, highly valued that the vehicles they were purchasing or leasing were clean diesel cars, and they paid accordingly.

482. Volkswagen had a duty to disclose its emissions scheme because knowledge of the scheme and its details were known and/or accessible only to Volkswagen, because Volkswagen had exclusive knowledge as to implementation and maintenance of its scheme, and because Volkswagen knew the facts were not known to or reasonably discoverable by Plaintiffs or Illinois Subclass members. Volkswagen also had a duty to disclose because it made general affirmative representations about the qualities of its vehicles with respect to emissions standards, starting with references to them as clean diesel cars, or cars with clean diesel engines, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding its emissions scheme, the actual emissions of its vehicles, its actual philosophy with respect to compliance with federal and state clean air laws and emissions regulations, and its actual practices with respect to the vehicles at issue. Having volunteered to provide information to Plaintiffs, Volkswagen had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the NOV II Affected Vehicles purchased or leased by Plaintiffs and Illinois Subclass members. Whether a manufacturer's products comply with federal and state clean air laws and emissions regulations, and whether

that manufacturer tells the truth with respect to such compliance or non-compliance, are material concerns to a consumer, including with respect to the emissions certification testing their vehicles must pass. Volkswagen represented to Plaintiffs and Illinois Subclass members that they were purchasing clean diesel vehicles, and certification testing appeared to confirm this—except that, secretly, Volkswagen had subverted the testing process.

483. Volkswagen actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles did not or could not comply with federal and state laws governing clean air and emissions, which perception would hurt the brand's image and cost Volkswagen money, and it did so at the expense of Plaintiffs and Illinois Subclass members.

484. On information and belief, Volkswagen has still not made full and adequate disclosures, and continues to defraud Plaintiffs and Illinois Subclass members by concealing material information regarding the emission qualities of its vehicles and its emissions scheme.

485. Plaintiffs and Illinois Subclass members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly "clean" diesel cars manufactured by Volkswagen, and/or would not have continued to drive their heavily polluting vehicles, or would have taken other affirmative steps in light of the information concealed from them. Plaintiffs' and Illinois Subclass members' actions were justified. Volkswagen was in exclusive control of the material facts, and such facts were not known to the public, Plaintiffs, or Illinois Subclass members.

486. Because of the concealment and/or suppression of the facts, Plaintiffs and Illinois Subclass members have sustained damage because they own vehicles that are diminished in value as a result of Volkswagen's concealment of the true quality and quantity of those vehicles' emissions and Volkswagen's failure to timely

disclose the actual emission qualities and quantities of hundreds of thousands of Volkswagen, Audi, and Porsche-branded vehicles and the serious issues engendered by Volkswagen's corporate policies. Had Plaintiff and Illinois Subclass members been aware of Volkswagen's emissions scheme, and the company's callous disregard for compliance with applicable federal and state laws and regulations, Plaintiffs and Illinois Subclass members who purchased or leased new or previously owned vehicles would have paid less for their vehicles or would not have purchased or leased them at all.

487. The value of Plaintiffs' and Illinois Subclass members' vehicles has diminished as a result of Volkswagen's fraudulent concealment of its emissions scheme, which has greatly tarnished the Volkswagen, Audi, and Porsche brand names attached to Plaintiffs' and Illinois Subclass members' vehicles and made any reasonable consumer reluctant to purchase any of the NOV II Affected Vehicles, let alone pay what otherwise would have been fair market value for the vehicles. In addition, Class members are entitled to damages for loss of use, costs of additional fuel, costs of unused warranties, and other damages to be proved at trial.

488. Accordingly, Volkswagen is liable to Plaintiffs and Illinois Subclass members for damages in an amount to be proven at trial.

489. Volkswagen's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and Illinois Subclass members' rights and the representations that Volkswagen made to them, in order to enrich Volkswagen. To the extent permitted under applicable law, Volkswagen's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT III
## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
## (810 ILL. COMP. STAT. 5/2-314 AND 5/2A-212)

490. Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

491. Plaintiffs bring this Count on behalf of the Illinois Subclass.

492. Volkswagen is and was at all relevant times a merchant with respect to motor vehicles.

493. A warranty that the NOV II Affected Vehicles were in merchantable condition is implied by law in the instant transactions. These NOV II Affected Vehicles, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which cars are used. Specifically, the NOV II Affected Vehicles are inherently defective in that they do not comply with federal and state emissions standards, rendering certain safety and emissions functions inoperative; and the CleanDiesel engine system was not adequately designed, manufactured, and tested.

494. Volkswagen was provided notice of these issues by the investigations of the EPA and individual state regulators, numerous complaints filed against it including the instant complaint, and by numerous individual letters and communications sent by Plaintiffs and other Class members before or within a reasonable amount of time after the allegations of NOV II Affected Vehicle defects became public.

495. As a direct and proximate result of Volkswagen's breach of the warranties of merchantability, Plaintiffs and the other Class members have been damaged in an amount to be proven at trial.

## COUNT IV
## BREACH OF CONTRACT
## (BASED ON ILLINOIS LAW)

496. Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

497. Plaintiffs bring this Count on behalf of new vehicle or certified pre-owned vehicle purchasers in the Illinois Subclass.

498. Volkswagen's misrepresentations and omissions alleged herein, including Volkswagen's failure to disclose the existence of the CleanDiesel engine system's defect and/or defective design as alleged herein, caused Plaintiff and the other Illinois Subclass members to make their purchases or leases of their NOV II Affected Vehicles. Absent those misrepresentations and omissions, Plaintiff and the other Illinois Subclass members would not have purchased or leased these NOV II Affected Vehicles, would not have purchased or leased these NOV II Affected Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain the CleanDiesel engine system and which were not marketed as including such a system. Accordingly, Plaintiff and the other Illinois Subclass members overpaid for their NOV II Affected Vehicles and did not receive the benefit of their bargain.

499. Each and every sale or lease of a NOV II Affected Vehicle by an authorized Volkswagen dealer constitutes a contract between Volkswagen and the purchaser or lessee. Volkswagen breached these contracts by selling or leasing Plaintiff and the other Illinois Subclass members defective NOV II Affected Vehicles and by misrepresenting or failing to disclose the existence of the CleanDiesel engine system's defect and/or defective design, including information known to Volkswagen rendering each NOV II Affected Vehicle non EPA-compliant, and thus less valuable, than vehicles not equipped with a CleanDiesel engine system.

500. As a direct and proximate result of Volkswagen's breach of contract, Plaintiff and the Illinois Subclass have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

## I. Claims Brought on Behalf of the Indiana Subclass

### COUNT I
### VIOLATION OF THE INDIANA DECEPTIVE CONSUMER SALES ACT
### (IND. CODE § 24-5-0.5-3)

501. Plaintiff Matthew Snyder ("Plaintiff," for purposes of all Indiana Subclass Counts) incorporates by reference all preceding allegations as though fully set forth herein.

502. Plaintiff intends to assert a claim under Indiana's Deceptive Consumer Sales Act ("Indiana DCSA") which prohibits a person from engaging in a "deceptive trade practice," which includes representing: "(1) That such subject of a consumer transaction has sponsorship, approval, performance, characteristics, accessories, uses, or benefits that they do not have, or that a person has a sponsorship, approval, status, affiliation, or connection it does not have; (2) That such subject of a consumer transaction is of a particular standard, quality, grade, style or model, if it is not and if the supplier knows or should reasonably know that it is not; … (7) That the supplier has a sponsorship, approval or affiliation in such consumer transaction that the supplier does not have, and which the supplier knows or should reasonably know that the supplier does not have; … (b) Any representations on or within a product or its packaging or in advertising or promotional materials which would constitute a deceptive act shall be the deceptive act both of the supplier who places such a representation thereon or therein, or who authored such materials, and such suppliers who shall state orally or in writing that such representation is true if such other supplier shall know or have reason to know that such representation was false." Plaintiffs will make a demand in satisfaction of IND. CODE § 24-5-0.5-5(a)(2), and may amend this Complaint to assert claims under the CLRA once the required six months have elapsed. This paragraph is included for purposes of notice only and is not intended to actually assert a claim under the CLRA.

## COUNT II
## FRAUD BY CONCEALMENT

503. Plaintiff realleges and incorporates by reference all paragraphs as though fully set forth herein.

504. This claim is brought on behalf of the Indiana Subclass.

505. Volkswagen intentionally concealed and suppressed material facts concerning the quality of the NOV II Affected Vehicles. As alleged in this Complaint, notwithstanding references in the very model names of the subject vehicles as “Clean Diesel,” or to their engines as “TDI Clean Diesel” engines, Volkswagen engaged in a secret scheme to evade federal and state vehicle emissions standards by installing software designed to conceal its vehicles’ emissions of the pollutant nitrogen oxide, which contributes to the creation of ozone and smog. The software installed on the vehicles at issue was designed nefariously to kick-in during emissions certification testing, such that the vehicles would show far lower emissions than when actually operating on the road. The result was what Volkswagen intended: vehicles passed emissions certifications by way of deliberately induced false readings. Reportedly, Volkswagen’s deliberate, secret scheme resulted in noxious emissions from these vehicles at up to nine times applicable standards.

506. Plaintiff and Indiana Subclass members reasonably relied upon Volkswagen’s false representations. They had no way of knowing that Volkswagen’s representations were false and gravely misleading. As alleged herein, Volkswagen employed extremely sophisticated methods of deception. Plaintiff and Indiana Subclass members did not, and could not, unravel Volkswagen’s deception on their own.

507. Volkswagen concealed and suppressed material facts concerning what is evidently the true culture of Volkswagen—one characterized by an emphasis on profits and sales above compliance with federal and state clean air laws, and

emissions regulations that are meant to protect the public and consumers. It also emphasized profits and sales over the trust that Plaintiff and Indiana Subclass members placed in its representations.

508. Necessarily, Volkswagen also took steps to ensure that its employees did not reveal the details of its scheme to regulators or consumers, including Plaintiff and Indiana Subclass members. Volkswagen did so in order to boost the reputations of its vehicles and to falsely assure purchasers and lessors of its vehicles, including previously owned vehicles, that Volkswagen is a reputable manufacturer that complies with applicable law, including federal and state clean air laws and emissions regulations, and that its vehicles likewise comply with applicable law and regulations. Volkswagen's false representations were material to consumers, both because they concerned the quality of the NOV II Affected Vehicles, including their compliance with applicable federal and state laws and regulations regarding clean air and emissions, and also because the representations played a significant role in the value of the vehicles. As Volkswagen well knew, its customers, including Plaintiff and Indiana Subclass members, highly valued that the vehicles they were purchasing or leasing were clean diesel cars, and they paid accordingly.

509. Volkswagen had a duty to disclose its emissions scheme because knowledge of the scheme and its details were known and/or accessible only to Volkswagen, because Volkswagen had exclusive knowledge as to implementation and maintenance of its scheme, and because Volkswagen knew the facts were not known to or reasonably discoverable by Plaintiff or Indiana Subclass members. Volkswagen also had a duty to disclose because it made general affirmative representations about the qualities of its vehicles with respect to emissions standards, starting with references to them as clean diesel cars, or cars with clean diesel engines, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding its emissions scheme, the actual emissions of its vehicles, its actual philosophy with respect to compliance

with federal and state clean air laws and emissions regulations, and its actual practices with respect to the vehicles at issue. Having volunteered to provide information to Plaintiffs, Volkswagen had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the NOV II Affected Vehicles purchased or leased by Plaintiff and Indiana Subclass members. Whether a manufacturer's products comply with federal and state clean air laws and emissions regulations, and whether that manufacturer tells the truth with respect to such compliance or non-compliance, are material concerns to a consumer, including with respect to the emissions certification testing their vehicles must pass. Volkswagen represented to Plaintiff and Indiana Subclass members that they were purchasing clean diesel vehicles, and certification testing appeared to confirm this—except that, secretly, Volkswagen had subverted the testing process.

510. Volkswagen actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles did not or could not comply with federal and state laws governing clean air and emissions, which perception would hurt the brand's image and cost Volkswagen money, and it did so at the expense of Plaintiff and Indiana Subclass members.

511. On information and belief, Volkswagen has still not made full and adequate disclosures, and continues to defraud Plaintiff and Indiana Subclass members by concealing material information regarding the emissions qualities of its vehicles and its emissions scheme.

512. Plaintiff and Indiana Subclass members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly "clean" diesel cars manufactured by Volkswagen, and/or would not have continued to drive their heavily polluting vehicles, or would have taken other affirmative steps in light of the information concealed from them.

Plaintiff's and Indiana Subclass members' actions were justified. Volkswagen was in exclusive control of the material facts, and such facts were not known to the public, Plaintiff, or Indiana Subclass members.

513. Because of the concealment and/or suppression of the facts, Plaintiff and Indiana Subclass members have sustained damage because they own vehicles that are diminished in value as a result of Volkswagen's concealment of the true quality and quantity of those vehicles' emissions and Volkswagen's failure to timely disclose the actual emissions qualities and quantities of hundreds of thousands of Volkswagen, Audi, and Porsche-branded vehicles and the serious issues engendered by Volkswagen's corporate policies. Had Plaintiff and Indiana Subclass members been aware of Volkswagen's emissions scheme, and the company's callous disregard for compliance with applicable federal and state laws and regulations, Plaintiff and Indiana Subclass members who purchased or leased new or previously owned vehicles would have paid less for their vehicles or would not have purchased or leased them at all.

514. The value of Plaintiff's and Indiana Subclass members' vehicles has diminished as a result of Volkswagen's fraudulent concealment of its emissions scheme, which has greatly tarnished the Volkswagen, Audi, and Porsche brand names attached to Plaintiff's and Indiana Subclass members' vehicles and made any reasonable consumer reluctant to purchase any of the NOV II Affected Vehicles, let alone pay what otherwise would have been fair market value for the vehicles. In addition, Class members are entitled to damages for loss of use, costs of additional fuel, costs of unused warranties, and other damages to be proved at trial.

515. Accordingly, Volkswagen is liable to Plaintiff and Indiana Subclass members for damages in an amount to be proven at trial.

516. Volkswagen's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff's and Indiana Subclass members' rights and the representations that Volkswagen made to

them, in order to enrich Volkswagen. To the extent permitted under applicable law, Volkswagen's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**COUNT III**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**(IND. CODE § 26-1-2-314)**

517. Plaintiff incorporates by reference all allegations of the preceding paragraphs as though fully set forth herein.

518. Plaintiff brings this Count on behalf of the Indiana Subclass.

519. Volkswagen is and was at all relevant times a merchant with respect to motor vehicles.

520. A warranty that the NOV II Affected Vehicles were in merchantable condition is implied by law in the instant transactions. These NOV II Affected Vehicles, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which cars are used. Specifically, the NOV II Affected Vehicles are inherently defective in that they do not comply with federal and state emissions standards, rendering certain safety and emissions functions inoperative; and the CleanDiesel engine system was not adequately designed, manufactured, and tested.

521. Volkswagen was provided notice of these issues by the investigations of the EPA and individual state regulators, numerous complaints filed against it including the instant complaint, and by numerous individual letters and communications sent by Plaintiffs and other Class members before or within a reasonable amount of time after the allegations of NOV II Affected Vehicle defects became public.

522. As a direct and proximate result of Volkswagen's breach of the warranties of merchantability, Plaintiffs and the other Class members have been damaged in an amount to be proven at trial.

**COUNT IV**
**BREACH OF CONTRACT**
**(BASED ON INDIANA LAW)**

523. Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

524. Plaintiff brings this Count on behalf of new vehicle or certified pre-owned vehicle purchasers in the Indiana Subclass.

525. Volkswagen's misrepresentations and omissions alleged herein, including Volkswagen's failure to disclose the existence of the CleanDiesel engine system's defect and/or defective design as alleged herein, caused Plaintiff and the other Indiana Subclass members to make their purchases or leases of their NOV II Affected Vehicles. Absent those misrepresentations and omissions, Plaintiff and the other Indiana Subclass members would not have purchased or leased these NOV II Affected Vehicles, would not have purchased or leased these NOV II Affected Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain the CleanDiesel engine system and which were not marketed as including such a system. Accordingly, Plaintiff and the other Indiana Subclass members overpaid for their NOV II Affected Vehicles and did not receive the benefit of their bargain.

526. Each and every sale or lease of a NOV II Affected Vehicle by an authorized Volkswagen dealer constitutes a contract between Volkswagen and the purchaser or lessee. Volkswagen breached these contracts by selling or leasing Plaintiff and the other Indiana Subclass members defective NOV II Affected Vehicles and by misrepresenting or failing to disclose the existence of the CleanDiesel engine system's defect and/or defective design, including information known to Volkswagen rendering each NOV II Affected Vehicle non EPA-compliant, and thus less valuable, than vehicles not equipped with a CleanDiesel engine system.

527. As a direct and proximate result of Volkswagen's breach of contract, Plaintiff and the Indiana Subclass have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

**J. Claims Brought on Behalf of the Massachusetts Subclass**

**COUNT I**
**VIOLATIONS OF THE MASSACHUSETTS CONSUMER PROTECTION ACT**
**(MASS. GEN. LAWS CH. 93A)**

528. Plaintiff Qiang Feng ("Plaintiff," for purposes of all Massachusetts Subclass Counts) incorporates by reference all preceding allegations as though fully set forth herein.

529. Plaintiff intends to assert a claim under the Massachusetts Consumer Protection Act ("MCPA"), which makes it unlawful to engage in any "[u]nfair methods of competition or deceptive acts or practices in the conduct of any trade or commerce." MASS. GEN. LAWS CH. 93A, § 2(1). Plaintiffs will make a demand in satisfaction of MASS. GEN. LAWS CH. 93A, § 9(3), and may amend this Complaint to assert claims under the MCPA once the required 30 days have elapsed. This paragraph is included for purposes of notice only and is not intended to actually assert a claim under the MCPA.

**COUNT II**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**

530. Plaintiff incorporates by reference all allegations of the preceding paragraphs as though fully set forth herein.

531. Plaintiff brings this Count on behalf of the Massachusetts Subclass.

532. Volkswagen is and was at all relevant times a merchant with respect to motor vehicles.

533. A warranty that the NOV II Affected Vehicles were in merchantable condition is implied by law in the instant transactions. These NOV II Affected Vehicles, when sold and at all times thereafter, were not in merchantable condition

and are not fit for the ordinary purpose for which cars are used. Specifically, the NOV II Affected Vehicles are inherently defective in that they do not comply with federal and state emissions standards, rendering certain safety and emissions functions inoperative; and the CleanDiesel engine system was not adequately designed, manufactured, and tested.

534. Volkswagen was provided notice of these issues by the investigations of the EPA and individual state regulators, numerous complaints filed against it including the instant complaint, and by numerous individual letters and communications sent by Plaintiffs and other Class members before or within a reasonable amount of time after the allegations of NOV II Affected Vehicle defects became public.

535. As a direct and proximate result of Volkswagen's breach of the warranties of merchantability, Plaintiffs and the other Class members have been damaged in an amount to be proven at trial.

**COUNT III**
**BREACH OF CONTRACT**
**(BASED ON MASSACHUSETTS LAW)**

536. Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

537. Plaintiff brings this Count on behalf of new vehicle or certified pre-owned vehicle purchasers in the Massachusetts Subclass.

538. Volkswagen's misrepresentations and omissions alleged herein, including Volkswagen's failure to disclose the existence of the CleanDiesel engine system's defect and/or defective design as alleged herein, caused Plaintiff and the Massachusetts Subclass members to make their purchases or leases of their NOV II Affected Vehicles. Absent those misrepresentations and omissions, Plaintiff and the Massachusetts Subclass members would not have purchased or leased these NOV II Affected Vehicles, would not have purchased or leased these NOV II Affected Vehicles at the prices they paid, and/or would have purchased or leased less

expensive alternative vehicles that did not contain the CleanDiesel engine system and which were not marketed as including such a system. Accordingly, Plaintiff and the Massachusetts Subclass members overpaid for their NOV II Affected Vehicles and did not receive the benefit of their bargain.

539. Each and every sale or lease of a NOV II Affected Vehicle by an authorized Volkswagen dealer constitutes a contract between Volkswagen and the purchaser or lessee. Volkswagen breached these contracts by selling or leasing Plaintiff and the Massachusetts Subclass members defective NOV II Affected Vehicles and by misrepresenting or failing to disclose the existence of the CleanDiesel engine system's defect and/or defective design, including information known to Volkswagen rendering each NOV II Affected Vehicle non EPA-compliant, and thus less valuable, than vehicles not equipped with a CleanDiesel engine system.

540. As a direct and proximate result of Volkswagen's breach of contract, Plaintiff and the Massachusetts Subclass have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

**COUNT IV**
**FRAUDULENT CONCEALMENT**
**(BASED ON MASSACHUSETTS LAW)**

541. Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

542. Plaintiff brings this Count on behalf of the Massachusetts Subclass.

543. Volkswagen intentionally concealed that the CleanDiesel engine systems were not EPA-compliant and used a "defeat device," or acted with reckless disregard for the truth, and denied Plaintiff and the Massachusetts Subclass members information that is highly relevant to their purchasing decision.

544. Volkswagen further affirmatively misrepresented to Plaintiff in advertising and other forms of communication, including standard and uniform

material provided with each car, that the NOV II Affected Vehicles it was selling were new, had no significant defects, complied with EPA regulations and would perform and operate properly when driven in normal usage.

545. Volkswagen knew these representations were false when made.

546. The NOV II Affected Vehicles purchased or leased by Plaintiff and the Massachusetts Subclass members were, in fact, defective, non-EPA compliant, unsafe, and unreliable because the NOV II Affected Vehicles contained faulty and defective CleanDiesel engine system, as alleged herein.

547. Volkswagen had a duty to disclose that these NOV II Affected Vehicles were defective, unsafe, non-EPA compliant and unreliable in that certain crucial emissions functions of the NOV II Affected Vehicles would be rendered inoperative due to the "defeat device" installed in the defective CleanDiesel engine system, because Plaintiff and the Massachusetts Subclass members relied on Volkswagen's material representations that the NOV II Affected Vehicles they were purchasing were safe, environmentally clean, efficient and free from defects.

548. The aforementioned concealment was material because if it had been disclosed Plaintiff and the Massachusetts Subclass members would not have bought or leased the NOV II Affected Vehicles, or would not have bought or leased those Vehicles at the prices they paid.

549. The aforementioned representations were material because they were facts that would typically be relied on by a person purchasing or leasing a new motor vehicle. Volkswagen knew or recklessly disregarded that its representations were false because it knew that it had to use the "defeat device" in order for NOV II Affected Vehicles to pass EPA emissions requirements. Volkswagen intentionally made the false statements in order to sell NOV II Affected Vehicles.

550. Plaintiff and the Massachusetts Subclass members relied on Volkswagen's reputation – along with Volkswagen's failure to disclose the faulty and defective nature of the CleanDiesel engine system and Volkswagen's

affirmative assurance that its NOV II Affected Vehicles were safe and reliable, and other similar false statements – in purchasing or leasing Volkswagen's NOV II Affected Vehicles.

551. As a result of their reliance, Plaintiff and the Massachusetts Subclass members have been injured in an amount to be proven at trial, including, but not limited to, their lost benefit of the bargain and overpayment at the time of purchase or lease and/or the diminished value of their NOV II Affected Vehicles.

552. Volkswagen's conduct was knowing, intentional, with malice, demonstrated a complete lack of care, and was in reckless disregard for the rights of Plaintiff and the Massachusetts Subclass members. Plaintiff and the Massachusetts Subclass members are therefore entitled to an award of punitive damages.

## K. Claims Brought on Behalf of the New Jersey Subclass

### COUNT I
### VIOLATIONS OF THE NEW JERSEY CONSUMER FRAUD ACT
### (N.J. STAT. ANN. §§ 56:8-1, et seq.)

553. Plaintiff Nathan Forbes ("Plaintiff," for purposes of all New Jersey Class Counts) incorporate by reference all preceding allegations as though fully set forth herein.

554. Plaintiff brings this Count on behalf of the New Jersey Subclass.

555. The New Jersey Consumer Fraud Act, N.J. STAT. ANN. §§ 56:8-1, *et seq.* ("NJ CFA"), prohibits unfair or deceptive acts or practices in the conduct of any trade or commerce.

556. In the course of Volkswagen's business, it willfully failed to disclose and actively concealed that the CleanDiesel Engine System was non-EPA compliant, and the use of the "defeat device in NOV II Affected Vehicles as described above. Accordingly, Volkswagen engaged in unfair and deceptive trade practices, including representing that NOV II Affected Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that NOV II Affected Vehicles are of a particular standard and quality when they are

not; advertising NOV II Affected Vehicles with the intent not to sell them as advertised; and otherwise engaging in conduct likely to deceive. Further, Volkswagen's acts and practices described herein offend established public policy because the harm they cause to consumers, motorists, and pedestrians outweighs any benefit associated with such practices, and because Volkswagen fraudulently concealed the defective nature of the NOV II Affected Vehicles from consumers.

557. Volkswagen's actions as set forth above occurred in the conduct of trade or commerce.

558. Volkswagen's conduct proximately caused injuries to Plaintiff and the other New Jersey Subclass members.

559. Plaintiff and the other New Jersey Subclass members were injured as a result of Volkswagen's conduct in that Plaintiff and the other New Jersey Subclass members overpaid for their NOV II Affected Vehicles and did not receive the benefit of their bargain, and their NOV II Affected Vehicles have suffered a diminution in value. These injuries are the direct and natural consequence of Volkswagen's misrepresentations and omissions.

560. Pursuant to N.J. STAT. ANN. § 56:8-20, Plaintiff will serve the New Jersey Attorney General with a copy of this Complaint.

**COUNT II**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**(N.J. STAT. ANN. § 12-A:2-314)**

561. Plaintiff incorporates by reference all allegations of the preceding paragraphs as though fully set forth herein.

562. Plaintiff brings this Count on behalf of the New Jersey Subclass.

563. Volkswagen is and was at all relevant times a merchant with respect to motor vehicles.

564. A warranty that the NOV II Affected Vehicles were in merchantable condition is implied by law in the instant transactions. These NOV II Affected Vehicles, when sold and at all times thereafter, were not in merchantable condition

and are not fit for the ordinary purpose for which cars are used. Specifically, the NOV II Affected Vehicles are inherently defective in that they do not comply with federal and state emissions standards, rendering certain safety and emissions functions inoperative; and the CleanDiesel engine system was not adequately designed, manufactured, and tested.

565. Volkswagen was provided notice of these issues by the investigations of the EPA and individual state regulators, numerous complaints filed against it including the instant complaint, and by numerous individual letters and communications sent by Plaintiffs and other Class members before or within a reasonable amount of time after the allegations of NOV II Affected Vehicle defects became public.

566. As a direct and proximate result of Volkswagen's breach of the warranties of merchantability, Plaintiffs and the other Class members have been damaged in an amount to be proven at trial.

**COUNT III**
**BREACH OF CONTRACT**
**(BASED ON NEW JERSEY LAW)**

567. Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

568. Plaintiff brings this Count on behalf of new vehicle or certified pre-owned vehicle purchasers in the New Jersey Subclass.

569. Volkswagen's misrepresentations and omissions alleged herein, including Volkswagen's failure to disclose the existence of the CleanDiesel engine system's defect and/or defective design as alleged herein, caused Plaintiff and the other New Jersey Subclass members to make their purchases or leases of their NOV II Affected Vehicles. Absent those misrepresentations and omissions, Plaintiff and the other New Jersey Subclass members would not have purchased or leased these NOV II Affected Vehicles, would not have purchased or leased these NOV II Affected Vehicles at the prices they paid, and/or would have purchased or leased

less expensive alternative vehicles that did not contain the CleanDiesel engine system and which were not marketed as including such a system. Accordingly, Plaintiff and the other New Jersey Subclass members overpaid for their NOV II Affected Vehicles and did not receive the benefit of their bargain.

570. Each and every sale or lease of a NOV II Affected Vehicle by an authorized Volkswagen dealer constitutes a contract between Volkswagen and the purchaser or lessee. Volkswagen breached these contracts by selling or leasing Plaintiff and the other New Jersey Subclass members defective NOV II Affected Vehicles and by misrepresenting or failing to disclose the existence of the CleanDiesel engine system's defect and/or defective design, including information known to Volkswagen rendering each NOV II Affected Vehicle non EPA-compliant, and thus less valuable, than vehicles not equipped with a CleanDiesel engine system.

571. As a direct and proximate result of Volkswagen's breach of contract, Plaintiff and the New Jersey Subclass have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

**COUNT IV**
**FRAUDULENT CONCEALMENT**

572. Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

573. Plaintiff brings this Count on behalf of the New Jersey Subclass.

574. Volkswagen intentionally concealed that the CleanDiesel engine systems were not EPA-compliant and used a "defeat device", or acted with reckless disregard for the truth, and denied Plaintiff and the other New Jersey Subclass members information that is highly relevant to their purchasing decision.

575. Volkswagen further affirmatively misrepresented to Plaintiff in advertising and other forms of communication, including standard and uniform

material provided with each car, that the NOV II Affected Vehicles it was selling were new, had no significant defects, complied with EPA regulations and would perform and operate properly when driven in normal usage.

576. Volkswagen knew these representations were false when made.

577. The NOV II Affected Vehicles purchased or leased by Plaintiff and the other New Jersey Subclass members were, in fact, defective, non-EPA compliant, unsafe, and unreliable because the NOV II Affected Vehicles contained faulty and defective CleanDiesel engine system, as alleged herein.

578. Volkswagen had a duty to disclose that these NOV II Affected Vehicles were defective, unsafe, non-EPA compliant and unreliable in that certain crucial emissions functions of the NOV II Affected Vehicles would be rendered inoperative due to the "defeat device" installed in the defective CleanDiesel engine system, because Plaintiff and the other New Jersey Subclass members relied on Volkswagen's material representations that the NOV II Affected Vehicles they were purchasing were safe, environmentally clean, efficient and free from defects.

579. The aforementioned concealment was material because if it had been disclosed Plaintiff and the other New Jersey Subclass members would not have bought or leased the NOV II Affected Vehicles, or would not have bought or leased those Vehicles at the prices they paid.

580. The aforementioned representations were material because they were facts that would typically be relied on by a person purchasing or leasing a new motor vehicle. Volkswagen knew or recklessly disregarded that its representations were false because it knew that it had to use the "defeat device" in order for NOV II Affected Vehicles to pass EPA emissions requirements. Volkswagen intentionally made the false statements in order to sell NOV II Affected Vehicles.

581. Plaintiff and the other New Jersey Subclass members relied on Volkswagen's reputation – along with Volkswagen's failure to disclose the faulty and defective nature of the CleanDiesel engine system and Volkswagen's

affirmative assurance that its NOV II Affected Vehicles were safe and reliable, and other similar false statements – in purchasing or leasing Volkswagen's NOV II Affected Vehicles.

582. As a result of their reliance, Plaintiff and the other New Jersey Subclass members have been injured in an amount to be proven at trial, including, but not limited to, their lost benefit of the bargain and overpayment at the time of purchase or lease and/or the diminished value of their NOV II Affected Vehicles.

583. Volkswagen's conduct was knowing, intentional, with malice, demonstrated a complete lack of care, and was in reckless disregard for the rights of Plaintiff and the other New Jersey Subclass members. Plaintiff and the other New Jersey Subclass members are therefore entitled to an award of punitive damages.

**L. Claims Brought on Behalf of the North Carolina Subclass**

**COUNT I**
**VIOLATIONS OF THE NORTH CAROLINA UNFAIR AND DECEPTIVE TRADE PRACTICES ACT**
**(N.C. GEN. STAT. §§ 75-1.1, et seq.)**

584. Plaintiff Andrew Walker ("Plaintiff," for purposes of all North Carolina Class Counts) incorporates by reference all preceding allegations as though fully set forth herein.

585. Plaintiff brings this Count on behalf of the North Carolina Subclass.

586. North Carolina's Unfair and Deceptive Trade Practices Act, N.C. GEN. STAT. §§ 75-1.1, *et seq.* ("NCUDTPA"), prohibits a person from engaging in "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce[.]" The NCUDTPA provides a private right of action for any person injured "by reason of any act or thing done by any other person, firm or corporation in violation of" the NCUDTPA. N.C. GEN. STAT. § 75-16.

587. Volkswagen's acts and practices complained of herein were performed in the course of Volkswagen's trade or business and thus occurred in or affected "commerce," as defined in N.C. GEN. STAT. § 75-1.1(b).

588. In the course of Volkswagen's business, it willfully failed to disclose and actively concealed that the CleanDiesel Engine System was non-EPA compliant, and the use of the "defeat device" in NOV II Affected Vehicles as described above. Accordingly, Volkswagen engaged in unlawful trade practices, including representing that NOV II Affected Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that NOV II Affected Vehicles are of a particular standard and quality when they are not; advertising NOV II Affected Vehicles with the intent not to sell them as advertised; and otherwise engaging in conduct likely to deceive.

589. Volkswagen's conduct proximately caused injuries to Plaintiff and the other Class members.

590. Volkswagen acted with willful and conscious disregard of the rights and safety of others, subjecting Plaintiff and the other Class members to cruel and unjust hardship as a result, such that an award of punitive damages is appropriate.

591. Plaintiff and the other Class members were injured as a result of Volkswagen's conduct in that Plaintiff and the other Class members overpaid for their NOV II Affected Vehicles and did not receive the benefit of their bargain, and their NOV II Affected Vehicles have suffered a diminution in value. These injuries are the direct and natural consequence of Volkswagen's misrepresentations and omissions.

592. Plaintiff, individually and on behalf of the other Class members, seeks treble damages pursuant to N.C. GEN. STAT. § 75-16, and an award of attorneys' fees pursuant to N.C. GEN. STAT. § 75-16.1.

**COUNT II**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**(N.C. GEN. STAT. § 25-2-314)**

593. Plaintiff incorporates by reference all allegations of the preceding paragraphs as though fully set forth herein.

594. Plaintiff brings this Count on behalf of the North Carolina Subclass.

595. Volkswagen is and was at all relevant times a merchant with respect to motor vehicles.

596. A warranty that the NOV II Affected Vehicles were in merchantable condition is implied by law in the instant transactions. These NOV II Affected Vehicles, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which cars are used. Specifically, the NOV II Affected Vehicles are inherently defective in that they do not comply with federal and state emissions standards, rendering certain safety and emissions functions inoperative; and the CleanDiesel engine system was not adequately designed, manufactured, and tested.

597. Volkswagen was provided notice of these issues by the investigations of the EPA and individual state regulators, numerous complaints filed against it including the instant complaint, and by numerous individual letters and communications sent by Plaintiffs and other Class members before or within a reasonable amount of time after the allegations of NOV II Affected Vehicle defects became public.

598. As a direct and proximate result of Volkswagen's breach of the warranties of merchantability, Plaintiffs and the other Class members have been damaged in an amount to be proven at trial.

**COUNT III**
**BREACH OF CONTRACT**
**(BASED ON NORTH CAROLINA LAW)**

599. Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

600. Plaintiff brings this Count on behalf of new vehicle or certified pre-owned vehicle purchasers in the North Carolina Class.

601. Volkswagen's misrepresentations and omissions alleged herein, including Volkswagen's failure to disclose the existence of the CleanDiesel engine system's defect and/or defective design as alleged herein, caused Plaintiff and the other North Carolina Class members to make their purchases or leases of their NOV II Affected Vehicles. Absent those misrepresentations and omissions, Plaintiff and the other North Carolina Class members would not have purchased or leased these NOV II Affected Vehicles, would not have purchased or leased these NOV II Affected Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain the CleanDiesel engine system and which were not marketed as including such a system. Accordingly, Plaintiff and the other North Carolina Class members overpaid for their NOV II Affected Vehicles and did not receive the benefit of their bargain.

602. Each and every sale or lease of a NOV II Affected Vehicle by an authorized Volkswagen dealer constitutes a contract between Volkswagen and the purchaser or lessee. Volkswagen breached these contracts by selling or leasing Plaintiff and the other North Carolina Class members defective NOV II Affected Vehicles and by misrepresenting or failing to disclose the existence of the CleanDiesel engine system's defect and/or defective design, including information known to Volkswagen rendering each NOV II Affected Vehicle non EPA-compliant, and thus less valuable, than vehicles not equipped with a CleanDiesel engine system.

603. As a direct and proximate result of Volkswagen's breach of contract, Plaintiff and the North Carolina Class have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

**COUNT IV**
**FRAUDULENT CONCEALMENT**
**(BASED ON NORTH CAROLINA LAW)**

604. Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

605. Plaintiff brings this Count on behalf of the North Carolina Class.

606. Volkswagen intentionally concealed that the CleanDiesel engine systems were not EPA-compliant and used a “defeat device,” or acted with reckless disregard for the truth, and denied Plaintiff and the other Class members information that is highly relevant to their purchasing decision.

607. Volkswagen further affirmatively misrepresented to Plaintiff in advertising and other forms of communication, including standard and uniform material provided with each car, that the NOV II Affected Vehicles it was selling were new, had no significant defects, complied with EPA regulations and would perform and operate properly when driven in normal usage.

608. Volkswagen knew these representations were false when made.

609. The NOV II Affected Vehicles purchased or leased by Plaintiff and the other Class members were, in fact, defective, non-EPA compliant, unsafe, and unreliable because the NOV II Affected Vehicles contained faulty and defective CleanDiesel engine system, as alleged herein.

610. Volkswagen had a duty to disclose that these NOV II Affected Vehicles were defective, unsafe, non-EPA compliant and unreliable in that certain crucial emissions functions of the NOV II Affected Vehicles would be rendered inoperative due to the “defeat device” installed in the defective CleanDiesel engine system, because Plaintiff and the other Class members relied on Volkswagen’s material representations that the NOV II Affected Vehicles they were purchasing were safe, environmentally clean, efficient and free from defects.

611. The aforementioned concealment was material because if it had been disclosed Plaintiff and the other Class members would not have bought or leased the

NOV II Affected Vehicles, or would not have bought or leased those Vehicles at the prices they paid.

612. The aforementioned representations were material because they were facts that would typically be relied on by a person purchasing or leasing a new motor vehicle. Volkswagen knew or recklessly disregarded that its representations were false because it knew that it had to use the "defeat device" in order for NOV II Affected Vehicles to pass EPA emissions requirements. Volkswagen intentionally made the false statements in order to sell NOV II Affected Vehicles.

613. Plaintiff and the other Class members relied on Volkswagen's reputation – along with Volkswagen's failure to disclose the faulty and defective nature of the CleanDiesel engine system and Volkswagen's affirmative assurance that its NOV II Affected Vehicles were safe and reliable, and other similar false statements – in purchasing or leasing Volkswagen's NOV II Affected Vehicles.

614. As a result of their reliance, Plaintiff and the other Class members have been injured in an amount to be proven at trial, including, but not limited to, their lost benefit of the bargain and overpayment at the time of purchase or lease and/or the diminished value of their NOV II Affected Vehicles.

615. Volkswagen's conduct was knowing, intentional, with malice, demonstrated a complete lack of care, and was in reckless disregard for the rights of Plaintiff and the other Class members. Plaintiff and the other Class members are therefore entitled to an award of punitive damages.

## M. Claims Brought on Behalf of the Ohio Subclass

### COUNT I
### VIOLATIONS OF THE CONSUMER SALES PRACTICES ACT
### (OHIO REV. CODE §§ 1345.01, et seq.)

616. Plaintiff Penghui Xue ("Plaintiff," for purposes of all Ohio Subclass Counts) incorporates by reference all preceding allegations as though fully set forth herein.

617. Plaintiff brings this Count on behalf of the Ohio Subclass.

618. Plaintiff and the other Ohio Subclass members are "consumers" as defined by the Ohio Consumer Sales Practices Act, Ohio Rev. Code § 1345.01 ("OCSPA"). Volkswagen is a "supplier" as defined by the OCSPA. Plaintiff's and the other Ohio Subclass members' purchases or leases of NOV II Affected Vehicles were "consumer transactions" as defined by the OCSPA.

619. By failing to disclose and actively concealing that the CleanDiesel engine systems were not EPA-compliant and used a "defeat device" in the NOV II Affected Vehicles, Volkswagen engaged in deceptive business practices prohibited by the OCSPA, including (1) representing that NOV II Affected Vehicles have characteristics, uses, benefits, and qualities which they do not have, (2) representing that NOV II Affected Vehicles are of a particular standard, quality, and grade when they are not, (3) advertising NOV II Affected Vehicles with the intent not to sell them as advertised, and (4) engaging in acts or practices which are otherwise unfair, misleading, false, or deceptive to the consumer.

620. As alleged above, Volkswagen made numerous material statements about the benefits and characteristics of the CleanDiesel engine system that were either false or misleading. Each of these statements contributed to the deceptive context of Volkswagen's unlawful advertising and representations as a whole.

621. Volkswagen knew that the CleanDiesel engine system in the NOV II Affected Vehicles were defectively designed or manufactured, did not comply with EPA regulations and the Clean Air Act, and were not suitable for their intended use. Volkswagen nevertheless failed to warn Plaintiff about these defects despite having a duty to do so.

622. Volkswagen owed Plaintiff a duty to disclose the defective nature of the CleanDiesel engine system in the NOV II Affected Vehicles, because Volkswagen:

i) Possessed exclusive knowledge of the defects rendering the NOV II Affected Vehicles more unreliable than similar vehicles;

ii) Intentionally concealed the use and installation of the "defeat device" that Volkswagen that it designed to hide the defects in the CleanDiesel engine system; and/or

iii) Made incomplete representations about the characteristics and performance of the CleanDiesel engine system generally, while purposefully withholding material facts from Plaintiff that contradicted these representations.

623. Volkswagen's unfair or deceptive acts or practices were likely to, and did in fact, deceive reasonable consumers, including Plaintiff, about the true performance and characteristics of the CleanDiesel engine system.

624. The Ohio Attorney General has made available for public inspection prior state court decisions which have held that the acts and omissions of Volkswagen in this Complaint, including, but not limited to, the failure to honor both implied warranties and express warranties, the making and distribution of false, deceptive, and/or misleading representations, and the concealment and/or non-disclosure of a dangerous defect, constitute deceptive sales practices in violation of the OCSPA. These cases include, but are not limited to, the following:

a. *Mason v. Mercedes Benz USA, LLC* (OPIF #10002382);

b. *State ex rel. Betty D. Montgomery v. Volkswagen Motor Co.* (OPIF #10002123);

c. *State ex rel. Betty D. Montgomery v. Bridgestone/Firestone, Inc.* (OPIF #10002025);

d. *Bellinger v. Hewlett-Packard Co.*, No. 20744, 2002 Ohio App. LEXIS 1573 (Ohio Ct. App. Apr. 10, 2002) (OPIF #10002077);

e. *Borror v. MarineMax of Ohio*, No. OT-06-010, 2007 Ohio App. LEXIS 525 (Ohio Ct. App. Feb. 9, 2007) (OPIF #10002388);

f. *State ex rel. Jim Petro v. Craftmatic Organization, Inc.* (OPIF #10002347);

g. *Mark J. Craw Volkswagen, et al. v. Joseph Airport Toyota, Inc.* (OPIF #10001586);

h. *State ex rel. William J. Brown v. Harold Lyons, et al.* (OPIF #10000304);

i. *Brinkman v. Mazda Motor of America, Inc.* (OPIF #10001427);

j. *Khouri v. Don Lewis* (OPIF #100001995);

k. *Mosley v. Performance Mitsubishi aka Automanage* (OPIF #10001326);

l. *Walls v. Harry Williams dba Butch's Auto Sales* (OPIF #10001524); and

m. *Brown v. Spears* (OPIF #10000403).

625. As a result of its violations of the OCSPA, as detailed above, Volkswagen caused actual damage to Plaintiff and, if not stopped, will continue to harm Plaintiff. Plaintiff currently owns or leases, or within the class period has owned or leased, a NOV II Affected Vehicle that is defective. Defects associated with the CleanDiesel engine system have caused the value of NOV II Affected Vehicles to decrease.

626. Plaintiff and the Class sustained damages as a result of Volkswagen's unlawful acts and are, therefore, entitled to damages and other relief as provided under the OCSPA.

627. Plaintiff also seeks court costs and attorneys' fees as a result of Volkswagen's violations of the OCSPA as provided in Ohio Rev. Code § 1345.09.

**COUNT II**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**(OHIO REV. CODE ANN. § 1302.27 (U.C.C. § 2-314))**

628. Plaintiff incorporates by reference all allegations of the preceding paragraphs as though fully set forth herein.

629. Plaintiff brings this Count on behalf of the Ohio Subclass.

630. Volkswagen is and was at all relevant times a merchant with respect to motor vehicles.

631. A warranty that the NOV II Affected Vehicles were in merchantable condition is implied by law in the instant transactions. These NOV II Affected Vehicles, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which cars are used. Specifically, the NOV II Affected Vehicles are inherently defective in that they do not comply with federal and state emissions standards, rendering certain safety and emissions

functions inoperative; and the CleanDiesel engine system was not adequately designed, manufactured, and tested.

632. Volkswagen was provided notice of these issues by the investigations of the EPA and individual state regulators, numerous complaints filed against it including the instant complaint, and by numerous individual letters and communications sent by Plaintiffs and other Class members before or within a reasonable amount of time after the allegations of NOV II Affected Vehicle defects became public.

633. As a direct and proximate result of Volkswagen's breach of the warranties of merchantability, Plaintiffs and the other Class members have been damaged in an amount to be proven at trial.

**COUNT III**
**BREACH OF CONTRACT**
**(BASED ON OHIO LAW)**

634. Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

635. Plaintiff brings this Count on behalf of new vehicle or certified pre-owned vehicle purchasers in the Ohio Subclass.

636. Volkswagen's misrepresentations and omissions alleged herein, including Volkswagen's failure to disclose the existence of the CleanDiesel engine system's defect and/or defective design as alleged herein, caused Plaintiff and the other Ohio Subclass members to make their purchases or leases of their NOV II Affected Vehicles. Absent those misrepresentations and omissions, Plaintiff and the other Ohio Subclass members would not have purchased or leased these NOV II Affected Vehicles, would not have purchased or leased these NOV II Affected Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain the CleanDiesel engine system and which were not marketed as including such a system. Accordingly, Plaintiff

and the other Ohio Subclass members overpaid for their NOV II Affected Vehicles and did not receive the benefit of their bargain.

637. Each and every sale or lease of a NOV II Affected Vehicle by an authorized Volkswagen dealer constitutes a contract between Volkswagen and the purchaser or lessee. Volkswagen breached these contracts by selling or leasing Plaintiff and the other Ohio Subclass members defective NOV II Affected Vehicles and by misrepresenting or failing to disclose the existence of the CleanDiesel engine system's defect and/or defective design, including information known to Volkswagen, rendering each NOV II Affected Vehicle non-EPA-compliant, and thus less valuable, than vehicles not equipped with a CleanDiesel engine system.

638. As a direct and proximate result of Volkswagen's breach of contract, Plaintiff and the Ohio Subclass have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

**COUNT IV**
**FRAUDULENT CONCEALMENT**
**(BASED ON OHIO LAW)**

639. Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

640. Plaintiff brings this Count on behalf of the Ohio Subclass.

641. Volkswagen intentionally concealed that the CleanDiesel engine systems were not EPA-compliant and used a "defeat device," or acted with reckless disregard for the truth, and denied Plaintiff and the other Class members information that is highly relevant to their purchasing decision.

642. Volkswagen further affirmatively misrepresented to Plaintiff in advertising and other forms of communication, including standard and uniform material provided with each car, that the NOV II Affected Vehicles it was selling were new, had no significant defects, complied with EPA regulations and would perform and operate properly when driven in normal usage.

643. Volkswagen knew these representations were false when made.

644. The NOV II Affected Vehicles purchased or leased by Plaintiff and the other Class members were, in fact, defective, non-EPA compliant, unsafe, and unreliable because the NOV II Affected Vehicles contained the faulty and defective CleanDiesel engine system, as alleged herein.

645. Volkswagen had a duty to disclose that these NOV II Affected Vehicles were defective, unsafe, non-EPA compliant and unreliable in that certain crucial emissions functions of the NOV II Affected Vehicles would be rendered inoperative due to the "defeat device" installed in the defective CleanDiesel engine system, because Plaintiff and the other Class members relied on Volkswagen's material representations that the NOV II Affected Vehicles they were purchasing were safe, environmentally clean, efficient and free from defects.

646. The aforementioned concealment was material because if it had been disclosed Plaintiff and the other Class members would not have bought or leased the NOV II Affected Vehicles, or would not have bought or leased those Vehicles at the prices they paid.

647. The aforementioned representations were material because they were facts that would typically be relied on by a person purchasing or leasing a new motor vehicle. Volkswagen knew or recklessly disregarded that its representations were false because it knew that it had to use the "defeat device" in order for NOV II Affected Vehicles to pass EPA emissions requirements. Volkswagen intentionally made the false statements in order to sell NOV II Affected Vehicles.

648. Plaintiff and the other Class members relied on Volkswagen's reputation – along with Volkswagen's failure to disclose the faulty and defective nature of the CleanDiesel engine system and Volkswagen's affirmative assurance that its NOV II Affected Vehicles were safe and reliable, and other similar false statements – in purchasing or leasing Volkswagen's NOV II Affected Vehicles.

649. As a result of their reliance, Plaintiff and the other Class members have been injured in an amount to be proven at trial, including, but not limited to, their lost benefit of the bargain and overpayment at the time of purchase or lease and/or the diminished value of their NOV II Affected Vehicles.

650. Volkswagen's conduct was knowing, intentional, with malice, demonstrated a complete lack of care, and was in reckless disregard for the rights of Plaintiff and the other Class members. Plaintiff and the other Class members are therefore entitled to an award of punitive damages.

**N. Claims Brought on Behalf of the Oregon Subclass**

**COUNT I**
**VIOLATION OF THE OREGON UNLAWFUL TRADE PRACTICES ACT (OR. REV. STAT. §§ 646.605, et seq.)**

651. Plaintiffs John Chapman and Coby Cohen ("Plaintiffs," for purposes of all Oregon Subclass Counts) incorporate by reference all preceding allegations as though fully set forth herein.

652. This claim is brought only on behalf of the Oregon Subclass.

653. Volkswagen is a person within the meaning of OR. REV. STAT. § 646.605(4).

654. The NOV II Affected Vehicles at issue are "goods" obtained primarily for personal family or household purposes within the meaning of OR. REV. STAT. § 646.605(6).

655. The Oregon Unfair Trade Practices Act ("Oregon UTPA") prohibits a person from, in the course of the person's business, doing any of the following: "(e) Represent[ing] that … goods … have … characteristics … uses, benefits, … or qualities that they do not have; (g) Represent[ing] that … goods … are of a particular standard [or] quality … if they are of another; (i) Advertis[ing] … goods or services with intent not to provide them as advertised;" and "(u) engag[ing] in any other unfair or deceptive conduct in trade or commerce." OR. REV. STAT. § 646.608(1).

656. Volkswagen engaged in unlawful trade practices, including representing that NOV II Affected Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that NOV II Affected Vehicles are of a particular standard and quality when they are not; advertising NOV II Affected Vehicles with the intent not to sell them as advertised; and engaging in other unfair or deceptive acts.

657. Volkswagen also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of NOV II Affected Vehicles.

658. Volkswagen's actions as set forth above occurred in the conduct of trade or commerce.

659. Volkswagen has known of its use of the "defeat device" and the true nature of its CleanDiesel engine system for at least six years, but concealed all of that information until recently.

660. Volkswagen was also aware that it valued profits over environmental cleanliness, efficiency, and lawfulness, and that it was manufacturing, selling and distributing vehicles throughout the United States that did not comply with EPA regulations. Volkswagen concealed this information as well.

661. By failing to disclose and by actively concealing the "defeat device" and the true cleanliness and performance of the CleanDiesel engine system, by marketing its vehicles as safe, reliable, environmentally clean, efficient, and of high quality, and by presenting itself as a reputable manufacturer that valued safety, environmental cleanliness and efficiency, and stood behind its vehicles after they were sold, Volkswagen engaged in deceptive business practices in violation of the Oregon UTPA.

662. In the course of Volkswagen's business, it willfully failed to disclose and actively concealed the use of the "defeat device" and true cleanliness and efficiency of the CleanDiesel engine system and serious defects discussed above. Volkswagen compounded the deception by repeatedly asserting that the NOV II Affected Vehicles were safe, reliable, environmentally clean, efficient, and of high quality, and by claiming to be a reputable manufacturer that valued safety, environmental cleanliness and efficiency, and stood behind its vehicles once they are on the road.

663. Volkswagen's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true cleanliness and efficiency of the CleanDiesel engine system, the quality of the Volkswagen, Audi, and Porsche brands, the devaluing of environmental cleanliness and integrity at Volkswagen, and the true value of the NOV II Affected Vehicles.

664. Volkswagen intentionally and knowingly misrepresented material facts regarding the NOV II Affected Vehicles with an intent to mislead Plaintiffs and the Oregon Subclass.

665. Volkswagen knew or should have known that its conduct violated the Oregon UTPA.

666. As alleged above, Volkswagen made material statements about the safety, cleanliness, efficiency and reliability of the NOV II Affected Vehicles that were either false or misleading.

667. Volkswagen owed Plaintiffs a duty to disclose the true safety, cleanliness, efficiency and reliability of the NOV II Affected Vehicles, and the devaluing of environmental cleanliness and integrity at Volkswagen, because Volkswagen:

a. Possessed exclusive knowledge that it valued profits over environmental cleanliness, efficiency, and lawfulness, and that it was manufacturing, selling and distributing vehicles throughout the United States that did not comply with EPA regulations;

b. Intentionally concealed the foregoing from Plaintiff; and/or

c. Made incomplete representations about the safety, cleanliness, efficiency and reliability of the NOV II Affected Vehicles generally, and the use of the "defeat device" and true nature of the CleanDiesel engine system in particular, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

668. Because Volkswagen fraudulently concealed the "defeat device" and the true cleanliness and performance of the CleanDiesel engine system, resulting in a raft of negative publicity once the use of the "defeat device" and true characteristics of the CleanDiesel engine system finally began to be disclosed, the value of the NOV II Affected Vehicles has greatly diminished. In light of the stigma attached to those vehicles by Volkswagen's conduct, they are now worth significantly less than they otherwise would be.

669. Volkswagen's fraudulent use of the "defeat device" and its concealment of the true characteristics of the CleanDiesel engine system were material to Plaintiffs and the Oregon Subclass. A vehicle made by a reputable manufacturer of environmentally friendly vehicles is worth more than an otherwise comparable vehicle made by a disreputable and dishonest manufacturer of polluting vehicles that conceals the amount its cars pollutes rather than make environmentally friendly vehicles.

670. Plaintiffs and the Oregon Subclass suffered ascertainable loss caused by Volkswagen's misrepresentations and its concealment of and failure to disclose material information.

671. Volkswagen had an ongoing duty to all Volkswagen, Audi, and Porsche customers to refrain from unfair and deceptive acts or practices under the Oregon UTPA. All owners of NOV II Affected Vehicles suffered ascertainable loss in the form of the diminished value of their vehicles as a result of Volkswagen's deceptive and unfair acts and practices that occurred in the course of Volkswagen's business.

672. Volkswagen's violations present a continuing risk to Plaintiffs as well as to the general public. Volkswagen's unlawful acts and practices complained of herein affect the public interest.

673. As a direct and proximate result of Volkswagen's violations of the Oregon UTPA, Plaintiffs and the Oregon Subclass have suffered injury-in-fact and/or actual damage.

674. Plaintiffs and the Oregon Subclass are entitled to recover the greater of actual damages or $200 pursuant to OR. REV. STAT. § 646.638(1). Plaintiffs and the Oregon Subclass are also entitled to punitive damages because Volkswagen engaged in conduct amounting to a particularly aggravated, deliberate disregard of the rights of others.

**COUNT II**
**FRAUD BY CONCEALMENT**

675. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

676. This claim is brought on behalf of the Oregon Subclass.

677. Volkswagen intentionally concealed and suppressed material facts concerning the quality of the NOV II Affected Vehicles. As alleged in this Complaint, notwithstanding references in the very model names of the subject vehicles as "Clean Diesel," or to their engines as "TDI Clean Diesel" engines, Volkswagen engaged in a secret scheme to evade federal and state vehicle emissions standards by installing software designed to conceal its vehicles' emissions of the pollutant nitrogen oxide, which contributes to the creation of ozone and smog. The software installed on the vehicles at issue was designed nefariously to kick-in during emissions certification testing, such that the vehicles would show far lower emissions than when actually operating on the road. The result was what Volkswagen intended: vehicles passed emissions certifications by way of deliberately induced false readings. Reportedly, Volkswagen's deliberate, secret

scheme resulted in noxious emissions from these vehicles at up to nine times applicable standards.

678. Plaintiffs and Class members reasonably relied upon Volkswagen's false representations. They had no way of knowing that Volkswagen's representations were false and gravely misleading. As alleged herein, Volkswagen employed extremely sophisticated methods of deception. Plaintiffs and Class members did not, and could not, unravel Volkswagen's deception on their own.

679. Volkswagen concealed and suppressed material facts concerning what is evidently the true culture of Volkswagen—one characterized by an emphasis on profits and sales above compliance with federal and state clean air laws, and emissions regulations that are meant to protect the public and consumers. It also emphasized profits and sales over the trust that Plaintiffs and Class members placed in its representations.

680. Necessarily, Volkswagen also took steps to ensure that its employees did not reveal the details of its scheme to regulators or consumers, including Plaintiffs and Class members. Volkswagen did so in order to boost the reputations of its vehicles and to falsely assure purchasers and lessors of its vehicles, including previously owned vehicles, that Volkswagen is a reputable manufacturer that complies with applicable law, including federal and state clean air laws and emissions regulations, and that its vehicles likewise comply with applicable laws and regulations. Volkswagen's false representations were material to consumers, both because they concerned the quality of the NOV II Affected Vehicles, including their compliance with applicable federal and state laws and regulations regarding clean air and emissions, and also because the representations played a significant role in the value of the vehicles. As Volkswagen well knew, its customers, including Plaintiffs and Class members, highly valued that the vehicles they were purchasing or leasing were clean diesel cars, and they paid accordingly.

681. Volkswagen had a duty to disclose its emissions scheme because knowledge of the scheme and its details were known and/or accessible only to Volkswagen, because Volkswagen had exclusive knowledge as to implementation and maintenance of its scheme, and because Volkswagen knew the facts were not known to or reasonably discoverable by Plaintiffs or Class members. Volkswagen also had a duty to disclose because it made general affirmative representations about the qualities of its vehicles with respect to emissions standards, starting with references to them as clean diesel cars, or cars with clean diesel engines, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding its emissions scheme, the actual emissions of its vehicles, its actual philosophy with respect to compliance with federal and state clean air laws and emissions regulations, and its actual practices with respect to the vehicles at issue. Having volunteered to provide information to Plaintiffs, Volkswagen had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the NOV II Affected Vehicles purchased or leased by Plaintiffs and Class members. Whether a manufacturer's products comply with federal and state clean air laws and emissions regulations, and whether that manufacturer tells the truth with respect to such compliance or non-compliance, are material concerns to a consumer, including with respect to the emissions certification testing their vehicles must pass. Volkswagen represented to Plaintiffs and Class members that they were purchasing clean diesel vehicles, and certification testing appeared to confirm this—except that, secretly, Volkswagen had subverted the testing process.

682. Volkswagen actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles did not or could not comply with federal and state laws governing clean air and emissions, which perception would hurt the brand's image and cost Volkswagen money, and it did so at the expense of Plaintiffs and Class members.

683. On information and belief, Volkswagen has still not made full and adequate disclosures, and continues to defraud Plaintiffs and Class members by concealing material information regarding the emission qualities of its vehicles and its emissions scheme.

684. Plaintiffs and Class members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly "clean" diesel cars manufactured by Volkswagen, and/or would not have continued to drive their heavily polluting vehicles, or would have taken other affirmative steps in light of the information concealed from them. Plaintiffs' and Class members' actions were justified. Volkswagen was in exclusive control of the material facts, and such facts were not known to the public, Plaintiffs, or Class members.

685. Because of the concealment and/or suppression of the facts, Plaintiffs and Class members have sustained damage because they own vehicles that are diminished in value as a result of Volkswagen's concealment of the true quality and quantity of those vehicles' emissions and Volkswagen's failure to timely disclose the actual emission qualities and quantities of hundreds of thousands of Volkswagen, Audi, and Porsche-branded vehicles and the serious issues engendered by Volkswagen's corporate policies. Had Plaintiffs and Class members been aware of Volkswagen's emissions scheme, and the company's callous disregard for compliance with applicable federal and state laws and regulations, Plaintiffs and Class members who purchased or leased new or previously owned vehicles would have paid less for their vehicles or would not have purchased or leased them at all.

686. The value of Plaintiffs' and Class members' vehicles has diminished as a result of Volkswagen's fraudulent concealment of its emissions scheme, which has greatly tarnished the Volkswagen, Audi, and Porsche brand names attached to Plaintiffs' and Class members' vehicles and made any reasonable consumer

reluctant to purchase any of the NOV II Affected Vehicles, let alone pay what otherwise would have been fair market value for the vehicles. In addition, Class members are entitled to damages for loss of use, costs of additional fuel, costs of unused warranties, and other damages to be proved at trial.

687. Accordingly, Volkswagen is liable to Plaintiffs and Class members for damages in an amount to be proven at trial.

688. Volkswagen's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and Class members' rights and the representations that Volkswagen made to them, in order to enrich Volkswagen. To the extent permitted under applicable law, Volkswagen's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**COUNT III**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**(OR. REV. STAT. § 72.3140)**

689. Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

690. Plaintiffs bring this Count on behalf of the Oregon Subclass.

691. Volkswagen is and was at all relevant times a merchant with respect to motor vehicles.

692. A warranty that the NOV II Affected Vehicles were in merchantable condition is implied by law in the instant transactions. These NOV II Affected Vehicles, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which cars are used. Specifically, the NOV II Affected Vehicles are inherently defective in that they do not comply with federal and state emissions standards, rendering certain safety and emissions functions inoperative; and the CleanDiesel engine system was not adequately designed, manufactured, and tested.

693. Volkswagen was provided notice of these issues by the investigations of the EPA and individual state regulators, numerous complaints filed against it including the instant complaint, and by numerous individual letters and communications sent by Plaintiffs and other Class members before or within a reasonable amount of time after the allegations of NOV II Affected Vehicle defects became public.

694. As a direct and proximate result of Volkswagen's breach of the warranties of merchantability, Plaintiffs and the other Class members have been damaged in an amount to be proven at trial.

**COUNT IV**
**BREACH OF CONTRACT**
**(BASED ON OREGON LAW)**

695. Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

696. Plaintiffs brings this Count on behalf of new vehicle or certified pre-owned vehicle purchasers in the Oregon Subclass.

697. Volkswagen's misrepresentations and omissions alleged herein, including Volkswagen's failure to disclose the existence of the CleanDiesel engine system's defect and/or defective design as alleged herein, caused Plaintiff and the other Oregon Subclass members to make their purchases or leases of their NOV II Affected Vehicles. Absent those misrepresentations and omissions, Plaintiffs and the other Oregon Subclass members would not have purchased or leased these NOV II Affected Vehicles, would not have purchased or leased these NOV II Affected Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain the CleanDiesel engine system and which were not marketed as including such a system. Accordingly, Plaintiffs and the other Oregon Subclass members overpaid for their NOV II Affected Vehicles and did not receive the benefit of their bargain.

698. Each and every sale or lease of a NOV II Affected Vehicle by an authorized Volkswagen dealer constitutes a contract between Volkswagen and the purchaser or lessee. Volkswagen breached these contracts by selling or leasing Plaintiffs and the other Oregon Subclass members defective NOV II Affected Vehicles and by misrepresenting or failing to disclose the existence of the CleanDiesel engine system's defect and/or defective design, including information known to Volkswagen, rendering each NOV II Affected Vehicle non-EPA-compliant, and thus less valuable, than vehicles not equipped with a CleanDiesel engine system.

699. As a direct and proximate result of Volkswagen's breach of contract, Plaintiffs and the Oregon Subclass have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

**O. Claims Brought on Behalf of the Pennsylvania Subclass**

**COUNT I**
**VIOLATION OF THE PENNSYLVANIA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW**
**(73 P.S. § 201-1, et seq.)**

700. Plaintiff Peter Harper ("Plaintiff," for purposes of all Pennsylvania Subclass Counts) incorporates by reference all preceding allegations as though fully set forth herein.

701. This claim is brought only on behalf of the Pennsylvania Subclass.

702. Plaintiff purchased his NOV II Affected Vehicles primarily for personal, family or household purposes within the meaning of 73 P.S. § 201-9.2.

703. All of the acts complained of herein were perpetrated by Volkswagen in the course of trade or commerce within the meaning of 73 P.S. § 201-2(3).

704. The Pennsylvania Unfair Trade Practices and Consumer Protection Law ("Pennsylvania CPL") prohibits unfair or deceptive acts or practices, including: (i) "Representing that goods or services have … characteristics, …. Benefits or

qualities that they do not have;" (ii) "Representing that goods or services are of a particular standard, quality or grade … if they are of another;:" (iii) "Advertising goods or services with intent not to sell them as advertised;" and (iv) "Engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or misunderstanding." 73 P.S. § 201-2(4).

705. Volkswagen engaged in unlawful trade practices, including representing that NOV II Affected Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that NOV II Affected Vehicles are of a particular standard and quality when they are not; advertising NOV II Affected Vehicles with the intent not to sell them as advertised; and engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding.

706. In the course of its business, Volkswagen installed the "defeat device" and concealed that its CleanDiesel systems failed EPA regulations as described herein and otherwise engaged in activities with a tendency or capacity to deceive. Volkswagen also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of NOV II Affected Vehicles.

707. Volkswagen has known of its use of the "defeat device" and the true nature of its CleanDiesel engine system for at least six years, but concealed all of that information until recently.

708. Volkswagen was also aware that it valued profits over environmental cleanliness, efficiency, and lawfulness, and that it was manufacturing, selling and distributing vehicles throughout the United States that did not comply with EPA regulations. Volkswagen concealed this information as well.

709. By failing to disclose and by actively concealing the "defeat device" and the true cleanliness and performance of the CleanDiesel engine system, by

marketing its vehicles as safe, reliable, environmentally clean, efficient, and of high quality, and by presenting itself as a reputable manufacturer that valued safety, environmental cleanliness and efficiency, and stood behind its vehicles after they were sold, Volkswagen engaged in unfair and deceptive business practices in violation of the Pennsylvania CPL.

710. In the course of Volkswagen's business, it willfully failed to disclose and actively concealed the use of the "defeat device" and true cleanliness and efficiency of the CleanDiesel engine system and serious defects discussed above. Volkswagen compounded the deception by repeatedly asserting that the NOV II Affected Vehicles were safe, reliable, environmentally clean, efficient, and of high quality, and by claiming to be a reputable manufacturer that valued safety, environmental cleanliness and efficiency, and stood behind its vehicles once they are on the road.

711. Volkswagen's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiff, about the true cleanliness and efficiency of the CleanDiesel engine system, the quality of the Volkswagen, Audi, and Porsche brands, the devaluing of environmental cleanliness and integrity at Volkswagen, and the true value of the NOV II Affected Vehicles.

712. Volkswagen intentionally and knowingly misrepresented material facts regarding the NOV II Affected Vehicles with an intent to mislead Plaintiff and the Pennsylvania Subclass.

713. Volkswagen knew or should have known that its conduct violated the Pennsylvania CPL.

714. As alleged above, Volkswagen made material statements about the safety, cleanliness, efficiency and reliability of the NOV II Affected Vehicles and the Volkswagen, Audi, and Porsche brands that were either false or misleading.

715. Volkswagen owed Plaintiffs a duty to disclose the true safety, cleanliness, efficiency and reliability of the NOV II Affected Vehicles and the

devaluing of environmental cleanliness and integrity at Volkswagen, because Volkswagen:

a. Possessed exclusive knowledge that it valued profits over environmental cleanliness, efficiency, and lawfulness, and that it was manufacturing, selling and distributing vehicles throughout the United States that did not comply with EPA regulations;

b. Intentionally concealed the foregoing from Plaintiff; and/or

c. Made incomplete representations about the safety, cleanliness, efficiency and reliability of the NOV II Affected Vehicles generally, and the use of the "defeat device" and true nature of the CleanDiesel engine system in particular, while purposefully withholding material facts from Plaintiff that contradicted these representations.

716. Because Volkswagen fraudulently concealed the "defeat device" and the true cleanliness and performance of the CleanDiesel engine system, resulting in a raft of negative publicity once the use of the "defeat device" and true characteristics of the CleanDiesel engine system finally began to be disclosed, the value of the NOV II Affected Vehicles has greatly diminished. In light of the stigma attached to those vehicles by Volkswagen's conduct, they are now worth significantly less than they otherwise would be.

717. Volkswagen's fraudulent use of the "defeat device" and its concealment of the true characteristics of the CleanDiesel engine system were material to Plaintiffs and the Pennsylvania Subclass. A vehicle made by a reputable manufacturer of environmentally friendly vehicles is worth more than an otherwise comparable vehicle made by a disreputable and dishonest manufacturer of polluting vehicles that conceals the amount its cars pollutes rather than make environmentally friendly vehicles.

718. Plaintiff and the Pennsylvania Subclass suffered ascertainable loss caused by Volkswagen's misrepresentations and its concealment of and failure to disclose material information.

719. Volkswagen had an ongoing duty to all Volkswagen, Audi, and Porsche customers to refrain from unfair and deceptive acts or practices under the

Pennsylvania CPL. All owners of NOV II Affected Vehicles suffered ascertainable loss in the form of the diminished value of their vehicles as a result of Volkswagen's deceptive and unfair acts and practices that occurred in the course of Volkswagen's business.

720. Volkswagen's violations present a continuing risk to Plaintiff as well as to the general public. Volkswagen's unlawful acts and practices complained of herein affect the public interest.

721. As a direct and proximate result of Volkswagen's violations of the Pennsylvania CPL, Plaintiff and the Pennsylvania Subclass have suffered injury-in-fact and/or actual damage.

722. Volkswagen is liable to Plaintiff and the Pennsylvania Subclass for treble their actual damages or $100, whichever is greater, and attorneys' fees and costs. 73 P.S. § 201-9.2(a). Plaintiff and the Pennsylvania Subclass are also entitled to an award of punitive damages given that Volkswagen's conduct was malicious, wanton, willful, oppressive, or exhibited a reckless indifference to the rights of others.

**COUNT II**
**FRAUD BY CONCEALMENT**

723. Plaintiff realleges and incorporates by reference all paragraphs as though fully set forth herein.

724. This claim is brought on behalf of the Pennsylvania Subclass.

725. Volkswagen intentionally concealed and suppressed material facts concerning the quality of the NOV II Affected Vehicles. As alleged in this Complaint, notwithstanding references in the very model names of the subject vehicles as "Clean Diesel," or to their engines as "TDI Clean Diesel" engines, Volkswagen engaged in a secret scheme to evade federal and state vehicle emissions standards by installing software designed to conceal its vehicles' emissions of the pollutant nitrogen oxide, which contributes to the creation of ozone and smog. The

software installed on the vehicles at issue was designed nefariously to kick-in during emissions certification testing, such that the vehicles would show far lower emissions than when actually operating on the road. The result was what Volkswagen intended: vehicles passed emissions certifications by way of deliberately induced false readings. Reportedly, Volkswagen's deliberate, secret scheme resulted in noxious emissions from these vehicles at up to nine times applicable standards.

726. Plaintiff and Class members reasonably relied upon Volkswagen's false representations. They had no way of knowing that Volkswagen's representations were false and gravely misleading. As alleged herein, Volkswagen employed extremely sophisticated methods of deception. Plaintiff and Class members did not, and could not, unravel Volkswagen's deception on their own.

727. Volkswagen concealed and suppressed material facts concerning what is evidently the true culture of Volkswagen—one characterized by an emphasis on profits and sales above compliance with federal and state clean air laws, and emissions regulations that are meant to protect the public and consumers. It also emphasized profits and sales over the trust that Plaintiff and Class members placed in its representations.

728. Necessarily, Volkswagen also took steps to ensure that its employees did not reveal the details of its scheme to regulators or consumers, including Plaintiff and Class members. Volkswagen did so in order to boost the reputations of its vehicles and to falsely assure purchasers and lessors of its vehicles, including previously owned vehicles, that Volkswagen is a reputable manufacturer that complies with applicable law, including federal and state clean air laws and emissions regulations, and that its vehicles likewise comply with applicable law and regulations. Volkswagen's false representations were material to consumers, both because they concerned the quality of the NOV II Affected Vehicles, including their compliance with applicable federal and state laws and regulations regarding clean

air and emissions, and also because the representations played a significant role in the value of the vehicles. As Volkswagen well knew, its customers, including Plaintiff and Class members, highly valued that the vehicles they were purchasing or leasing were clean diesel cars, and they paid accordingly.

729. Volkswagen had a duty to disclose its emissions scheme because knowledge of the scheme and its details were known and/or accessible only to Volkswagen, because Volkswagen had exclusive knowledge as to implementation and maintenance of its scheme, and because Volkswagen knew the facts were not known to or reasonably discoverable by Plaintiff or Class members. Volkswagen also had a duty to disclose because it made general affirmative representations about the qualities of its vehicles with respect to emissions standards, starting with references to them as clean diesel cars, or cars with clean diesel engines, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding its emissions scheme, the actual emissions of its vehicles, its actual philosophy with respect to compliance with federal and state clean air laws and emissions regulations, and its actual practices with respect to the vehicles at issue. Having volunteered to provide information to Plaintiffs, Volkswagen had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the NOV II Affected Vehicles purchased or leased by Plaintiff and Class members. Whether a manufacturer's products comply with federal and state clean air laws and emissions regulations, and whether that manufacturer tells the truth with respect to such compliance or non-compliance, are material concerns to a consumer, including with respect to the emissions certification testing their vehicles must pass. Volkswagen represented to Plaintiff and Class members that they were purchasing clean diesel vehicles, and certification testing appeared to confirm this—except that, secretly, Volkswagen had subverted the testing process.

730. Volkswagen actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles did not or could not comply with federal and state laws governing clean air and emissions, which perception would hurt the brand's image and cost Volkswagen money, and it did so at the expense of Plaintiff and Class members.

731. On information and belief, Volkswagen has still not made full and adequate disclosures, and continues to defraud Plaintiff and Class members by concealing material information regarding the emission qualities of its vehicles and its emissions scheme.

732. Plaintiff and Class members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly "clean" diesel cars manufactured by Volkswagen, and/or would not have continued to drive their heavily polluting vehicles, or would have taken other affirmative steps in light of the information concealed from them. Plaintiff's and Class members' actions were justified. Volkswagen was in exclusive control of the material facts, and such facts were not known to the public, Plaintiff, or Class members.

733. Because of the concealment and/or suppression of the facts, Plaintiff and Class members have sustained damage because they own vehicles that are diminished in value as a result of Volkswagen's concealment of the true quality and quantity of those vehicles' emissions and Volkswagen's failure to timely disclose the actual emission qualities and quantities of hundreds of thousands of Volkswagen, Audi, and Porsche-branded vehicles and the serious issues engendered by Volkswagen's corporate policies. Had Plaintiff and Class members been aware of Volkswagen's emissions scheme, and the company's callous disregard for compliance with applicable federal and state laws and regulations, Plaintiff and

Class members who purchased or leased new or previously owned vehicles would have paid less for their vehicles or would not have purchased or leased them at all.

734. The value of Plaintiff's and Class members' vehicles has diminished as a result of Volkswagen's fraudulent concealment of its emissions scheme, which has greatly tarnished the Volkswagen, Audi, and Porsche brand names attached to Plaintiff's and Class members' vehicles and made any reasonable consumer reluctant to purchase any of the NOV II Affected Vehicles, let alone pay what otherwise would have been fair market value for the vehicles. In addition, Class members are entitled to damages for loss of use, costs of additional fuel, costs of unused warranties, and other damages to be proved at trial.

735. Accordingly, Volkswagen is liable to Plaintiff and Class members for damages in an amount to be proven at trial.

736. Volkswagen's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff's and Class members' rights and the representations that Volkswagen made to them, in order to enrich Volkswagen. To the extent permitted under applicable law, Volkswagen's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**COUNT III**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**(13 PA. CONS. STAT. ANN. § 2314)**

737. Plaintiff incorporates by reference all allegations of the preceding paragraphs as though fully set forth herein.

738. Plaintiff brings this Count on behalf of the Pennsylvania Subclass.

739. Volkswagen is and was at all relevant times a merchant with respect to motor vehicles.

740. A warranty that the NOV II Affected Vehicles were in merchantable condition is implied by law in the instant transactions. These NOV II Affected Vehicles, when sold and at all times thereafter, were not in merchantable condition

and are not fit for the ordinary purpose for which cars are used. Specifically, the NOV II Affected Vehicles are inherently defective in that they do not comply with federal and state emissions standards, rendering certain safety and emissions functions inoperative; and the CleanDiesel engine system was not adequately designed, manufactured, and tested.

741. Volkswagen was provided notice of these issues by the investigations of the EPA and individual state regulators, numerous complaints filed against it including the instant complaint, and by numerous individual letters and communications sent by Plaintiff and other Class members before or within a reasonable amount of time after the allegations of NOV II Affected Vehicle defects became public.

742. As a direct and proximate result of Volkswagen's breach of the warranties of merchantability, Plaintiff and the other Class members have been damaged in an amount to be proven at trial.

**COUNT IV**
**BREACH OF CONTRACT**
**(BASED ON PENNSYLVANIA LAW)**

743. Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

744. Plaintiff brings this Count on behalf of new vehicle or certified pre-owned vehicle purchasers in the Pennsylvania Subclass.

745. Volkswagen's misrepresentations and omissions alleged herein, including Volkswagen's failure to disclose the existence of the CleanDiesel engine system's defect and/or defective design as alleged herein, caused Plaintiff and the other Pennsylvania Subclass members to make their purchases or leases of their NOV II Affected Vehicles. Absent those misrepresentations and omissions, Plaintiff and the other Pennsylvania Subclass members would not have purchased or leased these NOV II Affected Vehicles, would not have purchased or leased these NOV II Affected Vehicles at the prices they paid, and/or would have purchased or

leased less expensive alternative vehicles that did not contain the CleanDiesel engine system and which were not marketed as including such a system. Accordingly, Plaintiff and the other Pennsylvania Subclass members overpaid for their NOV II Affected Vehicles and did not receive the benefit of their bargain.

746. Each and every sale or lease of a NOV II Affected Vehicle by an authorized Volkswagen dealer constitutes a contract between Volkswagen and the purchaser or lessee. Volkswagen breached these contracts by selling or leasing Plaintiff and the other Pennsylvania Subclass members defective NOV II Affected Vehicles and by misrepresenting or failing to disclose the existence of the CleanDiesel engine system's defect and/or defective design, including information known to Volkswagen rendering each NOV II Affected Vehicle non-EPA-compliant, and thus less valuable, than vehicles not equipped with a CleanDiesel engine system.

747. As a direct and proximate result of Volkswagen's breach of contract, Plaintiff and the Pennsylvania Subclass have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

## P. Claims Brought on Behalf of the Rhode Island Subclass

### COUNT I
### VIOLATION OF THE RHODE ISLAND UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION ACT
### (R.I. GEN. LAWS § 6-13.1, et seq.)

748. Plaintiff Paul-Matthieu Coste ("Plaintiff," for purposes of all Rhode Island Subclass Counts) incorporates by reference all preceding allegations as though fully set forth herein.

749. This claim is brought on behalf of the Rhode Island Subclass.

750. Plaintiff who purchased a NOV II Affected Vehicle primarily for personal, family, or household purposes within the meaning of R.I. GEN. LAWS § 6-13.1-5.2(a).

751. Rhode Island's Unfair Trade Practices and Consumer Protection Act ("Rhode Island CPA") prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce" including: "(v) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have"; "(vii) Representing that goods or services are of a particular standard, quality, or grade …, if they are of another"; "(ix) Advertising goods or services with intent not to sell them as advertised"; "(xii) Engaging in any other conduct that similarly creates a likelihood of confusion or of misunderstanding"; "(xiii) Engaging in any act or practice that is unfair or deceptive to the consumer"; and "(xiv) Using any other methods, acts or practices which mislead or deceive members of the public in a material respect." R.I. GEN. LAWS § 6-13.1-1(6).

752. Volkswagen engaged in unlawful trade practices, including: (1) representing that the NOV II Affected Vehicles have characteristics, uses, benefits, and qualities which they do not have; (2) representing that the NOV II Affected Vehicles are of a particular standard and quality when they are not; (3) advertising the NOV II Affected Vehicles with the intent not to sell them as advertised; and (4) otherwise engaging in conduct that is unfair or deceptive and likely to deceive.

753. Volkswagen's actions as set forth above occurred in the conduct of trade or commerce.

754. In the course of its business, Volkswagen installed the "defeat device" and concealed that its CleanDiesel systems failed EPA regulations as described herein and otherwise engaged in activities with a tendency or capacity to deceive. Volkswagen also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of NOV II Affected Vehicles.

755. Volkswagen has known of its use of the "defeat device" and the true nature of its CleanDiesel engine system for at least six years, but concealed all of that information until recently.

756. Volkswagen was also aware that it valued profits over environmental cleanliness, efficiency, and lawfulness, and that it was manufacturing, selling and distributing vehicles throughout the United States that did not comply with EPA regulations. Volkswagen concealed this information as well.

757. By failing to disclose and by actively concealing the "defeat device" and the true cleanliness and performance of the CleanDiesel engine system, by marketing its vehicles as safe, reliable, environmentally clean, efficient, and of high quality, and by presenting itself as a reputable manufacturer that valued safety, environmental cleanliness and efficiency, and stood behind its vehicles after they were sold, Volkswagen engaged in unfair and deceptive business practices in violation of the Rhode Island CPA.

758. In the course of Volkswagen's business, it willfully failed to disclose and actively concealed the use of the "defeat device" and true cleanliness and efficiency of the CleanDiesel engine system and serious defects discussed above. Volkswagen compounded the deception by repeatedly asserting that the NOV II Affected Vehicles were safe, reliable, environmentally clean, efficient, and of high quality, and by claiming to be a reputable manufacturer that valued safety, environmental cleanliness and efficiency, and stood behind its vehicles once they are on the road.

759. Volkswagen's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiff, about the true cleanliness and efficiency of the CleanDiesel engine system, the quality of the Volkswagen, Audi, and Porsche brands, the devaluing of environmental cleanliness and integrity at Volkswagen, and the true value of the NOV II Affected Vehicles.

760. Volkswagen intentionally and knowingly misrepresented material facts regarding the NOV II Affected Vehicles with an intent to mislead Plaintiff and the Rhode Island Class.

761. Volkswagen knew or should have known that its conduct violated the Rhode Island CPA.

762. As alleged above, Volkswagen made material statements about the safety, cleanliness, efficiency and reliability of the NOV II Affected Vehicles and the Volkswagen, Audi, and Porsche brands that were either false or misleading.

763. Volkswagen owed Plaintiff a duty to disclose the true safety, cleanliness, efficiency and reliability of the NOV II Affected Vehicles and the devaluing of environmental cleanliness and integrity at Volkswagen, because Volkswagen:

a. Possessed exclusive knowledge that it valued profits over environmental cleanliness, efficiency, and lawfulness, and that it was manufacturing, selling and distributing vehicles throughout the United States that did not comply with EPA regulations;

b. Intentionally concealed the foregoing from Plaintiff; and/or

c. Made incomplete representations about the safety, cleanliness, efficiency and reliability of the NOV II Affected Vehicles generally, and the use of the "defeat device" and true nature of the CleanDiesel engine system in particular, while purposefully withholding material facts from Plaintiff that contradicted these representations.

764. Because Volkswagen fraudulently concealed the "defeat device" and the true cleanliness and performance of the CleanDiesel engine system, resulting in a raft of negative publicity once the use of the "defeat device" and true characteristics of the CleanDiesel engine system finally began to be disclosed, the value of the NOV II Affected Vehicles has greatly diminished. In light of the stigma attached to those vehicles by Volkswagen's conduct, they are now worth significantly less than they otherwise would be.

765. Volkswagen's fraudulent use of the "defeat device" and its concealment of the true characteristics of the CleanDiesel engine system were

material to Plaintiffs and the Rhode Island Class. A vehicle made by a reputable manufacturer of environmentally friendly vehicles is worth more than an otherwise comparable vehicle made by a disreputable and dishonest manufacturer of polluting vehicles that conceals the amount its cars pollutes rather than make environmentally friendly vehicles.

766. Plaintiff and the Rhode Island Class suffered ascertainable loss caused by Volkswagen's misrepresentations and its concealment of and failure to disclose material information. Class members who purchased the NOV II Affected Vehicles either would have paid less for their vehicles or would not have purchased or leased them at all.

767. Volkswagen's unlawful acts and practices complained of herein affect the public interest.

768. As a direct and proximate result of Volkswagen's violations of the Rhode Island CPA, Plaintiff and the Rhode Island Class have suffered injury-in-fact and/or actual damage.

769. Plaintiff and the Rhode Island Class are entitled to recover the greater of actual damages or $200 pursuant to R.I. GEN. LAWS § 6-13.1-5.2(a). Plaintiff also seeks punitive damages in the discretion of the Court because of Volkswagen's egregious disregard of consumer and public safety and its long-running concealment of the serious safety defects and their tragic consequences.

## COUNT II
## FRAUD BY CONCEALMENT

770. Plaintiff realleges and incorporates by reference all paragraphs as though fully set forth herein.

771. This claim is brought on behalf of the Rhode Island Subclass.

772. Volkswagen intentionally concealed and suppressed material facts concerning the quality of the NOV II Affected Vehicles. As alleged in this Complaint, notwithstanding references in the very model names of the subject

vehicles as "Clean Diesel," or to their engines as "TDI Clean Diesel" engines, Volkswagen engaged in a secret scheme to evade federal and state vehicle emissions standards by installing software designed to conceal its vehicles' emissions of the pollutant nitrogen oxide, which contributes to the creation of ozone and smog. The software installed on the vehicles at issue was designed nefariously to kick-in during emissions certification testing, such that the vehicles would show far lower emissions than when actually operating on the road. The result was what Volkswagen intended: vehicles passed emissions certifications by way of deliberately induced false readings. Reportedly, Volkswagen's deliberate, secret scheme resulted in noxious emissions from these vehicles up to nine times applicable standards.

773. Plaintiff and Class members reasonably relied upon Volkswagen's false representations. They had no way of knowing that Volkswagen's representations were false and gravely misleading. As alleged herein, Volkswagen employed extremely sophisticated methods of deception. Plaintiff and Class members did not, and could not, unravel Volkswagen's deception on their own.

774. Volkswagen concealed and suppressed material facts concerning what is evidently the true culture of Volkswagen—one characterized by an emphasis on profits and sales above compliance with federal and state clean air laws, and emissions regulations that are meant to protect the public and consumers. It also emphasized profits and sales over the trust that Plaintiff and Class members placed in its representations.

775. Necessarily, Volkswagen also took steps to ensure that its employees did not reveal the details of its scheme to regulators or consumers, including Plaintiff and Class members. Volkswagen did so in order to boost the reputations of its vehicles and to falsely assure purchasers and lessors of its vehicles, including previously owned vehicles, that Volkswagen is a reputable manufacturer that complies with applicable law, including federal and state clean air laws and

emissions regulations, and that its vehicles likewise comply with applicable law and regulations. Volkswagen's false representations were material to consumers, both because they concerned the quality of the NOV II Affected Vehicles, including their compliance with applicable federal and state laws and regulations regarding clean air and emissions, and also because the representations played a significant role in the value of the vehicles. As Volkswagen well knew, its customers, including Plaintiff and Class members, highly valued that the vehicles they were purchasing or leasing were clean diesel cars, and they paid accordingly.

776. Volkswagen had a duty to disclose its emissions scheme because knowledge of the scheme and its details were known and/or accessible only to Volkswagen, because Volkswagen had exclusive knowledge as to implementation and maintenance of its scheme, and because Volkswagen knew the facts were not known to or reasonably discoverable by Plaintiff or Class members. Volkswagen also had a duty to disclose because it made general affirmative representations about the qualities of its vehicles with respect to emissions standards, starting with references to them as clean diesel cars, or cars with clean diesel engines, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding its emissions scheme, the actual emissions of its vehicles, its actual philosophy with respect to compliance with federal and state clean air laws and emissions regulations, and its actual practices with respect to the vehicles at issue. Having volunteered to provide information to Plaintiff, Volkswagen had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the NOV II Affected Vehicles purchased or leased by Plaintiff and Class members. Whether a manufacturer's products comply with federal and state clean air laws and emissions regulations, and whether that manufacturer tells the truth with respect to such compliance or non-compliance, are material concerns to a consumer, including with respect to the emissions certification testing their vehicles must pass. Volkswagen

represented to Plaintiff and Class members that they were purchasing clean diesel vehicles, and certification testing appeared to confirm this—except that, secretly, Volkswagen had subverted the testing process.

777. Volkswagen actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles did not or could not comply with federal and state laws governing clean air and emissions, which perception would hurt the brand's image and cost Volkswagen money, and it did so at the expense of Plaintiff and Class members.

778. On information and belief, Volkswagen has still not made full and adequate disclosures, and continues to defraud Plaintiff and Class members by concealing material information regarding the emissions qualities of its vehicles and its emissions scheme.

779. Plaintiff and Class members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly "clean" diesel cars manufactured by Volkswagen, and/or would not have continued to drive their heavily polluting vehicles, or would have taken other affirmative steps in light of the information concealed from them. Plaintiff's and Class members' actions were justified. Volkswagen was in exclusive control of the material facts, and such facts were not known to the public, Plaintiff, or Class members.

780. Because of the concealment and/or suppression of the facts, Plaintiff and Class members have sustained damage because they own vehicles that are diminished in value as a result of Volkswagen's concealment of the true quality and quantity of those vehicles' emissions and Volkswagen's failure to timely disclose the actual emissions qualities and quantities of hundreds of thousands of Volkswagen, Audi, and Porsche-branded vehicles and the serious issues engendered by Volkswagen's corporate policies. Had Plaintiff and Class members been aware

of Volkswagen's emissions scheme, and the company's callous disregard for compliance with applicable federal and state laws and regulations, Plaintiff and Class members who purchased or leased new or previously owned vehicles would have paid less for their vehicles or would not have purchased or leased them at all.

781. The value of Plaintiff's and Class Members' vehicles has diminished as a result of Volkswagen's fraudulent concealment of its emissions scheme, which has greatly tarnished the Volkswagen, Audi, and Porsche brand names attached to Plaintiff's and Class members' vehicles and made any reasonable consumer reluctant to purchase any of the NOV II Affected Vehicles, let alone pay what otherwise would have been fair market value for the vehicles. In addition, Class members are entitled to damages for loss of use, costs of additional fuel, costs of unused warranties, and other damages to be proved at trial.

782. Accordingly, Volkswagen is liable to Plaintiff and Class members for damages in an amount to be proven at trial.

783. Volkswagen's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff's and Class members' rights and the representations that Volkswagen made to them, in order to enrich Volkswagen. To the extent permitted under applicable law, Volkswagen's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT III
## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
## (R.I. GEN. LAWS § 6A-2-314)

784. Plaintiff incorporates by reference all allegations of the preceding paragraphs as though fully set forth herein.

785. Plaintiff brings this Count on behalf of the Rhode Island Subclass.

786. Volkswagen is and was at all relevant times a merchant with respect to motor vehicles.

787. A warranty that the NOV II Affected Vehicles were in merchantable condition is implied by law in the instant transaction. These NOV II Affected Vehicles, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which cars are used. Specifically, the NOV II Affected Vehicles are inherently defective in that they do not comply with federal and state emissions standards, rendering certain safety and emissions functions inoperative; and the CleanDiesel engine system was not adequately designed, manufactured, and tested.

788. Volkswagen was provided notice of these issues by the investigations of the EPA and individual state regulators, numerous complaints filed against it including the instant complaint, and by numerous individual letters and communications sent by Plaintiff and other Class members before or within a reasonable amount of time after the allegations of NOV II Affected Vehicle defects became public.

789. As a direct and proximate result of Volkswagen's breach of the warranties of merchantability, Plaintiffs and the other Class members have been damaged in an amount to be proven at trial.

**COUNT IV**
**BREACH OF CONTRACT**
**(BASED ON RHODE ISLAND LAW)**

790. Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

791. Plaintiff brings this Count on behalf of new vehicle or certified pre-owned vehicle purchasers in the Rhode Island Subclass.

792. Volkswagen's misrepresentations and omissions alleged herein, including Volkswagen's failure to disclose the existence of the CleanDiesel engine system's defect and/or defective design as alleged herein, caused Plaintiff and the other Rhode Island Subclass members to make their purchases or leases of their NOV II Affected Vehicles. Absent those misrepresentations and omissions,

Plaintiff and the other Rhode Island Subclass members would not have purchased or leased these NOV II Affected Vehicles, would not have purchased or leased these NOV II Affected Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain the CleanDiesel engine system and which were not marketed as including such a system. Accordingly, Plaintiff and the other Rhode Island Subclass members overpaid for their NOV II Affected Vehicles and did not receive the benefit of their bargain.

793. Each and every sale or lease of a NOV II Affected Vehicle by an authorized Volkswagen dealer constitutes a contract between Volkswagen and the purchaser or lessee. Volkswagen breached these contracts by selling or leasing Plaintiff and the other Rhode Island Subclass members defective NOV II Affected Vehicles and by misrepresenting or failing to disclose the existence of the CleanDiesel engine system's defect and/or defective design, including information known to Volkswagen rendering each NOV II Affected Vehicle non EPA-compliant, and thus less valuable, than vehicles not equipped with a CleanDiesel engine system.

794. As a direct and proximate result of Volkswagen's breach of contract, Plaintiff and the Rhode Island Subclass have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

## Q. Claims Brought on Behalf of the Texas Subclass

### COUNT I
### VIOLATIONS OF THE DECEPTIVE TRADE PRACTICES ACT
### (TEX. BUS. & COM. CODE §§ 17.41, et seq.)

795. Plaintiff Jeremy Coder ("Plaintiff," for purposes of all Texas Subclass Counts) incorporate by reference all preceding allegations as though fully set forth herein.

796. Plaintiff intends to assert a claim under the Texas Deceptive Trade Practices Act ("TDTPA"), which makes it unlawful to commit "[f]alse, misleading,

or deceptive acts or practices in the conduct of any trade or commerce." TEX. BUS. & COM. CODE § 17.46. Plaintiffs will make a demand in satisfaction of TEX. BUS. & COM. CODE § 17.45(2), and may amend this Complaint to assert claims under the TDTPA once the required 60 days have elapsed. This paragraph is included for purposes of notice only and is not intended to actually assert a claim under the TDTPA.

**COUNT II**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**(TEX. BUS. & COM. CODE § 2.314)**

797. Plaintiff incorporates by reference all allegations of the preceding paragraphs as though fully set forth herein.

798. Plaintiff brings this Count on behalf of the Texas Subclass.

799. Volkswagen is and was at all relevant times a merchant with respect to motor vehicles.

800. A warranty that the NOV II Affected Vehicles were in merchantable condition is implied by law in the instant transactions. These NOV II Affected Vehicles, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which cars are used. Specifically, the NOV II Affected Vehicles are inherently defective in that they do not comply with federal and state emissions standards, rendering certain safety and emissions functions inoperative; and the CleanDiesel engine system was not adequately designed, manufactured, and tested.

801. Volkswagen was provided notice of these issues by the investigations of the EPA and individual state regulators, numerous complaints filed against it including the instant complaint, and by numerous individual letters and communications sent by Plaintiffs and other Class members before or within a reasonable amount of time after the allegations of NOV II Affected Vehicle defects became public.

802. As a direct and proximate result of Volkswagen's breach of the warranties of merchantability, Plaintiff and the other Class members have been damaged in an amount to be proven at trial.

**COUNT III**
**BREACH OF CONTRACT**
**(BASED ON TEXAS LAW)**

803. Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

804. Plaintiff brings this Count on behalf of new vehicle or certified pre-owned vehicle purchasers in the Texas Subclass.

805. Volkswagen's misrepresentations and omissions alleged herein, including Volkswagen's failure to disclose the existence of the CleanDiesel engine system's defect and/or defective design as alleged herein, caused Plaintiff and the other Texas Subclass members to make their purchases or leases of their NOV II Affected Vehicles. Absent those misrepresentations and omissions, Plaintiff and the other Texas Subclass members would not have purchased or leased these NOV II Affected Vehicles, would not have purchased or leased these NOV II Affected Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain the CleanDiesel engine system and which were not marketed as including such a system. Accordingly, Plaintiff and the other Texas Subclass members overpaid for their NOV II Affected Vehicles and did not receive the benefit of their bargain.

806. Each and every sale or lease of a NOV II Affected Vehicle by an authorized Volkswagen dealer constitutes a contract between Volkswagen and the purchaser or lessee. Volkswagen breached these contracts by selling or leasing Plaintiff and the other Texas Subclass members defective NOV II Affected Vehicles and by misrepresenting or failing to disclose the existence of the CleanDiesel engine system's defect and/or defective design, including information known to

Volkswagen rendering each NOV II Affected Vehicle non EPA-compliant, and thus less valuable, than vehicles not equipped with a CleanDiesel engine system.

807. As a direct and proximate result of Volkswagen's breach of contract, Plaintiff and the Texas Subclass have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

## COUNT IV
## FRAUD BY CONCEALMENT

808. Plaintiff realleges and incorporates by reference all paragraphs as though fully set forth herein.

809. This claim is brought on behalf of the Texas Subclass.

810. Volkswagen intentionally concealed and suppressed material facts concerning the quality of the NOV II Affected Vehicles. As alleged in this Complaint, notwithstanding references in the very model names of the subject vehicles as "Clean Diesel," or to their engines as "TDI Clean Diesel" engines, Volkswagen engaged in a secret scheme to evade federal and state vehicle emissions standards by installing software designed to conceal its vehicles' emissions of the pollutant nitrogen oxide, which contributes to the creation of ozone and smog. The software installed on the vehicles at issue was designed nefariously to kick-in during emissions certification testing, such that the vehicles would show far lower emissions than when actually operating on the road. The result was what Volkswagen intended: vehicles passed emissions certifications by way of deliberately induced false readings. Reportedly, Volkswagen's deliberate, secret scheme resulted in noxious emissions from these vehicles at up to nine times applicable standards.

811. Plaintiff and Class members reasonably relied upon Volkswagen's false representations. They had no way of knowing that Volkswagen's representations were false and gravely misleading. As alleged herein, Volkswagen employed

extremely sophisticated methods of deception. Plaintiff and Class members did not, and could not, unravel Volkswagen's deception on their own.

812. Volkswagen concealed and suppressed material facts concerning what is evidently the true culture of Volkswagen—one characterized by an emphasis on profits and sales above compliance with federal and state clean air laws, and emissions regulations that are meant to protect the public and consumers. It also emphasized profits and sales over the trust that Plaintiff and Class members placed in its representations.

813. Necessarily, Volkswagen also took steps to ensure that its employees did not reveal the details of its scheme to regulators or consumers, including Plaintiff and Class members. Volkswagen did so in order to boost the reputations of its vehicles and to falsely assure purchasers and lessors of its vehicles, including previously owned vehicles, that Volkswagen is a reputable manufacturer that complies with applicable law, including federal and state clean air laws and emissions regulations, and that its vehicles likewise comply with applicable law and regulations. Volkswagen's false representations were material to consumers, both because they concerned the quality of the NOV II Affected Vehicles, including their compliance with applicable federal and state laws and regulations regarding clean air and emissions, and also because the representations played a significant role in the value of the vehicles. As Volkswagen well knew, its customers, including Plaintiff and Class members, highly valued that the vehicles they were purchasing or leasing were clean diesel cars, and they paid accordingly.

814. Volkswagen had a duty to disclose its emissions scheme because knowledge of the scheme and its details were known and/or accessible only to Volkswagen, because Volkswagen had exclusive knowledge as to implementation and maintenance of its scheme, and because Volkswagen knew the facts were not known to or reasonably discoverable by Plaintiff or Class members. Volkswagen also had a duty to disclose because it made general affirmative representations about

the qualities of its vehicles with respect to emissions standards, starting with references to them as clean diesel cars, or cars with clean diesel engines, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding its emissions scheme, the actual emissions of its vehicles, its actual philosophy with respect to compliance with federal and state clean air laws and emissions regulations, and its actual practices with respect to the vehicles at issue. Having volunteered to provide information to Plaintiff, Volkswagen had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the NOV II Affected Vehicles purchased or leased by Plaintiff and Class members. Whether a manufacturer's products comply with federal and state clean air laws and emissions regulations, and whether that manufacturer tells the truth with respect to such compliance or non-compliance, are material concerns to a consumer, including with respect to the emissions certification testing their vehicles must pass. Volkswagen represented to Plaintiff and Class members that they were purchasing clean diesel vehicles, and certification testing appeared to confirm this—except that, secretly, Volkswagen had subverted the testing process.

815. Volkswagen actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles did not or could not comply with federal and state laws governing clean air and emissions, which perception would hurt the brand's image and cost Volkswagen money, and it did so at the expense of Plaintiff and Class members.

816. On information and belief, Volkswagen has still not made full and adequate disclosures, and continues to defraud Plaintiff and Class members by concealing material information regarding the emission qualities of its vehicles and its emissions scheme.

817. Plaintiff and Class members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of

the concealed and/or suppressed facts, in that they would not have purchased purportedly "clean" diesel cars manufactured by Volkswagen, and/or would not have continued to drive their heavily polluting vehicles, or would have taken other affirmative steps in light of the information concealed from them. Plaintiff's and Class members' actions were justified. Volkswagen was in exclusive control of the material facts, and such facts were not known to the public, Plaintiff, or Class members.

818. Because of the concealment and/or suppression of the facts, Plaintiff and Class members have sustained damage because they own vehicles that are diminished in value as a result of Volkswagen's concealment of the true quality and quantity of those vehicles' emissions and Volkswagen's failure to timely disclose the actual emission qualities and quantities of hundreds of thousands of Volkswagen, Audi, and Porsche-branded vehicles and the serious issues engendered by Volkswagen's corporate policies. Had Plaintiff and Class members been aware of Volkswagen's emissions scheme, and the company's callous disregard for compliance with applicable federal and state laws and regulations, Plaintiff and Class members who purchased or leased new or previously owned vehicles would have paid less for their vehicles or would not have purchased or leased them at all.

819. The value of Plaintiff's and Class members' vehicles has diminished as a result of Volkswagen's fraudulent concealment of its emissions scheme, which has greatly tarnished the Volkswagen, Audi, and Porsche brand names attached to Plaintiff's and Class members' vehicles and made any reasonable consumer reluctant to purchase any of the NOV II Affected Vehicles, let alone pay what otherwise would have been fair market value for the vehicles. In addition, Class members are entitled to damages for loss of use, costs of additional fuel, costs of unused warranties, and other damages to be proved at trial.

820. Accordingly, Volkswagen is liable to Plaintiff and Class members for damages in an amount to be proven at trial.

821. Volkswagen's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff's and Class members' rights and the representations that Volkswagen made to them, in order to enrich Volkswagen. To the extent permitted under applicable law, Volkswagen's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**R. Claims Brought on Behalf of the Vermont Subclass**

**COUNT I**
**VIOLATION OF VERMONT CONSUMER FRAUD ACT**
**(VT. STAT. ANN. TIT. 9, § 2451, et seq.)**

822. Plaintiff Susan Keohan ("Plaintiff," for purposes of all Vermont Subclass Counts) incorporates by reference all preceding allegations as though fully set forth herein.

823. This claim is brought on behalf of the Vermont Subclass.

824. Volkswagen is a seller within the meaning of VT. STAT. ANN. TIT. 9, § 2451(a)(c).

825. The Vermont Consumer Fraud Act ("Vermont CFA") makes unlawful "[u]nfair methods of competition in commerce, and unfair or deceptive acts or practices in commerce...." VT. STAT. ANN. TIT. 9, § 2453(a). Volkswagen engaged in unfair and deceptive acts or practices in trade or commerce in violation of the Vermont CFA by fraudulently installing the "defeat device" to make it appear that its CleanDiesel engine systems complied with EPA regulations.

826. In the course of its business, Volkswagen installed the "defeat device" and concealed that its CleanDiesel systems failed EPA regulations as described herein and otherwise engaged in activities with a tendency or capacity to deceive. Volkswagen also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of NOV II Affected Vehicles.

827. Volkswagen has known of its use of the “defeat device” and the true nature of its CleanDiesel engine system for at least six years, but concealed all of that information until recently.

828. Volkswagen was also aware that it valued profits over environmental cleanliness, efficiency, and lawfulness, and that it was manufacturing, selling and distributing vehicles throughout the United States that did not comply with EPA regulations. Volkswagen concealed this information as well.

829. By failing to disclose and by actively concealing the “defeat device” and the true cleanliness and performance of the CleanDiesel engine system, by marketing its vehicles as safe, reliable, environmentally clean, efficient, and of high quality, and by presenting itself as a reputable manufacturer that valued safety, environmental cleanliness and efficiency, and stood behind its vehicles after they were sold, Volkswagen engaged in unfair and deceptive business practices in violation of the Vermont CFA.

830. In the course of Volkswagen’s business, it willfully failed to disclose and actively concealed the use of the “defeat device” and true cleanliness and efficiency of the CleanDiesel engine system and serious defects discussed above. Volkswagen compounded the deception by repeatedly asserting that the NOV II Affected Vehicles were safe, reliable, environmentally clean, efficient, and of high quality, and by claiming to be a reputable manufacturer that valued safety, environmental cleanliness and efficiency, and stood behind its vehicles once they are on the road.

831. Volkswagen’s unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiff, about the true cleanliness and efficiency of the CleanDiesel engine system, the quality of the Volkswagen, Audi, and Porsche brands, the devaluing of environmental cleanliness and integrity at Volkswagen, and the true value of the NOV II Affected Vehicles.

832. Volkswagen intentionally and knowingly misrepresented material facts regarding the NOV II Affected Vehicles with an intent to mislead Plaintiff and the Vermont Subclass.

833. Volkswagen knew or should have known that its conduct violated the Vermont CFA.

834. As alleged above, Volkswagen made material statements about the safety, cleanliness, efficiency and reliability of the NOV II Affected Vehicles and the Volkswagen, Audi, and Porsche brands that were either false or misleading.

835. Volkswagen owed Plaintiff a duty to disclose the true safety, cleanliness, efficiency and reliability of the NOV II Affected Vehicles and the devaluing of environmental cleanliness and integrity at Volkswagen, because Volkswagen:

a. Possessed exclusive knowledge that it valued profits over environmental cleanliness, efficiency, and lawfulness, and that it was manufacturing, selling and distributing vehicles throughout the United States that did not comply with EPA regulations;

b. Intentionally concealed the foregoing from Plaintiff; and/or

c. Made incomplete representations about the safety, cleanliness, efficiency and reliability of the NOV II Affected Vehicles generally, and the use of the "defeat device" and true nature of the CleanDiesel engine system in particular, while purposefully withholding material facts from Plaintiff that contradicted these representations.

836. Because Volkswagen fraudulently concealed the "defeat device" and the true cleanliness and performance of the CleanDiesel engine system, resulting in a raft of negative publicity once the use of the "defeat device" and true characteristics of the CleanDiesel engine system finally began to be disclosed, the value of the NOV II Affected Vehicles has greatly diminished. In light of the stigma attached to those vehicles by Volkswagen's conduct, they are now worth significantly less than they otherwise would be.

837. Volkswagen's fraudulent use of the "defeat device" and its concealment of the true characteristics of the CleanDiesel engine system were

material to Plaintiff and the Vermont Class. A vehicle made by a reputable manufacturer of environmentally friendly vehicles is worth more than an otherwise comparable vehicle made by a disreputable and dishonest manufacturer of polluting vehicles that conceals the amount its cars pollutes rather than make environmentally friendly vehicles.

838. Plaintiff and the Vermont Subclass suffered ascertainable loss caused by Volkswagen's misrepresentations and its concealment of and failure to disclose material information. Class members who purchased the NOV II Affected Vehicles either would have paid less for their vehicles or would not have purchased or leased them at all.

839. Volkswagen had an ongoing duty to all Volkswagen, Audi, and Porsche customers to refrain from unfair and deceptive acts or practices under the Vermont CFA. All owners of Affected Vehicles suffered ascertainable loss in the form of the diminished value of their vehicles as a result of Volkswagen's deceptive and unfair acts and practices that occurred in the course of Volkswagen's business.

840. Volkswagen's violations present a continuing risk to Plaintiff as well as to the general public. Volkswagen's unlawful acts and practices complained of herein affect the public interest.

841. As a direct and proximate result of Volkswagen's violations of the Vermont CFA, Plaintiff and the Vermont Subclass have suffered injury-in-fact and/or actual damage.

842. Plaintiff and the Vermont Subclass are entitled to recover "appropriate equitable relief" and "the amount of [their] damages, or the consideration or the value of the consideration given by [them], reasonable attorney's fees, and exemplary damages not exceeding three times the value of the consideration given by [them]" pursuant to VT. STAT. ANN. TIT. 9, § 2461(b).

**COUNT II**
**FRAUD BY CONCEALMENT**

843. Plaintiff realleges and incorporates by reference all paragraphs as though fully set forth herein.

844. This claim is brought on behalf of the Vermont Subclass.

845. Volkswagen intentionally concealed and suppressed material facts concerning the quality of the NOV II Affected Vehicles. As alleged in this Complaint, notwithstanding references in the very model names of the subject vehicles as "Clean Diesel," or to their engines as "TDI Clean Diesel" engines, Volkswagen engaged in a secret scheme to evade federal and state vehicle emissions standards by installing software designed to conceal its vehicles' emissions of the pollutant nitrogen oxide, which contributes to the creation of ozone and smog. The software installed on the vehicles at issue was designed nefariously to kick-in during emissions certification testing, such that the vehicles would show far lower emissions than when actually operating on the road. The result was what Volkswagen intended: vehicles passed emissions certifications by way of deliberately induced false readings. Reportedly, Volkswagen's deliberate, secret scheme resulted in noxious emissions from these vehicles up to 40 times applicable standards.

846. Plaintiff and Class members reasonably relied upon Volkswagen's false representations. They had no way of knowing that Volkswagen's representations were false and gravely misleading. As alleged herein, Volkswagen employed extremely sophisticated methods of deception. Plaintiff and Class members did not, and could not, unravel Volkswagen's deception on their own.

847. Volkswagen concealed and suppressed material facts concerning what is evidently the true culture of Volkswagen—one characterized by an emphasis on profits and sales above compliance with federal and state clean air laws, and emissions regulations that are meant to protect the public and consumers. It also

emphasized profits and sales over the trust that Plaintiff and Class members placed in its representations.

848. Necessarily, Volkswagen also took steps to ensure that its employees did not reveal the details of its scheme to regulators or consumers, including Plaintiff and Class members. Volkswagen did so in order to boost the reputations of its vehicles and to falsely assure purchasers and lessors of its vehicles, including previously owned vehicles, that Volkswagen is a reputable manufacturer that complies with applicable law, including federal and state clean air laws and emissions regulations, and that its vehicles likewise comply with applicable law and regulations. Volkswagen's false representations were material to consumers, both because they concerned the quality of the NOV II Affected Vehicles, including their compliance with applicable federal and state laws and regulations regarding clean air and emissions, and also because the representations played a significant role in the value of the vehicles. As Volkswagen well knew, its customers, including Plaintiff and Class members, highly valued that the vehicles they were purchasing or leasing were *clean* diesel cars, and they paid accordingly.

849. Volkswagen had a duty to disclose its emissions scheme because knowledge of the scheme and its details were known and/or accessible only to Volkswagen, because Volkswagen had exclusive knowledge as to implementation and maintenance of its scheme, and because Volkswagen knew the facts were not known to or reasonably discoverable by Plaintiff or Class members. Volkswagen also had a duty to disclose because it made general affirmative representations about the qualities of its vehicles with respect to emissions standards, starting with references to them as *clean* diesel cars, or cars with *clean* diesel engines, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding its emissions scheme, the actual emissions of its vehicles, its actual philosophy with respect to compliance with federal and state clean air laws and emissions regulations, and its actual practices with respect to the

vehicles at issue. Having volunteered to provide information to Plaintiff, Volkswagen had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the NOV II Affected Vehicles purchased or leased by Plaintiff and Class members. Whether a manufacturer's products comply with federal and state clean air laws and emissions regulations, and whether that manufacturer tells the truth with respect to such compliance or non-compliance, are material concerns to a consumer, including with respect to the emissions certification testing their vehicles must pass. Volkswagen represented to Plaintiff and Class members that they were purchasing *clean* diesel vehicles, and certification testing appeared to confirm this—except that, secretly, Volkswagen had subverted the testing process.

850. Volkswagen actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles did not or could not comply with federal and state laws governing clean air and emissions, which perception would hurt the brand's image and cost Volkswagen money, and it did so at the expense of Plaintiff and Class members.

851. On information and belief, Volkswagen has still not made full and adequate disclosures, and continues to defraud Plaintiff and Class members by concealing material information regarding the emissions qualities of its vehicles and its emissions scheme.

852. Plaintiff and Class members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly "clean" diesel cars manufactured by Volkswagen, and/or would not have continued to drive their heavily polluting vehicles, or would have taken other affirmative steps in light of the information concealed from them. Plaintiff's and Class members' actions were justified. Volkswagen was in exclusive control of the

material facts, and such facts were not known to the public, Plaintiff, or Class members.

853. Because of the concealment and/or suppression of the facts, Plaintiff and Class members have sustained damage because they own vehicles that are diminished in value as a result of Volkswagen's concealment of the true quality and quantity of those vehicles' emissions and Volkswagen's failure to timely disclose the actual emissions qualities and quantities of hundreds of thousands of Volkswagen, Audi and Porsche-branded vehicles and the serious issues engendered by Volkswagen's corporate policies. Had Plaintiffs and Class members been aware of Volkswagen's emissions scheme, and the company's callous disregard for compliance with applicable federal and state laws and regulations, Plaintiff and Class members who purchased or leased new or previously owned vehicles would have paid less for their vehicles or would not have purchased or leased them at all.

854. The value of Plaintiff's and Class members' vehicles has diminished as a result of Volkswagen's fraudulent concealment of its emissions scheme, which has greatly tarnished the Volkswagen, Audi, and Porsche brand names attached to Plaintiff's and Class members' vehicles and made any reasonable consumer reluctant to purchase any of the NOV II Affected Vehicles, let alone pay what otherwise would have been fair market value for the vehicles. In addition, Class members are entitled to damages for loss of use, costs of additional fuel, costs of unused warranties, and other damages to be proved at trial.

855. Accordingly, Volkswagen is liable to Plaintiff and Class members for damages in an amount to be proven at trial. Volkswagen's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff's and Class members' rights and the representations that Volkswagen made to them, in order to enrich Volkswagen. To the extent permitted under applicable law, Volkswagen's conduct warrants an assessment of punitive

damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**COUNT III**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**(VT. COM. CODE § 2-314)**

856. Plaintiff incorporates by reference all allegations of the preceding paragraphs as though fully set forth herein.

857. Plaintiff brings this Count on behalf of the Vermont Subclass.

858. Volkswagen is and was at all relevant times a merchant with respect to motor vehicles.

859. A warranty that the NOV II Affected Vehicles were in merchantable condition is implied by law in the instant transactions. These NOV II Affected Vehicles, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which cars are used. Specifically, the NOV II Affected Vehicles are inherently defective in that they do not comply with federal and state emissions standards, rendering certain safety and emissions functions inoperative; and the CleanDiesel engine system was not adequately designed, manufactured, and tested.

860. Volkswagen was provided notice of these issues by the investigations of the EPA and individual state regulators, numerous complaints filed against it including the instant complaint, and by numerous individual letters and communications sent by Plaintiffs and other Class members before or within a reasonable amount of time after the allegations of NOV II Affected Vehicle defects became public.

861. As a direct and proximate result of Volkswagen's breach of the warranties of merchantability, Plaintiff and the other Class members have been damaged in an amount to be proven at trial.

**COUNT IV**
**BREACH OF CONTRACT**
**(BASED ON VERMONT LAW)**

862. Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

863. Plaintiff brings this Count on behalf of new vehicle or certified preowned vehicle purchasers in the Vermont Subclass.

864. Volkswagen's misrepresentations and omissions alleged herein, including Volkswagen's failure to disclose the existence of the CleanDiesel engine system's defect and/or defective design as alleged herein, caused Plaintiff and the other Vermont Subclass members to make their purchases or leases of their NOV II Affected Vehicles. Absent those misrepresentations and omissions, Plaintiff and the other Vermont Subclass members would not have purchased or leased these NOV II Affected Vehicles, would not have purchased or leased these NOV II Affected Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain the CleanDiesel engine system and which were not marketed as including such a system. Accordingly, Plaintiff and the other Vermont Subclass members overpaid for their NOV II Affected Vehicles and did not receive the benefit of their bargain.

865. Each and every sale or lease of a NOV II Affected Vehicle by an authorized Volkswagen dealer constitutes a contract between Volkswagen and the purchaser or lessee. Volkswagen breached these contracts by selling or leasing Plaintiff and the other Vermont Subclass members defective NOV II Affected Vehicles and by misrepresenting or failing to disclose the existence of the CleanDiesel engine system's defect and/or defective design, including information known to Volkswagen rendering each NOV II Affected Vehicle non EPA-compliant, and thus less valuable, than vehicles not equipped with a CleanDiesel engine system.

866. As a direct and proximate result of Volkswagen's breach of contract, Plaintiff and the Vermont Subclass have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

## S. Claims Brought on Behalf of the Virginia Subclass

### COUNT I
### FRAUD BY CONCEALMENT UNDER VIRGINIA LAW

867. Plaintiff Russell Cronquist ("Plaintiff," for purposes of all Virginia Subclass Counts) incorporates by reference all preceding allegations as though fully set forth herein.

868. This claim is brought on behalf of the Virginia Subclass.

869. Volkswagen intentionally concealed and suppressed material facts concerning the quality of the NOV II Affected Vehicles. As alleged in this Complaint, notwithstanding references in the very model names of the subject vehicles as "Clean Diesel," or to their engines as "TDI Clean Diesel" engines, Volkswagen engaged in a secret scheme to evade federal and state vehicle emissions standards by installing software designed to conceal its vehicles' emissions of the pollutant nitrogen oxide, which contributes to the creation of ozone and smog. The software installed on the vehicles at issue was designed nefariously to kick-in during emissions certification testing, such that the vehicles would show far lower emissions than when actually operating on the road. The result was what Volkswagen intended: vehicles passed emissions certifications by way of deliberately induced false readings. Reportedly, Volkswagen's deliberate, secret scheme resulted in noxious emissions from these vehicles at up to nine times applicable standards.

870. Plaintiff and Class members reasonably relied upon Volkswagen's false representations. They had no way of knowing that Volkswagen's representations were false and gravely misleading. As alleged herein, Volkswagen employed

extremely sophisticated methods of deception. Plaintiff and Class members did not, and could not, unravel Volkswagen's deception on their own.

871. Volkswagen concealed and suppressed material facts concerning what is evidently the true culture of Volkswagen – one characterized by an emphasis on profits and sales above compliance with federal and state clean air laws, and emissions regulations that are meant to protect the public and consumers. It also emphasized profits and sales over the trust that Plaintiff and Class members placed in its representations.

872. Necessarily, Volkswagen also took steps to ensure that its employees did not reveal the details of its scheme to regulators or consumers, including Plaintiff and Class members. Volkswagen did so in order to boost the reputations of its vehicles and to falsely assure purchasers and lessors of its vehicles, including previously owned vehicles, that Volkswagen is a reputable manufacturer that complies with applicable law, including federal and state clean air laws and emissions regulations, and that its vehicles likewise comply with applicable law and regulations. Volkswagen's false representations were material to consumers, both because they concerned the quality of the NOV II Affected Vehicles, including their compliance with applicable federal and state law and regulations regarding clean air and emissions, and also because the representations played a significant role in the value of the vehicles. As Volkswagen well knew, its customers, including Plaintiff and Class members, highly valued that the vehicles they were purchasing or leasing were *clean* diesel cars, and they paid accordingly.

873. Volkswagen had a duty to disclose its emissions scheme because knowledge of the scheme and its details were known and/or accessible only to Volkswagen, because Volkswagen had exclusive knowledge as to implementation and maintenance of its scheme, and because Volkswagen knew the facts were not known to or reasonably discoverable by Plaintiff or Class members. Volkswagen also had a duty to disclose because it made general affirmative representations about

the qualities of its vehicles with respect to emissions standards, starting with references to them as *clean* diesel cars, or cars with *clean* diesel engines, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding its emissions scheme, the actual emissions of its vehicles, its actual philosophy with respect to compliance with federal and state clean air laws and emissions regulations, and its actual practices with respect to the vehicles at issue. Having volunteered to provide information to Plaintiff, Volkswagen had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the NOV II Affected Vehicles purchased or leased by Plaintiff and Class members. Whether a manufacturer's products comply with federal and state clean air laws and emissions regulations, and whether that manufacturer tells the truth with respect to such compliance or non-compliance, are material concerns to a consumer, including with respect to the emissions certification testing their vehicles must pass. Volkswagen represented to Plaintiff and Class members that they were purchasing *clean* diesel vehicles, and certification testing appeared to confirm this—except that, secretly, Volkswagen had subverted the testing process.

874. Volkswagen actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles did not or could not comply with federal and state laws governing clean air and emissions, which perception would hurt the brand's image and cost Volkswagen money, and it did so at the expense of Plaintiff and Class members.

875. On information and belief, Volkswagen has still not made full and adequate disclosures, and continues to defraud Plaintiff and Class members by concealing material information regarding the emission qualities of its vehicles and its emissions scheme.

876. Plaintiff and Class members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of

the concealed and/or suppressed facts, in that they would not have purchased purportedly "clean" diesel cars manufactured by Volkswagen, and/or would not have continued to drive their heavily polluting vehicles, or would have taken other affirmative steps in light of the information concealed from them. Plaintiff's and Class members' actions were justified. Volkswagen was in exclusive control of the material facts, and such facts were not known to the public, Plaintiff, or Class members.

877. Because of the concealment and/or suppression of the facts, Plaintiff and Class members have sustained damage because they own vehicles that are diminished in value as a result of Volkswagen's concealment of the true quality and quantity of those vehicles' emissions and Volkswagen's failure to timely disclose the actual emission qualities and quantities of hundreds of thousands of Volkswagen- and Audi-branded vehicles and the serious issues engendered by Volkswagen's corporate policies. Had Plaintiff and Class members been aware of Volkswagen's emissions scheme, and the company's callous disregard for compliance with applicable federal and state law and regulations, Plaintiff and Class members who purchased or leased new or previously owned vehicles would have paid less for their vehicles or would not have purchased or leased them at all.

878. The value of Plaintiffs' and Class members' vehicles has diminished as a result of Volkswagen's fraudulent concealment of its emissions scheme, which has greatly tarnished the Volkswagen and Audi brand names attached to Plaintiff's and Class members' vehicles and made any reasonable consumer reluctant to purchase any of the NOV II Affected Vehicles, let alone pay what otherwise would have been fair market value for the vehicles. In addition, Class members are entitled to damages for loss of use, costs of additional fuel, costs of unused warranties, and other damages to be proved at trial.

879. Accordingly, Volkswagen is liable to Plaintiff and Class members for damages in an amount to be proven at trial.

880. Volkswagen's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff's and Class members' rights and the representations that Volkswagen made to them, in order to enrich Volkswagen. To the extent permitted under applicable law, Volkswagen's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**COUNT II**
**VIOLATIONS OF THE VIRGINIA CONSUMER PROTECTION ACT**
**(Va. Code Ann. §§ 59.1-196, et seq.)**

881. Plaintiff realleges and incorporates by reference all paragraphs as though fully set forth herein.

882. This claim is brought on behalf of the Virginia Subclass.

883. The Virginia Consumer Protection Act prohibits "…(5) misrepresenting that goods or services have certain quantities, characteristics, ingredients, uses, or benefits; (6) misrepresenting that goods or services are of a particular standard, quality, grade, style, or model; … (8) advertising goods or services with intent not to sell them as advertised …; [and] (14) using any other deception, fraud, false pretense, false promise, or misrepresentation in connection with a consumer transaction[.]" VA. CODE ANN. § 59.1-200(A).

884. Defendants are each a "person" as defined by VA. CODE ANN. § 59.1-198. The transactions between Plaintiff and the other Class members on one hand and Volkswagen on the other, leading to the purchase or lease of the NOV II Affected Vehicles by Plaintiff and the other Class members, are "consumer transactions" as defined by VA. CODE ANN. § 59.1-198, because the NOV II Affected Vehicles were purchased or leased primarily for personal, family or household purposes.

885. In the course of Volkswagen's business, it willfully failed to disclose and actively concealed the defeat device in NOV II Affected Vehicles as described above. Accordingly, Volkswagen engaged in acts and practices violating VA.

CODE ANN. § 59.1-200(A), including representing that NOV II Affected Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that NOV II Affected Vehicles are of a particular standard and quality when they are not; advertising NOV II Affected Vehicles with the intent not to sell them as advertised; and otherwise engaging in conduct likely to deceive.

886. Volkswagen's actions as set forth above occurred in the conduct of trade or commerce.

887. Volkswagen's conduct proximately caused injuries to Plaintiff and the other Class members.

888. Plaintiff and the other Class members were injured as a result of Volkswagen's conduct in that Plaintiff and the other Class members overpaid for their NOV II Affected Vehicles and did not receive the benefit of their bargain, and their NOV II Affected Vehicles have suffered a diminution in value. These injuries are the direct and natural consequence of Volkswagen's misrepresentations and omissions.

889. Volkswagen actively and willfully concealed and/or suppressed the material facts regarding the defective and non-EPA compliant CleanDiesel engine system, the defeat device and the NOV II Affected Vehicles, in whole or in part, with the intent to deceive and mislead Plaintiff and the other Class members and to induce Plaintiff and the other Class members to purchase or lease NOV II Affected Vehicles at a higher price, which did not match the NOV II Affected Vehicles' true value. Plaintiff and the other Class members therefore seek treble damages.

**COUNT III**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**(Va. Code Ann. § 8.2-314)**

890. Plaintiff incorporates by reference all allegations of the preceding paragraphs as though fully set forth herein.

891. Plaintiff brings this Count on behalf of the Virginia Subclass.

892. Volkswagen is and was at all relevant times a merchant with respect to motor vehicles.

893. A warranty that the NOV II Affected Vehicles were in merchantable condition is implied by law in the instant transactions. These NOV II Affected Vehicles, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which cars are used. Specifically, the NOV II Affected Vehicles are inherently defective in that they do not comply with federal and state emissions standards, rendering certain safety and emissions functions inoperative; and the CleanDiesel engine system was not adequately designed, manufactured, and tested.

894. Volkswagen was provided notice of these issues by the investigations of the EPA and individual state regulators, numerous complaints filed against it including the instant complaint, and by numerous individual letters and communications sent by Plaintiff and other Class members before or within a reasonable amount of time after the allegations of NOV II Affected Vehicle defects became public.

895. As a direct and proximate result of Volkswagen's breach of the warranties of merchantability, Plaintiff and the other Class members have been damaged in an amount to be proven at trial.

**COUNT IV**
**BREACH OF CONTRACT**
**(Based on Virginia Law)**

896. Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

897. Plaintiff brings this Count on behalf new or certified pre-owned purchasers in the Virginia Subclass.

898. Volkswagen's misrepresentations and omissions alleged herein, including Volkswagen's failure to disclose the CleanDiesel engine system was not EPA compliant and the existence of the defeat device as alleged herein, caused

Plaintiff and the other Class members to make their purchases or leases of their NOV II Affected Vehicles. Absent those misrepresentations and omissions, Plaintiff and the other Class members would not have purchased or leased these NOV II Affected Vehicles, would not have purchased or leased these NOV II Affected Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain non EPA-compliant engine systems and a defeat device. Accordingly, Plaintiff and the other Class members overpaid for their NOV II Affected Vehicles and did not receive the benefit of their bargain.

899. Each and every sale or lease of a NOV II Affected Vehicle by an authorized Volkswagen dealer constitutes a contract between Volkswagen and the purchaser or lessee. Volkswagen breached these contracts by selling or leasing Plaintiff and the other Class members defective NOV II Affected Vehicles and by misrepresenting or failing to disclose the CleanDiesel engine system was not EPA-compliant and failing to disclose the existence of the defeat device, including information known to Volkswagen rendering each NOV II Affected Vehicle illegal under federal and state environmental laws, and thus less valuable, than vehicles not equipped with CleanDiesel engine systems.

900. As a direct and proximate result of Volkswagen's breach of contract, Plaintiff and the Class have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

## T. Claims Brought on Behalf of the Washington Subclass

### COUNT I
### VIOLATION OF THE WASHINGTON CONSUMER PROTECTION ACT (WASH. REV. CODE ANN. §§ 19.86.010, et seq.)

901. Plaintiffs Jonathan Huggett and Ryan Hurst ("Plaintiffs," for purposes of all Washington Subclass Counts) incorporate by reference all preceding allegations as though fully set forth herein.

902. Plaintiffs bring this Count on behalf of the Washington Subclass.

903. Volkswagen, Plaintiffs, and the Washington Subclass are a "person" under WASH. REV. CODE ANN. § 19.86.010(1) ("Washington CPA").

904. Volkswagen engaged in "trade" or "commerce" under WASH. REV. CODE ANN. § 19.86.010(2).

905. In the course of its business, Volkswagen installed the "defeat device" and concealed that its CleanDiesel systems failed EPA regulations as described herein and otherwise engaged in activities with a tendency or capacity to deceive. Volkswagen also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of NOV II Affected Vehicles.

906. Volkswagen has known of its use of the "defeat device" and the true nature of its CleanDiesel engine system for at least six years, but concealed all of that information until recently.

907. Volkswagen was also aware that it valued profits over environmental cleanliness, efficiency, and lawfulness, and that it was manufacturing, selling and distributing vehicles throughout the United States that did not comply with EPA regulations. Volkswagen concealed this information as well.

908. By failing to disclose and by actively concealing the "defeat device" and the true cleanliness and performance of the CleanDiesel engine system, by marketing its vehicles as safe, reliable, environmentally clean, efficient, and of high quality, and by presenting itself as a reputable manufacturer that valued safety, environmental cleanliness and efficiency, and stood behind its vehicles after they were sold, Volkswagen engaged in deceptive business practices in violation of the Washington CPA.

909. In the course of Volkswagen's business, it willfully failed to disclose and actively concealed the use of the "defeat device" and true cleanliness and

efficiency of the CleanDiesel engine system and serious defects discussed above. Volkswagen compounded the deception by repeatedly asserting that the NOV II Affected Vehicles were safe, reliable, environmentally clean, efficient, and of high quality, and by claiming to be a reputable manufacturer that valued safety, environmental cleanliness and efficiency, and stood behind its vehicles once they are on the road.

910. Volkswagen's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true cleanliness and efficiency of the CleanDiesel engine system, the quality of the Volkswagen, Audi, and Porsche brands, the devaluing of environmental cleanliness and integrity at Volkswagen, and the true value of the NOV II Affected Vehicles.

911. Volkswagen intentionally and knowingly misrepresented material facts regarding the NOV II Affected Vehicles with an intent to mislead Plaintiff and the Wyoming Subclass.

912. Volkswagen knew or should have known that its conduct violated the Washington CPA.

913. As alleged above, Volkswagen made material statements about the safety, cleanliness, efficiency and reliability of the NOV II Affected Vehicles and the Volkswagen, Audi, and Porsche brands that were either false or misleading.

914. Volkswagen owed Plaintiffs a duty to disclose the true safety, cleanliness, efficiency, and reliability of the NOV II Affected Vehicles and the devaluing of environmental cleanliness and integrity at Volkswagen, because Volkswagen:

a. Possessed exclusive knowledge that it valued profits over environmental cleanliness, efficiency, and lawfulness, and that it was manufacturing, selling and distributing vehicles throughout the United States that did not comply with EPA regulations;

b. Intentionally concealed the foregoing from Plaintiffs; and/or

c. Made incomplete representations about the safety, cleanliness, efficiency and reliability of the NOV II Affected Vehicles

generally, and the use of the "defeat device" and true nature of the CleanDiesel engine system in particular, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

915. Because Volkswagen fraudulently concealed the "defeat device" and the true cleanliness and performance of the CleanDiesel engine system, resulting in a raft of negative publicity once the use of the "defeat device" and true characteristics of the CleanDiesel engine system finally began to be disclosed, the value of the NOV II Affected Vehicles has greatly diminished. In light of the stigma attached to those vehicles by Volkswagen's conduct, they are now worth significantly less than they otherwise would be.

916. Volkswagen's fraudulent use of the "defeat device" and its concealment of the true characteristics of the CleanDiesel engine system were material to Plaintiffs and the Washington Subclass. A vehicle made by a reputable manufacturer of environmentally friendly vehicles is worth more than an otherwise comparable vehicle made by a disreputable and dishonest manufacturer of polluting vehicles that conceals the amount its cars pollutes rather than make environmentally friendly vehicles.

917. Plaintiffs and the Washington Subclass suffered ascertainable loss caused by Volkswagen's misrepresentations and its concealment of and failure to disclose material information. Plaintiffs who purchased the NOV II Affected Vehicles either would have paid less for their vehicles or would not have purchased or leased them at all.

918. Volkswagen's actions constituted a generalized course of deception that impacts the public interest because Plaintiffs and the Washington Subclass members were injured in exactly the same way as millions of others purchasing and/or leasing Volkswagen vehicles, and the failure to follow the practices pertaining to motor vehicle warranties in WASH. REV. CODE § 19.118 is recognized by statute as matters vitally affecting the public interest. All of the

wrongful conduct alleged herein occurred, and continues to occur, in the conduct of Volkswagen's business and has the potential for repetition.

919. As a direct and proximate result of Volkswagen's violations of the Washington CPA, Plaintiffs and the Washington Subclass have suffered injury-in-fact and/or actual damage.

920. Volkswagen's actions as set forth above induced Plaintiffs and the Washington Subclass members to purchase their NOV II Affected Vehicles from Volkswagen and/or pay a higher price for their NOV II Affected Vehicles than they otherwise would have.

921. Plaintiffs and the Washington Class members were injured as a result of Volkswagen's conduct. Due to Volkswagen's deceptive or unfair conduct, Plaintiffs and the Washington Class members overpaid for their NOV II Affected Vehicles and did not receive the benefit of their bargain. Their vehicles have also suffered a diminution in value.

922. Pursuant to WASH. REV. CODE § 19.86.095, Plaintiffs will serve the Washington Attorney General with a copy of this complaint as Plaintiffs and the Washington Class members seek injunctive relief.

923. As a direct and proximate result of Volkswagen's breach of contract, Plaintiff and the Washington Class have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, attorneys' fees, costs, treble damages, and other damages allowed by law.

**COUNT II**
**FRAUD BY CONCEALMENT**

924. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

925. This claim is brought on behalf of the Washington Subclass.

926. Volkswagen intentionally concealed and suppressed material facts concerning the quality of the NOV II Affected Vehicles. As alleged in this Complaint, notwithstanding references in the very model names of the subject vehicles as “Clean Diesel,” or to their engines as “TDI Clean Diesel” engines, Volkswagen engaged in a secret scheme to evade federal and state vehicle emissions standards by installing software designed to conceal its vehicles’ emissions of the pollutant nitrogen oxide, which contributes to the creation of ozone and smog. The software installed on the vehicles at issue was designed nefariously to kick-in during emissions certification testing, such that the vehicles would show far lower emissions than when actually operating on the road. The result was what Volkswagen intended: vehicles passed emissions certifications by way of deliberately induced false readings. Reportedly, Volkswagen’s deliberate, secret scheme resulted in noxious emissions from these vehicles up to nine times applicable standards.

927. Plaintiffs and Class members reasonably relied upon Volkswagen’s false representations. They had no way of knowing that Volkswagen’s representations were false and gravely misleading. As alleged herein, Volkswagen employed extremely sophisticated methods of deception. Plaintiffs and Class members did not, and could not, unravel Volkswagen’s deception on their own.

928. Volkswagen concealed and suppressed material facts concerning what is evidently the true culture of Volkswagen—one characterized by an emphasis on profits and sales above compliance with federal and state clean air laws, and emissions regulations that are meant to protect the public and consumers. It also emphasized profits and sales over the trust that Plaintiffs and Class members placed in its representations.

929. Necessarily, Volkswagen also took steps to ensure that its employees did not reveal the details of its scheme to regulators or consumers, including Plaintiffs and Class members. Volkswagen did so in order to boost the reputations

of its vehicles and to falsely assure purchasers and lessors of its vehicles, including previously owned vehicles, that Volkswagen is a reputable manufacturer that complies with applicable law, including federal and state clean air laws and emissions regulations, and that its vehicles likewise comply with applicable law and regulations. Volkswagen's false representations were material to consumers, both because they concerned the quality of the NOV II Affected Vehicles, including their compliance with applicable federal and state laws and regulations regarding clean air and emissions, and also because the representations played a significant role in the value of the vehicles. As Volkswagen well knew, its customers, including Plaintiffs and Class members, highly valued that the vehicles they were purchasing or leasing were clean diesel cars, and they paid accordingly.

930. Volkswagen had a duty to disclose its emissions scheme because knowledge of the scheme and its details were known and/or accessible only to Volkswagen, because Volkswagen had exclusive knowledge as to implementation and maintenance of its scheme, and because Volkswagen knew the facts were not known to or reasonably discoverable by Plaintiffs or Class members. Volkswagen also had a duty to disclose because it made general affirmative representations about the qualities of its vehicles with respect to emissions standards, starting with references to them as clean diesel cars, or cars with clean diesel engines, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding its emissions scheme, the actual emissions of its vehicles, its actual philosophy with respect to compliance with federal and state clean air laws and emissions regulations, and its actual practices with respect to the vehicles at issue. Having volunteered to provide information to Plaintiffs, Volkswagen had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the NOV II Affected Vehicles purchased or leased by Plaintiffs and Class members. Whether a manufacturer's products comply with federal and state clean air laws and emissions

regulations, and whether that manufacturer tells the truth with respect to such compliance or non-compliance, are material concerns to a consumer, including with respect to the emissions certification testing their vehicles must pass. Volkswagen represented to Plaintiffs and Class members that they were purchasing clean diesel vehicles, and certification testing appeared to confirm this—except that, secretly, Volkswagen had subverted the testing process.

931. Volkswagen actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles did not or could not comply with federal and state laws governing clean air and emissions, which perception would hurt the brand's image and cost Volkswagen money, and it did so at the expense of Plaintiffs and Class members.

932. On information and belief, Volkswagen has still not made full and adequate disclosures, and continues to defraud Plaintiffs and Class members by concealing material information regarding the emissions qualities of its vehicles and its emissions scheme.

933. Plaintiffs and Class members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly "clean" diesel cars manufactured by Volkswagen, and/or would not have continued to drive their heavily polluting vehicles, or would have taken other affirmative steps in light of the information concealed from them. Plaintiffs' and Class members' actions were justified. Volkswagen was in exclusive control of the material facts, and such facts were not known to the public, Plaintiffs, or Class members.

934. Because of the concealment and/or suppression of the facts, Plaintiffs and Class members have sustained damage because they own vehicles that are diminished in value as a result of Volkswagen's concealment of the true quality and quantity of those vehicles' emissions and Volkswagen's failure to timely disclose

the actual emissions qualities and quantities of hundreds of thousands of Volkswagen, Audi, and Porsche-branded vehicles and the serious issues engendered by Volkswagen's corporate policies. Had Plaintiffs and Class members been aware of Volkswagen's emissions scheme, and the company's callous disregard for compliance with applicable federal and state laws and regulations, Plaintiffs and Class members who purchased or leased new or previously owned vehicles would have paid less for their vehicles or would not have purchased or leased them at all.

935. The value of Plaintiffs' and Class Members' vehicles has diminished as a result of Volkswagen's fraudulent concealment of its emissions scheme, which has greatly tarnished the Volkswagen, Audi, and Porsche brand names attached to Plaintiffs' and Class members' vehicles and made any reasonable consumer reluctant to purchase any of the NOV II Affected Vehicles, let alone pay what otherwise would have been fair market value for the vehicles. In addition, Class members are entitled to damages for loss of use, costs of additional fuel, costs of unused warranties, and other damages to be proved at trial.

936. Accordingly, Volkswagen is liable to Plaintiffs and Class members for damages in an amount to be proven at trial.

937. Volkswagen's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and Class members' rights and the representations that Volkswagen made to them, in order to enrich Volkswagen. To the extent permitted under applicable law, Volkswagen's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT III
## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
## (REV. CODE WASH. § 62A.2-614)

938. Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

939. Plaintiffs bring this Count on behalf of the Washington Subclass.

940. Volkswagen is and was at all relevant times a merchant with respect to motor vehicles.

941. A warranty that the NOV II Affected Vehicles were in merchantable condition is implied by law in the instant transactions. These NOV II Affected Vehicles, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which cars are used. Specifically, the NOV II Affected Vehicles are inherently defective in that they do not comply with federal and state emissions standards, rendering certain safety and emissions functions inoperative; and the CleanDiesel engine system was not adequately designed, manufactured, and tested.

942. Volkswagen was provided notice of these issues by the investigations of the EPA and individual state regulators, numerous complaints filed against it including the instant complaint, and by numerous individual letters and communications sent by Plaintiffs and other Class members before or within a reasonable amount of time after the allegations of NOV II Affected Vehicle defects became public.

943. As a direct and proximate result of Volkswagen's breach of the warranties of merchantability, Plaintiffs and the other Class members have been damaged in an amount to be proven at trial.

**COUNT IV**
**BREACH OF CONTRACT**
**(BASED ON WASHINGTON LAW)**

944. Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

945. Plaintiffs bring this Count on behalf of new vehicle or certified pre-owned vehicle purchasers in the Washington Subclass.

946. Volkswagen's misrepresentations and omissions alleged herein, including Volkswagen's failure to disclose the existence of the CleanDiesel engine system's defect and/or defective design as alleged herein, caused Plaintiff and the

other Washington Subclass members to make their purchases or leases of their NOV II Affected Vehicles. Absent those misrepresentations and omissions, Plaintiffs and the other Washington Subclass members would not have purchased or leased these NOV II Affected Vehicles, would not have purchased or leased these NOV II Affected Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain the CleanDiesel engine system and which were not marketed as including such a system. Accordingly, Plaintiff and the other Washington Subclass members overpaid for their NOV II Affected Vehicles and did not receive the benefit of their bargain.

947. Each and every sale or lease of NOV II Affected Vehicles by an authorized Volkswagen dealer constitutes a contract between Volkswagen and the purchaser or lessee. Volkswagen breached these contracts by selling or leasing Plaintiffs and the other Washington Subclass members defective NOV II Affected Vehicles and by misrepresenting or failing to disclose the existence of the CleanDiesel engine system's defect and/or defective design, including information known to Volkswagen rendering each NOV II Affected Vehicle non EPA-compliant, and thus less valuable, than vehicles not equipped with a CleanDiesel engine system.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of members of the Nationwide Class and the Subclasses, respectfully request that the Court enter judgment in their favor and against Defendants, as follows:

A. Certification of the proposed Nationwide Class and Subclasses, including appointment of Plaintiffs' counsel as Class Counsel;

B. An order temporarily and permanently enjoining Volkswagen from continuing the unlawful, deceptive, fraudulent, and unfair business practices alleged in this Complaint;

C. Injunctive relief in the form of a recall or free replacement program;

D. Injunctive relief in the form of environmental remediation to offset the harm caused by the illegal emissions of the CleanDiesel engine systems;

E. Costs, restitution, damages, including punitive damages, and disgorgement in an amount to be determined at trial;

F. An order requiring Volkswagen to pay both pre- and post-judgment interest on any amounts awarded;

G. An award of costs and attorneys' fees; and

H. Such other or further relief as may be appropriate.

**DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a jury trial for all claims so triable.

DATED: November 24, 2015

HAGENS BERMAN SOBOL SHAPIRO LLP

By *_/s/ Thomas E. Loeser_*

Thomas E. Loeser
Steve W. Berman (*pro hac vice* to be filed)
1918 8th Avenue, Suite 3300
Seattle, Washington 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com
toml@hbsslaw.com

QUINN EMANUEL URQUHART & SULLIVAN, LLP
JOHN B. QUINN
SHON MORGAN
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017
Telephone: (213) 443 3000
Facsimile: (213) 443 3100
johnquinn@quinnemanuel.com
shonmorgan@quinnemanuel.com

*Attorneys for Plaintiffs and the proposed class and subclasses*